ADRMOP

# U.S. District Court
## California Northern District (San Francisco)
## CIVIL DOCKET FOR CASE #: 3:25-cv-07369-SK

Doe NLG (B.J.) v. Lyft, Inc.
Assigned to: Magistrate Judge Sallie Kim
Cause: 28:1332 Diversity-(Citizenship)

Date Filed: 09/02/2025
Jury Demand: Plaintiff
Nature of Suit: 360 P.I.: Other
Jurisdiction: Diversity

**Plaintiff**

**Jane Doe NLG (B.J.)**

represented by **Steve S. Schulte**
Nachawati Law Group
5489 Blair Road
Dallas, TX 75231
(214) 838-7496
Email: schulte@ntrial.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Arati Chauhan Furness**
Nachawati Law Group
5489 Blair Road
Dallas, TX 75231
(310) 743-2803
Email: afurness@ntrial.com
*ATTORNEY TO BE NOTICED*

**John Warren Raggio**
Nachawati Law Group
5489 Blair Road
Dallas, TX 75231
(214) 890-0711
Email: jraggio@ntrial.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Lyft, Inc.**
*a Delaware Corporation*

| Date Filed | # | Docket Text |
|---|---|---|
| 09/02/2025 | 1 | COMPLAINT for Damages and Demand for Jury Trial against Lyft, Inc. (Filing fee $ 405, receipt number ACANDC-21077172.). Filed by Jane Doe NLG (B.J.). (Schulte, Steve) (Filed on 9/2/2025) (Entered: 09/02/2025) |
| 09/02/2025 | 2 | Proposed Summons. (Schulte, Steve) (Filed on 9/2/2025) (Entered: 09/02/2025) |

| 09/02/2025 | 3 | Case assigned to Magistrate Judge Sallie Kim. Counsel for plaintiff or the removing party is responsible for serving the Complaint or Notice of Removal, Summons and the assigned judge's standing orders and all other new case documents upon the opposing parties. For information, visit *E-Filing A New Civil Case* at http://cand.uscourts.gov/ecf/caseopening. Standing orders can be downloaded from the court's web page at www.cand.uscourts.gov/judges. Upon receipt, the summons will be issued and returned electronically. A scheduling order will be sent by Notice of Electronic Filing (NEF) within two business days. Consent/Declination due by 9/16/2025. (ark, COURT STAFF) (Filed on 9/2/2025) (Entered: 09/02/2025) |
|---|---|---|
| 09/02/2025 | 4 | **Initial Case Management Scheduling Order with ADR Deadlines: Case Management Statement due by 11/24/2025. Initial Case Management Conference set for 12/1/2025 01:30 PM in San Francisco, - Videoconference Only. (gba, COURT STAFF) (Filed on 9/2/2025) (Entered: 09/02/2025)** |
| 09/02/2025 | 5 | Summons Issued as to Lyft, Inc. (gba, COURT STAFF) (Filed on 9/2/2025) (Entered: 09/02/2025) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 09/05/2025 13:41:44 | | |
| **PACER Login:** | samanthavhoefs | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 3:25-cv-07369-SK |
| **Billable Pages:** | 2 | **Cost:** | 0.20 |

# CIVIL COVER SHEET

This civil cover sheet does not replace or supplement the filing and service of pleadings or other papers. The information on this form, approved in its original form by the Judicial Conference of the United States in September 1974, is required for the Clerk of Court to initiate the civil docket. Instructions are on the reverse of this form.

## I. PLAINTIFF(S)

## DEFENDANT(S)

County of Residence of First Listed Plaintiff:
*Leave blank in cases where United States is plaintiff.*

County of Residence of First Listed Defendant:
*Use ONLY in cases where United States is plaintiff.*

Attorney or Pro Se Litigant Information *(Firm Name, Address, and Telephone Number)*

Defendant's Attorney's Name and Contact Information *(if known)*

## II.  BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

1  U.S. Government Plaintiff

3  Federal Question
   *(U.S. Government Not a Party)*

2  U.S. Government Defendant

4  Diversity

## III.  CAUSE OF ACTION

Cite the U.S. Statute under which you are filing: *(Use jurisdictional statutes only for diversity)*

Brief description of case:

## IV.  NATURE OF SUIT *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | 625 Drug Related Seizure of Property 21 USC § 881 | 422 Appeal 28 USC § 158 | 375 False Claims Act |
| 120 Marine | 310 Airplane | 365 Personal Injury – Product Liability | 690 Other | 423 Withdrawal 28 USC § 157 | 376 Qui Tam (31 USC § 3729(a)) |
| 130 Miller Act | 315 Airplane Product Liability | 367 Health Care/ Pharmaceutical Personal Injury Product Liability | **LABOR** | **PROPERTY RIGHTS** | 400 State Reapportionment |
| 140 Negotiable Instrument | 320 Assault, Libel & Slander | | 710 Fair Labor Standards Act | 820 Copyrights | 410 Antitrust |
| 150 Recovery of Overpayment & Enforcement of Judgment | 330 Federal Employers' Liability | 368 Asbestos Personal Injury Product Liability | 720 Labor/Management Relations | 830 Patent | 430 Banks and Banking |
| 151 Medicare Act | 340 Marine | **PERSONAL PROPERTY** | 740 Railway Labor Act | 835 Patent–Abbreviated New Drug Application | 450 Commerce |
| 152 Recovery of Defaulted Student Loans (Excludes Veterans) | 345 Marine Product Liability | 370 Other Fraud | 751 Family and Medical Leave Act | 840 Trademark | 460 Deportation |
| | 350 Motor Vehicle | 371 Truth in Lending | 790 Other Labor Litigation | 880 Defend Trade Secrets Act of 2016 | 470 Racketeer Influenced & Corrupt Organizations |
| 153 Recovery of Overpayment of Veteran's Benefits | 355 Motor Vehicle Product Liability | 380 Other Personal Property Damage | 791 Employee Retirement Income Security Act | **SOCIAL SECURITY** | 480 Consumer Credit |
| 160 Stockholders' Suits | 360 Other Personal Injury | 385 Property Damage Product Liability | | 861 HIA (1395ff) | 485 Telephone Consumer Protection Act |
| 190 Other Contract | 362 Personal Injury -Medical Malpractice | | | 862 Black Lung (923) | 490 Cable/Sat TV |
| 195 Contract Product Liability | | | **IMMIGRATION** | 863 DIWC/DIWW (405(g)) | 850 Securities/Commodities/ Exchange |
| 196 Franchise | **CIVIL RIGHTS** | **PRISONER PETITIONS** | 462 Naturalization Application | 864 SSID Title XVI | 890 Other Statutory Actions |
| **REAL PROPERTY** | 440 Other Civil Rights | **HABEAS CORPUS** | 465 Other Immigration Actions | 865 RSI (405(g)) | 891 Agricultural Acts |
| 210 Land Condemnation | 441 Voting | 463 Alien Detainee | | **FEDERAL TAX SUITS** | 893 Environmental Matters |
| 220 Foreclosure | 442 Employment | 510 Motions to Vacate Sentence | | 870 Taxes (U.S. Plaintiff or Defendant) | 895 Freedom of Information Act |
| 230 Rent Lease & Ejectment | 443 Housing/ Accommodations | 530 General | | 871 IRS–Third Party 26 U.S.C. § 7609 | 896 Arbitration |
| 240 Torts to Land | 445 Amer. w/Disabilities– Employment | 535 Death Penalty | | | 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| 245 Tort Product Liability | 446 Amer. w/Disabilities–Other | **OTHER** | | | 950 Constitutionality of State Statutes |
| 290 All Other Real Property | 448 Education | 540 Mandamus & Other | | | |
| | | 550 Civil Rights | | | |
| | | 555 Prison Condition | | | |
| | | 560 Civil Detainee– Conditions of Confinement | | | |

## V.  ORIGIN *(Place an "X" in One Box Only)*

Original Proceeding      Removed from State Court      Remanded from Appellate Court      Reinstated or Reopened      Transferred from Another District

Multidistrict Litigation–Transfer

Multidistrict Litigation–Direct File

## VI.  FOR DIVERSITY CASES ONLY: CITIZENSHIP OF PRINCIPAL PARTIES
*(Place an "X" in One Box for Plaintiff and One Box for Defendant)*

**Plaintiff   Defendant**

Citizen of California

Citizen of Another State

Citizen or Subject of a Foreign Country

Incorporated or Principal Place of Business In California

Incorporated and Principal Place of Business In Another State

Foreign Nation

## VII.  REQUESTED IN COMPLAINT

Check if the complaint contains a **jury demand.**

Check if the complaint contains a **monetary demand**. Amount: $

Check if the complaint seeks **class action** status under Fed. R. Civ. P. 23.

Check if the complaint seeks a **nationwide injunction** or Administrative Procedure Act vacatur.

## VIII.  RELATED CASE(S) OR MDL CASE
*Provide case name(s), number(s), and presiding judge(s).*

## IX.  DIVISIONAL ASSIGNMENT pursuant to Civil Local Rule 3-2
*(Place an "X" in One Box Only)*      SAN FRANCISCO/OAKLAND      SAN JOSE      EUREKA-MCKINLEYVILLE

DATE                    SIGNATURE OF ATTORNEY OR PRO SE LITIGANT

1  John Raggio (CA Bar No. 338261)
   Arati Furness (CA Bar No. 225435)
2  **NACHAWATI LAW GROUP**
   5489 Blair Road
3  Dallas, Texas 75231
   Telephone: (214) 890-0711
4  Fax Number: (214) 890-0712
   Email: jraggio@ntrial.com
5  Email: afurness@ntrial.com
   *Counsel for Plaintiff*
6

7              **UNITED STATES DISTRICT COURT**
               **NORTHERN DISTRICT OF CALIFORNIA**
8              **SAN FRANCISCO DIVISION**

9

10  JANE DOE (B.J.), an individual,          )  Case No.
                                             )
11                                           )  **PLAINTIFF'S ORIGINAL COMPLAINT**
                                             )  **FOR DAMAGES AND**
12              Plaintiff,                    )  **DEMAND FOR JURY TRIAL**
                                             )
13     v.                                    )  1. **GENERAL NEGLIGENCE**
                                             )
14  LYFT, INC., a Delaware Corporation; and  )  2. **NEGLIGENT HIRING,**
    DOES 1 through 50, Inclusive,            )     **RETENTION, AND SUPERVISION**
15                                           )
              Defendants.                    )  3. **COMMON-CARRIER**
16                                           )     **NEGLIGENCE**
                                             )
17                                           )  4. **NEGLIGENT FAILURE TO WARN**
                                             )
18                                           )  5. **INTENTIONAL**
19                                           )     **MISREPRESENTATION**
                                             )
20                                           )  6. **NEGLIGENT**
21                                           )     **MISREPRESENTATION**
                                             )
22                                           )  7. **NEGLIGENT INFLICTION OF**
23                                           )     **EMOTIONAL DISTRESS**
                                             )
24                                           )  8. **BREACH OF CONTRACT**
                                             )
25                                           )  9. **STRICT PRODUCT LIABILITY –**
26                                           )     **DESIGN**
                                             )
27                                           )  10. **STRICT PRODUCT LIABILITY –**
                                             )      **FAILURE TO WARN**
28

CASE NO.                        1           PLAINTIFF'S ORIGINAL
                                            COMPLAINT AND JURY DEMAND

### PLAINTIFF'S ORIGINAL COMPLAINT AND JURY DEMAND

Plaintiff, JANE DOE (B.J.), by her undersigned counsel, makes the following Complaint against Defendants Lyft, Inc., a Delaware Corporation ("Lyft"), and DOES 1 through 50 (collectively, "Lyft" or "Defendants"), alleging as follows:

### NATURE OF ACTION

1.     Plaintiff was assaulted, battered, harassed, and/or otherwise attacked by a Lyft driver with whom she had been paired through the Lyft App. As a common carrier, Lyft is vicariously liable for the injuries its driver inflicted on Plaintiff. In addition, through its officers, directors, and managing agents, Lyft contributed to the attack on Plaintiff by abandoning its utmost duty of heightened care toward its passengers.

2.     Lyft is a transportation company headquartered in San Francisco, California and is one of the fastest growing companies in the United States. As early as 2015, Lyft became aware that Lyft drivers were sexually assaulting and raping female passengers. Since 2015, sexual predators driving for Lyft have continued to assault and rape Lyft's female passengers. For more than eight years, Lyft has known of the ongoing sexual assaults and rapes by Lyft drivers upon Lyft passengers. Complaints to Lyft by female passengers who have been attacked by Lyft drivers, combined with subsequent criminal investigations by law enforcement, clearly establish that Lyft has been fully aware of these continuing attacks by sexual predators driving for Lyft.

3.     Lyft's response to this sexual predator crisis amongst Lyft drivers has been appallingly inadequate. Lyft continues to hire drivers without performing adequate background checks. Lyft continues to allow culpable drivers to keep driving for Lyft. And, perhaps most importantly, Lyft has failed to adopt and implement reasonable driver monitoring procedures designed to ensure the safety of its passengers. Consequently, Lyft passengers continue to be victims of sexual assaults and rapes by Lyft drivers.

4.     As more fully set forth below, Plaintiff was assaulted, battered, harassed, and/or otherwise attacked by the Lyft driver she was led to believe would give her a safe ride to her destination.

5.     The Lyft ride at issue was ordered for Plaintiff through the ride-sharing software application owned and controlled by Lyft ("the Lyft App").

6.     At all relevant times Lyft operated and controlled the Lyft App.

7.     The Lyft driver, while in the course and scope of his employment for Lyft and while otherwise working on behalf of Lyft, assaulted, battered, harassed, and/or otherwise attacked Plaintiff as set forth below.

8.     Plaintiff brings this civil action against Lyft to recover damages for the injuries she suffered as a result of the assault, battery, harassment, and/or otherwise attack by the Lyft driver.

## PARTIES

9.     Plaintiff JANE DOE (B.J.) is over the age of 18 and is a resident of Tennessee. The assault described below took place in the state of Tennessee.

10.     Plaintiff files this action under a pseudonym because as a victim of sexual assault, she needs anonymity to protect her privacy in this sensitive and highly personal matter. Plaintiff respectfully requests that this Court grant her motion to proceed anonymously pursuant to Federal Rule of Civil Procedure 26(c), filed contemporaneously herewith, and ensure that Defendants keep her identity confidential throughout the pendency of the lawsuit and thereafter. As set forth in that motion, disclosure of Plaintiff's full name would expose her to stigmatization, invade her privacy and make her vulnerable to retaliation. For these reasons, Plaintiff's need for anonymity outweighs both the prejudice to Defendants and the public's interest in knowing her identity. Counsel for Plaintiff will inform Defendants of Plaintiff's true name and the circumstances

surrounding these causes of action. Plaintiff further anticipates seeking concurrence from Defendants for entry into a protective order to prevent the unnecessary disclosure of Plaintiff's real name in the public record.

11.     Defendant Lyft, Inc. is a Delaware corporation with its corporate headquarters, principal office, and principal place of business at 185 Berry Street, Suite 400, San Francisco, California 94107.

12.     The true names and capacities, whether individual, plural, corporate, partnership, associate, or otherwise, of Does 1 through 50, inclusive, are unknown to Plaintiff who therefore sues said Defendants by such fictitious names. The full extent of the facts linking such fictitiously sued Defendants is unknown to Plaintiff. Plaintiff is informed and believes, and thereon alleges, that each of the Defendants designated herein as a Doe was, and is, negligent, or in some other actionable manner, responsible for the events and happenings hereinafter referred to, and thereby negligently, or in some other actionable manner, legally caused the hereinafter described injuries and damages to Plaintiff. Plaintiff will hereafter seek leave of the Court to amend this Complaint to show the Defendants' true names and capacities after the same have been ascertained.

13.     Plaintiff is informed and believes, and on that basis alleges, that at all relevant times, each Defendant was the agent, servant, licensee, employee, assistant, consultant, or alter ego, of each other Defendant, and was at all relevant times acting within the course and scope of said relationship when Plaintiff was injured.

14.     Plaintiff is informed and believes that each Defendant, when acting as a principal, was negligent in the selection, hiring, supervision, or retention of each other Defendant as an agent, servant, employee, assistant, or consultant.

15.     Plaintiff is further informed and believes, that at all relevant times, each Defendant, through its officers, directors, supervisors and managing agents, and each individual

Defendant, had advance knowledge of the wrongful conduct, psychological profile, and behavior propensity of said agents, servants, licensees, employees, assistants, consultants, and alter egos, and allowed said wrongful conduct to occur and continue to occur, thus ratifying said wrongful conduct, and, after becoming aware of their wrongful conduct, each Defendant by and through its officers, directors, supervisors, and managing agents, and each individual Defendant, authorized and ratified the wrongful conduct that injured Plaintiff.

16.     Defendants are liable for the acts of each other through principles of *respondeat superior*, agency, ostensible agency, partnership, alter-ego, and other forms of vicarious liability.

17.     The Lyft driver who perpetrated the assault described herein ("Lyft driver") was an agent, servant, and employee of Lyft.

18.     This Complaint refers to Defendant Lyft, Inc., and Does 1 through 50, inclusive, as Defendants.

**JURISDICTION AND VENUE**

19.     The Court has jurisdiction under 28 U.S.C. § 1332(a)(1) because the amount in controversy exceeds $75,000, exclusive of interest and costs, and is between citizens of different states.

20.     Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in this judicial district.

21.     All corporate decision-making with respect to passenger safety issues is centered at Lyft's corporate headquarters in San Francisco. All executive decision making by Lyft regarding hiring policies, handling of complaints regarding drivers, driver termination policies, training of drivers, supervision of drivers, and standard operating procedures relating to drivers occurred in San Francisco.

22.     All executive decision making on the part of Lyft regarding its marketing campaigns and representations to passengers regarding its safety occurred in San Francisco.

23.     Lyft's contract with Lyft customers specifies that the agreement should be governed by California law.

## DIVISIONAL ASSIGNMENT

24.     Division is proper in this Court under Local Rules 3-2(c) and 3-5(b) because a substantial part of the events or omissions giving rise to the claim occurred in this judicial division.

## RELEVANT FACTUAL BACKGROUND

### *Lyft's Inadequate Safety Precautions and Inadequate Screening*

25.     Lyft is a transportation company. Passengers pay Lyft a fee in exchange for safe passage to their destination. Lyft drivers and Lyft split the fare Lyft charges riders for the riders' trips. Lyft's public representations state that "safety is our top priority" and "it is our goal to make every ride safe, comfortable and reliable." Sadly, Lyft's priority is not passenger safety. Profits are Lyft's priority. As a result, Plaintiff and other female passengers continue to be attacked by sexual predators driving for Lyft.

26.     When faced with this sexual predator crisis, there are a number of potential safety procedures that a reasonable transportation company would implement in order to address this dangerous situation. Yet Lyft corporate management has failed to implement the most obvious and straightforward safety procedures to address the growing problem of sexual assault by those Lyft drivers who are sexual predators.

27.     For example, even today, the hiring of Lyft drivers occurs without any real screening. Potential drivers merely fill out a form online. There is no interview, either in person

or through online platforms such as Skype or Zoom. There is no adequate background check and no biometric fingerprinting. Almost all online applicants become drivers.

28.    Once a Lyft applicant becomes a driver, Lyft fails to utilize its own technology, including in-car cameras and GPS tracking, to ensure that drivers keep the camera running during the entire ride and that the driver remains on course to the passenger's destination. Lyft does not have a zero-tolerance policy for sexual misconduct and has allowed drivers who have been reported for misconduct to continue driving.

29.    Lyft does not require non-harassment training, nor does it adequately investigate passenger complaints of sexually inappropriate behavior or serious sexual assaults. Shockingly, a chatroom of rideshare drivers exists where they openly discuss and brag about the access that they have to "hot" young women. Notwithstanding Lyft's history of hiring sexual predators who have assaulted Lyft passengers, and notwithstanding the obvious and open subculture of Lyft drivers who harbor a sexual motivation for driving young female passengers, Lyft does nothing to warn its female passengers about this very serious and real danger.

### *Lyft's Financial Model*

30.    The key to Lyft's business model is getting as many new Lyft drivers on the road as possible. The more drivers, the more rides, the more money Lyft makes. Unfortunately, because more careful screening and supervision would result in fewer drivers and lower profits, Lyft has chosen not to implement those necessary procedures.

31.    Lyft also has a high turnover among its drivers because they are not well paid and often move on to other jobs. As a result, and to maximize the number of drivers on the road, Lyft's business model is designed to accept as many new drivers as possible and to keep as many existing drivers working for Lyft as possible. Unfortunately, Lyft prioritizes profits over passenger safety. That is why Lyft corporate management has made deliberate decisions to adopt inadequate initial

screening procedures, inadequate safety monitoring, and has failed to warn passengers of the dangers of riding with Lyft.

### *Lyft's Control Over Its Drivers*

32.     Lyft exercises significant control over its drivers. Lyft executives set the fare rates. Drivers have no input on the fares charged and no ability to negotiate fares with customers. Fees are standardized based on mileage and/or ride time, similar to taxis.

33.     Lyft collects a percentage fee for every ride. Lyft does not charge drivers a fee to become a Lyft driver, and Lyft does not charge drivers to use the Lyft App.

34.     Lyft drivers are prohibited from answering passenger inquiries about booking rides outside of the Lyft App.

35.     Lyft has the power to terminate drivers with or without cause.

36.     Lyft drivers are expected to accept all ride requests while they are logged into the App. Lyft drivers who reject or cancel too many ride requests risk facing discipline, including suspension or termination.

37.     Lyft provides its drivers with and requires them to use and display Lyft branding materials to make their drivers easily identifiable as Lyft drivers.

38.     Lyft also allows passengers to provide comments to Lyft regarding their experiences with their Lyft drivers. These comments are not shared with other passengers. Passengers are not provided with any information regarding their driver other than a photograph, and other basic information about the car. Passengers are not informed about prior complaints concerning particular drivers.

39.     Within the app, Lyft does not tell passengers whether their comments regarding drivers are shared with drivers, resulting in a rideshare culture where passengers are fearful that

giving honest negative feedback could negatively impact their passenger star rating—or result in retaliation from the driver.

### *Lyft's Failure to Monitor Rides*

40.     Given Lyft's knowledge of the sexual assaults and rapes of its passengers by Lyft drivers, the company should have implemented a monitoring system to protect its passengers. As a technology company with access to a state-of-the-art in-app tracking system, as well as a camera within the required mobile device, Lyft could take the following steps towards the elimination of the sexual assaults by Lyft drivers:

- Adopt a zero-tolerance policy for improper conduct and inform all drivers of the policy;

- Maintain a surveillance camera and require its continuing operation during all rides;

- Save camera footage and make it accessible for up to 72 hours after each ride;

- Inform drivers that if they turn off the surveillance system during a Lyft ride, they will never drive for Lyft again;

- Inform drivers that they may not leave the car and accompany a passenger to their home or to any other location outside the vehicle, other than to provide temporary and time-limited assistance to a passenger;

- Modify the functionality of the Lyft app so that Lyft can determine immediately if a driver deviates from these protocols;

- Monitor rides and implement a system whereby passengers are required to confirm their intention to terminate a ride before reaching their destination; and

- Monitor rides and implement a system whereby passengers are required to confirm their intention to change their destination or their intention to deviate significantly from the assigned route.

41.     The ongoing sexual attacks by Lyft drivers are and have long been known to Lyft. Prior to Plaintiff's assault, Lyft knew that a consequence of its business model has been exposing women, who rely on Lyft for a safe ride home, to drivers that may take advantage of their vulnerable position. Despite holding itself out to the public as being engaged in the safe

CASE NO.                                          9                    PLAINTIFF'S ORIGINAL
                                                                       COMPLAINT AND JURY DEMAND

transportation of its passengers from place to place for compensation, Lyft has failed to take reasonable precautions to attempt to prevent harm to its passengers.

42.     At the time of the actions alleged in this complaint, Lyft was aware of the established occurrence of sexual assault of its female passengers by its drivers but failed to take reasonable action to protect its passengers from these assaults and violations.

### *Lyft's Misrepresentations as to Safety*

43.     In addition to inadequate background check procedures, Lyft affirmatively induces passengers, particularly young, unaccompanied, intoxicated, and/or vulnerable women, to use its services with the expectation of safety, while Lyft simultaneously knows that sexual abuse of its passengers has been prevalent.

44.     In February 2015, Lyft's website posted a blog post announcing it had partnered with It's On Us, an anti-sexual assault initiative, and offered free ride credits for new Lyft passengers during the Spring Break season, "making it easier to get a safe ride home even if you're in a new city." In November 2016, Lyft's website posted a blog post entitled "Get Home Safely with Lyft," again touting its partnership with It's On Us, and offering college students free Lyft rides so that they "don't need to worry about finding a safe ride after going out." The insinuation of these articles is that Lyft prevents, and does not create, the risk of sexual assault. Nowhere on Lyft's website does Lyft discuss the occurrence or risk of sexual assault by Lyft's drivers. As a result, many women, like Plaintiff, enter Lyft cars unaccompanied with the expectation that they will not be harassed, propositioned, kidnapped, attacked, stalked, raped, or worse, by their Lyft drivers.

45.     Further, Lyft does not report statistics about sexual harassment or sexual assault by its drivers. Lyft does not disclose its policies or procedures on dealing with sexual assault by its drivers. Lyft does not properly train its customer service representatives on how to deal with

serious allegations of driver misconduct. As a result, passengers who report sexual abuse by a driver have been later matched with the same driver, and dangerous drivers continue to drive with Lyft and assault passengers while Lyft profits from their actions. At the time of Plaintiff's attack, Lyft's guidelines for their drivers made no mention of sexual harassment or assault guidelines.

46.     In short, Lyft fails to follow reasonable safety procedures and intentionally induces passengers to use Lyft's services while in a vulnerable state. As a result, Plaintiff, and women like her, are attacked, sexually harassed, assaulted, and raped by Lyft's drivers.

### *Lyft's Inadequate Background Checks*

47.     Lyft relies on a quick, name-based background check process to screen its applicant drivers and has continuously refused to adopt an industry-standard, fingerprint-based background check qualification process. Lyft's background check process requires drivers to submit personal identifiers (driver's license and social security number) through an online webpage. Lyft, in turn, provides this information to third party vendors to perform a basic, name-based background check.

48.     Neither Lyft nor the third-party vendors it uses for background checks verify that the information provided by applicants is accurate or complete. The turnaround time for a Lyft background check is typically between 3-5 days.

49.     The difference between name-based background checks and fingerprint-based background checks is significant. While a name-based background check searches the applicant's reported name against various databases and compares records that have the same name, a fingerprint-based background check (or biometric check) uses the fingerprints of the individual to match against a law enforcement database, comparing records that have the same print, even if the names are different.

50.     For example, most prospective taxi drivers are required by the taxicab companies to undergo criminal background checks that require the driver to submit fingerprints through a technology called "Live Scan." The fingerprint images are used to automatically search against all other fingerprint images in government criminal record databases, including databases maintained by state law enforcement and the Federal Bureau of Investigation (FBI). The FBI's database includes criminal record information from all 50 states, including sex offender registries. If a person has a criminal history anywhere in the U.S., it will register as a match.

51.     Fingerprints are not only a highly accurate way to confirm an individual's identity, but they are also universally used among state and federal government agencies. This allows for the highest levels of information sharing among all relevant agencies—an element that is lacking when fingerprints are not used to verify identities.

52.     Because of the unique identifying characteristics of fingerprints, the Live Scan process provides assurance that the person whose criminal history has been run is, in fact, the applicant. This would ensure that a convicted rapist or sexual predator could not use a false identification to become a Lyft driver.

53.     Name-based background checks, on the other hand, are limited and not easily shared among the appropriate authorities. These name-based criminal background checks are performed on publicly available databases and records from county courthouses, which are not linked to each other and typically do not go back past seven years. Because the FBI database is not accessed, there is no true national search performed, making these searches incomplete, limited and inaccurate.

54.     Name-based background checks present systematic, fundamental problems. First, there is no way to positively identify a person via a biometric indicator, increasing the likelihood of fraud. Likewise, because names, addresses and birthdays are not unique, the likelihood of false

positives (a person linked in error with another's record) and false negatives (someone getting cleared when they should not) are greatly increased. For example, if an individual changes her name, or for some other reason has a criminal history under a different name, the name-based checks can miss the individual's criminal history.

55. Lyft has refused to adopt fingerprint-based biometric checks and has in fact spent millions of dollars lobbying against local regulations requiring these checks.

56. Despite advertising to passengers that "Your safety is important" and "Safety is our top priority," Lyft's background check process is designed for speed, not safety. In refusing to adopt reasonable safety procedures, Lyft makes clear that its main priority is profit, not passenger safety.

## THE ATTACK ON PLAINTIFF

57. This suit arises from the serious harm Plaintiff suffered as a result of the wrongful acts and omissions of Defendants.

58. On or about July 20, 2025, Plaintiff requested a Lyft ride through the Lyft App.

59. Shortly thereafter, a Lyft vehicle arrived, and Plaintiff entered the Lyft vehicle and sat in the front passenger seat due to items being in the rear seats.

60. After Plaintiff entered the Lyft vehicle, the Lyft driver began to drive toward Plaintiff's destination, which was set to a location in Memphis, Tennessee.

61. Within moments of leaving the pickup location, the Lyft driver began making inappropriate and suggestive comments toward Plaintiff, including telling her how pretty and sexy she was and how he would love to be her man. The Lyft driver also recounted his interactions with another client to whom he claimed he paid money for sexual favors.

CASE NO.                               13                    PLAINTIFF'S ORIGINAL
                                                            COMPLAINT AND JURY DEMAND

62.     Without explanation, the Lyft driver deviated from the designated route, drove to an apartment complex, and parked the Lyft vehicle. Plaintiff frantically questioned the Lyft driver as to why he had veered off course and pleaded with him to take her to her designated drop-off location, where her friend was waiting.

63.     The Lyft driver leaned over and began aggressively grabbing, groping, and kissing Plaintiff's upper body and breasts. He then went for her lower extremities. Plaintiff screamed and worked to push him away with every advance, to no avail, as he persisted and overpowered her. The Lyft driver put his hand beneath her pants and groped Plaintiff's private area, all while Plaintiff continued to scream and push against the Lyft driver in resistance. When the Lyft driver removed his hand from Plaintiff's pants, he began touching himself, exposing his genitals, and then forcibly pulled Plaintiff's head toward his genitals while demanding that she touch him and perform oral sex. Plaintiff fought and screamed and was eventually able to push herself off the Lyft driver. The Lyft driver then restarted his vehicle and proceeded to take Plaintiff to her destination. On the way to her destination, the Lyft driver continued to aggressively grope Plaintiff's breasts while she cried and tried to push him away. Upon arrival, the Lyft driver unlocked his vehicle's doors, and Plaintiff quickly exited and ran inside of her friend's house.

64.     By failing to take reasonable steps to confront the problem of multiple rapes and sexual assaults of Lyft passengers by Lyft drivers, Lyft has acted in conscious disregard of the safety of its passengers, including Plaintiff, has breached its duty of reasonable care, and has breached the implied and express covenants arising from its contract with its passengers.

65.     The Lyft driver who assaulted Plaintiff perpetrated the above-described assault, battery, harassment, and/or attack in the course and scope of his employment with Lyft and while he was under Lyft's direction and control. These acts caused Plaintiff severe pain and suffering that persist to this day.

CASE NO.                                   14                 PLAINTIFF'S ORIGINAL
                                                             COMPLAINT AND JURY DEMAND

66.    The Lyft driver who assaulted Plaintiff was acting on behalf of, for the benefit of, at the direction of, and within the course and scope of employment with Lyft and engagement by Lyft. Lyft provided the Lyft driver with access to its ride-sharing app platform, a tool necessary for Lyft drivers to perform the work Lyft assigned. Lyft, through the Lyft App, directed the Lyft driver regarding the location of the pickup, time of the pickup, and routes for both the pickup of Plaintiff and transportation to her destination, and much more, as discussed below.

67.    The Lyft driver who assaulted Plaintiff was an agent or employee of Lyft, which is a common carrier. His duties were directed at the comfort and protection of passengers in his vehicle, including Plaintiff.

68.    Lyft derived a monetary benefit from every ride assigned to said Lyft driver through its Lyft App, including Plaintiff's ride during which she was assaulted.

69.    Lyft is a transportation company. Its core business is providing transportation to the public through its network of drivers. It connects its drivers to the public through the Lyft App. Anyone may download the Lyft App for free. Using the app, a customer may request a ride from one of Lyft's drivers for a standardized charge unilaterally set by Lyft. Lyft directs its drivers to pick up the passengers and transport them to their destinations.

70.    Lyft provides transportation through a digital application made available to the general public for the purpose of transporting its users—the passengers—from place to place for profit. Lyft has widely offered its services to the general public and charges standard fees for its services through its application. Lyft represents that it does not allow discrimination against passengers on the basis of race, color, national origin, religion, gender, gender identity, physical or mental disability, medical condition, marital status, age, or sexual orientation. Any member of the public can use Lyft's services for transportation.

CASE NO.                                              15                          PLAINTIFF'S ORIGINAL
                                                                                  COMPLAINT AND JURY DEMAND

71.     Lyft is a common carrier under California Civil Code §2168 and the common law.[1] Lyft holds itself out to the public generally and indifferently to transport persons from place to place for profit. As a common carrier, Lyft owes its passengers, including the Plaintiff named herein, a heightened duty of care. Lyft has an affirmative duty to protect its passengers from assault by its employees or agents and is liable for its employees' or agents' assaults, regardless whether such acts were committed within the course and scope of employment for Lyft.

72.     Given the heightened duty Lyft has as a common carrier, to the extent it failed or refused to implement procedures, policies, and App functions that it knew or should have known would prevent assaults such as those suffered by Plaintiff, as Plaintiff has alleged, Lyft is liable for the above-described tortious acts of its driver, which harmed Plaintiff.

73.     Further, the heightened duty Lyft has as a common carrier a non-delegable duty. Lyft has a non-delegable duty to safely transport its passengers from the place it picks them up to their destination. This duty cannot be delegated to Lyft drivers. When a Lyft driver assaults a passenger, Lyft is liable for the driver's actions due to its non-delegable duty.

74.     Lyft drivers are largely nonprofessional, untrained, and use their own vehicles. Lyft employs and engages its drivers, including the driver who assaulted Plaintiff, in traditional at-will relationships, in which:

a.     Lyft has discretion to fire its drivers for any reason and at any time; that is, Lyft maintains the right to discharge its drivers at will, and without cause;

b.     Lyft drivers are not charged a fee by Lyft to apply to become employees;

c.     At all times relevant, there was no agreement between Lyft and the driver designating the driver as an independent contractor;

---

[1] *See, e.g., Doe v. Lyft Techs., Inc.*, 184 F. Supp.3d 774, 787 (N.D. Cal. 2016) ("Plaintiff's allegations support the claim that Lyft 'offers to the public to carry persons,' thereby bringing it within California's definition of common carrier for tort purposes.")

d.      Lyft drivers are not charged a fee to download the app or to receive notifications from Lyft that customers want rides;

e.      Fare prices for rides are set exclusively by Lyft;

f.      Lyft drivers have no input on fares charged to consumers;

g.      Lyft drivers are not permitted to negotiate with consumers on fares charged;

h.      Lyft drivers do not know what riders are charged for a given ride;

i.      Lyft can and does modify charges to consumers; for example, if Lyft determines that a driver has taken a circuitous route to a destination;

j.      Lyft takes a fee of every ride charged to a consumer;

k.      Lyft retains control over customer-contact information;

l.      Lyft controls its drivers' contacts with its consumer base and considers its consumer list to be proprietary information;

m.      In some instances, Lyft controls the hours a driver works;

n.      Drivers are not permitted to answer passenger inquiries about booking future rides outside of the Lyft App;

o.      Driving for Lyft is not a specialized skill;

p.      Lyft's business model depends on having a large pool of non-professional drivers;

q.      Lyft drivers must abide by a list of regulations to drive for Lyft;

r.      Lyft requires its drivers to pick up Lyft customers on the correct side of the street;

s.      Lyft forbids its drivers from talking on their cell phones while driving customers;

t.      Lyft tracks drivers' speed and braking and sends drivers reports based on how many times the driver had to brake hard;

u.      Lyft drivers are not allowed to ask Lyft customers for their contact information;

v.      Lyft drivers who reject ride requests risk discipline, including suspension or termination from the platform;

w.      Consumers give feedback on rides they have taken and rate drivers on a scale from one star to five stars. These ratings are used by Lyft to discipline and terminate drivers; and

x.      Such other acts of control that discovery will show.

75.      Lyft actively markets itself as a safe company that provides safe rides. Both before 2014 and after, Lyft actively and aggressively marketed the supposed safety of its transportation

CASE NO.                                    17                    PLAINTIFF'S ORIGINAL
                                                                 COMPLAINT AND JURY DEMAND

services. These efforts continue to this day, and include email messages sent to every Lyft customer, including Plaintiff.

76.     Over the years, Lyft has launched marketing campaigns specifically marketing its transportation services to, among others, young women too intoxicated to drive.

77.     Lyft actively and publicly markets its transportation services to be safe and reliable services.

78.     Lyft actively and publicly markets its transportation services to be safe and reliable during late-night hours.

79.     Lyft has cultivated an image among its customers of safety and superiority to public transportation and traditional taxis. Because of aggressive marketing, most Lyft customers are generally unaware of the real risks associated with Lyft rides and continue to believe a ride with Lyft is a safer and better alternative.

80.     Riders, including Plaintiff, reasonably rely on Lyft's representations and promises regarding safety and security measures. Riders, including Plaintiff, choose to ride with Lyft as a result of this reliance.

81.     Lyft markets its ride hailing service to female riders as a safer alternative to traditional taxis.

82.     The safe image that Lyft aggressively cultivates suggests to customers, including Plaintiff, that riding while intoxicated with Lyft is safe. Lyft does not inform riders, like Plaintiff, that hailing a ride after drinking puts riders in peril from the drivers themselves. By marketing heavily to young women who have been drinking, and promising safe rides, Lyft puts riders in peril.

83.     Lyft knew its representations and promises about rider safety were false and misleading yet continued to allow riders to believe in the truth of these representations and promises and continued to profit from riders' reliance on those representations and promises.

84.     Lyft employs a vast network of drivers. But, at all relevant times, Lyft provided its drivers with inadequate training regarding sexual assault, sexual relations, sexually inappropriate behavior, sensitivity, and customer relations.

85.     Lyft has also provided inadequate background checks and screening of its drivers. Among other things, it does not fingerprint its drivers (unless forced to do so by state or local laws), and it does not run the applicant drivers against all available public databases.

86.     Lyft lobbies state and local governments to limit what is required of Lyft with respect to driver background checks. Lyft also lobbies local government entities to continue allowing Lyft to perform its own background checks of its driver applicants, rather than municipalities performing the more stringent and reliable screening they conduct for traditional taxi drivers.

87.     Lyft has successfully persuaded lawmakers in several states to keep background-check requirements for its drivers limited.

88.     As a direct result of Lyft's lobbying efforts, those entities largely self-enforce hiring standards for their drivers. In cities where municipalities perform the screening, such as in Houston, Texas and Seattle Washington, hundreds of driver applicants Lyft approved are ultimately rejected by the municipality.

89.     Even where authorized to do so, Lyft generally does not perform driver background checks and instead outsources the checks to a third-party vendor that often limits the extent of its background check and that does not verify the information provided by the applicant is accurate or complete. The turnaround time for a Lyft background check is often under 36 hours.

The application process to become a Lyft driver is simple, fast, and designed to allow the company to hire as many drivers as possible while incurring minimal associated costs. Lyft fought for and implemented a less robust hiring process knowing it would be at the expense of passenger safety.

90.     Although Lyft claims its drivers are not employees, Lyft engages its drivers as part of its business, and the Lyft drivers are charged with the responsibility of safely transporting Lyft passengers to their destination.

### DELAYED DISCOVERY AND FRAUDULENT CONCEALMENT

91.     The discovery rule applies to toll the running of the statute of limitations until Plaintiff knew, or through the exercise of reasonable care and diligence, should have known of the existence of her claim against Lyft.

92.     Plaintiff was not aware of the foreseeability of the assault she endured because Lyft intentionally concealed the fact that Lyft drivers had been regularly physically and/or sexually assaulting women and instead represented that Lyft was a safe mode of transportation.

93.     A reasonable investigation by Plaintiff at the time of her assault would not have revealed the factual basis of her claims against Lyft. This is because Lyft, through marketing and more, took actions to conceal that its drivers regularly and frequently assaulted women. This is also because Lyft has publicly claimed that it does not control its drivers and that its drivers are not Lyft employees. As such, despite reasonable diligence, Plaintiff was unable to discover Lyft's negligent or wrongful conduct, which brought about or contributed to bringing about the assault she suffered.

94.     Furthermore, the running of any statute of limitations has been equitably tolled by reason of Lyft's intentional representations and fraudulent concealment and conduct.

95.     Through its affirmative misrepresentations and omissions, Lyft actively concealed from Plaintiff the true risks associated with using the Lyft App and riding in a Lyft, specifically, the risk of being assaulted, battered, harassed, and/or otherwise attacked.

96.     As a result of Lyft's actions, Plaintiff was unaware, and could not reasonably know or have learned through reasonable diligence, that Lyft could be held liable for the risks its drivers posed and that those risks were the direct and proximate result of Lyft's acts and omissions.

97.     Plaintiff did not learn of Lyft's negligent or wrongful actions and omissions in bringing about the assault until after she saw advertisements for legal help.

98.     Furthermore, Lyft is estopped from relying on any statute of limitations because of its concealment of the truth about its failure to adequately employ measures to ensure the safety of its passengers. Lyft had a duty to disclose the true character, quality, and nature of its background checks and the incidence of Lyft drivers sexually assaulting or otherwise attacking passengers, because this was non-public information over which Defendants had, and continue to have, exclusive control, and because Defendants knew this information was not available to Plaintiff, Lyft passengers/customers, and/or the general public.

**CLAIM 1: GENERAL NEGLIGENCE**

99.     Plaintiff incorporates all prior allegations.

100.     By providing transportation to the general public using its application and network of drivers, Lyft owed a duty to act with due and reasonable care towards the public and in particular its own passengers, including Plaintiff.

101.     Lyft has been on notice that its drivers have been sexually harassing, sexually assaulting, and raping its passengers since at least 2015. Lyft was aware or should have been

aware that some Lyft drivers would continue to sexually assault, stalk, harass, kidnap, physically

assault, rape, and/or otherwise attack their vulnerable Lyft patrons and passengers.

102.    Since learning of the sexual assaults perpetrated by its drivers, Lyft never adapted

or improved its safety procedures in any meaningful way.

103.    Lyft does not require video monitoring of its drivers that cannot be turned off, nor

does it provide emergency notification to law-enforcement authorities when a driver drastically

veers off course from the passenger's destination, abruptly cancels the ride, or ends the ride at the

intended destination but GPS data indicates the passenger remains in the car for a significant

period of time.

104.    At all times relevant, Lyft was well aware of the dangers its drivers posed, yet it

still induced, and continues to induce, the public, including Plaintiff, to rely on Lyft as a safe

means of transportation. In doing so, Lyft failed to warn passengers, including Plaintiff, of the

possibility of being assaulted, battered, harassed, and/or otherwise attacked by a Lyft driver.

105.    At the time Plaintiff was assaulted, Lyft did not require sexual harassment/assault

training for its drivers, nor did it have any policies in place for immediate termination if a driver

engages in sexual misconduct.

106.    Lyft does not cooperate with the police when a driver commits an illegal sexual

attack on its passengers. Despite having the express right to disclose driver information at Lyft's

sole discretion, Lyft requires that extensive standards be met before the company will even

consider law enforcement requests for information. Even after a report of sexual assault has been

made, Lyft generally requires a subpoena before it will release information. Lyft's policy of

noncooperation discourages police agencies from making recommendations to local prosecutors

to file complaints against Lyft drivers and provides Lyft's predatory drivers with tacit assurance

that their illegal attacks will not be detected by law enforcement.

107.    When hiring new drivers, Lyft does not verify driver identities with biometric background checks. Lyft does not correct for false negatives created by its name-based screening procedures. Lyft does not provide industry-standard background checks that would provide the most comprehensive means of screening applicant drivers. Lyft does not invest in continuous monitoring of its drivers and is not immediately alerted when one of its drivers is implicated in criminal acts.

108.    Lyft does not have a consistent, reliable system for addressing passenger reports of sexual assault by its drivers and continues to let dangerous predators drive for and earn money for Lyft.

109.    For the above reasons and others, Lyft breached its duty of reasonable care to Plaintiff.

110.    As a legal and direct result of Lyft's actions and omissions, Plaintiff was assaulted, battered, harassed, and/or otherwise attacked by a Lyft driver, which humiliated, degraded, violated, and robbed Plaintiff of her dignity and personal safety. The assault on Plaintiff caused her to suffer psychological and physical harm from which she may never fully recover.

111.    As a direct and proximate result of Defendants' general negligence, Plaintiff suffered economic and non-economic damages.

112.    Plaintiff will seek actual and punitive damages based on Defendants' above-described actions, which evidence wanton and reckless disregard for the safety of passengers like Plaintiff.

### CLAIM 2: NEGLIGENT HIRING, RETENTION, AND SUPERVISION

113.    Plaintiff incorporates all prior allegations.

114.    Lyft engaged and retained or otherwise employed the Lyft driver who assaulted, battered, harassed, and/or otherwise attacked Plaintiff as described above.

CASE NO.                                23          PLAINTIFF'S ORIGINAL
                                                    COMPLAINT AND JURY DEMAND

115.    Lyft did not interview, check the references of, provide training to, or advise the Lyft driver of any anti-sexual assault policies when hiring him. Lyft had no reasonable basis for believing Lyft drivers in general were fit to drive vulnerable women around, particularly at night, and failed to use reasonable care in determining whether the driver in question was fit for the task. Lyft should have known of the unfitness of the Lyft driver involved in the assault on Plaintiff but failed to use reasonable care to discover his unfitness and incompetence.

116.    Despite failing to reasonably endeavor to investigate the incompetence of Lyft drivers, including the one who harmed Plaintiff, for transporting vulnerable and/or intoxicated women in a moving vehicle, Lyft hired said driver to do exactly that.

117.    Lyft knew or should have known that assigning the task of transporting vulnerable passengers to an inadequately screened driver created an unreasonable risk of harm to Lyft's passengers, including Plaintiff, particularly when Lyft had been on notice of the string of sexual assaults committed by Lyft's drivers.

118.    Lyft failed to employ measures to adequately supervise its drivers.

119.    Lyft failed to adequately record, investigate, and respond to passenger reports of unsafe conduct such as sexual harassment and sexual assault by Lyft drivers.

120.    Lyft was negligent in failing to terminate drivers it knew or reasonably should have known were a threat to passengers, including but not limited to Plaintiff and other vulnerable female passengers traveling alone.

121.    The Lyft driver who assaulted Plaintiff was, and/or became, unfit to perform the work for which he was hired as he improperly and illegally took advantage of Plaintiff when she attempted to use the service for a safe ride to her destination, which caused her psychological and/or physical harm.

CASE NO.                                        24                      PLAINTIFF'S ORIGINAL
                                                                        COMPLAINT AND JURY DEMAND

122.     Because of the Lyft driver's unfitness to perform the task of transporting Plaintiff, Plaintiff was assaulted, battered, harassed, and/or otherwise attacked, which humiliated, degraded, violated, and robbed Plaintiff of her dignity and personal safety.

123.     Lyft's negligence in hiring, retaining, and or supervising Lyft drivers, including the driver who harmed Plaintiff, caused Plaintiff to be assaulted, battered, harassed, and/or otherwise attacked by the Lyft driver, which humiliated, degraded, violated, and robbed Plaintiff of her dignity and personal safety. The depraved attack on Plaintiff caused Plaintiff to suffer physical and/or psychological harm from which she may never fully recover.

124.     As a direct and proximate result of Defendants' negligent supervision, hiring, and retention of Lyft drivers, including the driver who harmed Plaintiff, Plaintiff suffered economic and non-economic damages.

125.     Plaintiff will seek actual and punitive damages based on Defendants' above-described actions, which evidence wanton and reckless disregard for the safety of passengers like Plaintiff.

**CLAIM 3: COMMON-CARRIER NEGLIGENCE**

126.     Plaintiff incorporates all prior allegations.

127.     At the time Plaintiff was sexually assaulted, Lyft was a common carrier as it provided transportation, generally and indifferently, to the general public.

128.     Lyft provides transportation through a digital application and transportation network made available to the general public, generally and indifferently, for the purpose of transporting its users, the passengers, from place to place for profit. Lyft has widely offered its services to the general public and charges standard fees for its services through its application. Lyft represents that it does not allow discrimination against passengers on the basis of race, color, national origin, religion, gender, gender identity, physical or mental disability, medical condition,

marital status, age, or sexual orientation. Any member of the public can use Lyft's services for transportation.

129.    As a common carrier, Lyft must carry its passengers, including Plaintiff, safely.

130.    Lyft has a duty to employ the utmost degree of care and diligence that would be expected of a very cautious company. Lyft has a duty to do all that human care, vigilance, and foresight reasonably can do under the circumstances to avoid harm to passengers, including Plaintiff.

131.    Lyft must use reasonable skill to provide everything necessary for safe transportation, in view of the transportation used and the practical operation of the business.

132.    Despite complaints to Lyft of physical and/or sexual assaults committed by Lyft drivers and lawsuits against Lyft for physical and/or sexual assault, to this day Lyft has failed to implement safety precautions that would adequately address its assault problem.

133.    Lyft does not provide a consistent and reliable way for passengers to report physical and/or sexual abuse.

134.    Lyft does not warn passengers of the dangers of riding with Lyft and fails to warn passengers of past complaints regarding Lyft drivers.

135.    Lyft does not have an effective program in place to deal with the sexual-predator crisis posed by some of its drivers.

136.    Lyft knows its female passengers are in a uniquely vulnerable situation enclosed in a moving vehicle and that a subset of its drivers are sexual predators.

137.    Lyft has not exercised reasonable care to protect its passengers from harassment and assault by Lyft's drivers.

138.    Lyft has not exercised the utmost degree of care in order to protect its passengers from the danger posed by sexual predators who drive for Lyft. If Lyft had used the highest degree

of care, Lyft could have prevented or dramatically reduced the likelihood of the physical and/or sexual assault of its passengers, including Plaintiff.

139. Lyft failed to safely transport Plaintiff.

140. Lyft failed to use the utmost care and vigilance to protect Plaintiff from its own driver who assaulted, battered, harassed, and/or otherwise attacked Plaintiff while she was supposed to transported safely by Lyft.

141. Lyft failed to take reasonable precautions to protect its vulnerable female passengers, including Plaintiff, from the foreseeable and known risk of assault and/or harassment by its drivers. If Lyft had used the highest degree of care, Lyft could have prevented or reduced the likelihood of the sexual assault of its passengers, including Plaintiff.

142. As a legal and proximate result of Lyft's actions and omissions of Lyft, Plaintiff was assaulted, battered, harassed, and/or otherwise attacked by the Lyft driver, which humiliated, degraded, violated, and robbed Plaintiff of her dignity and personal safety. The depraved attack on Plaintiff caused Plaintiff to suffer physical and/or psychological harm from which she may never fully recover.

143. As a direct and proximate result of Lyft's negligence as a common carrier, Plaintiff suffered economic and non-economic damages.

144. Plaintiff will seek actual and punitive damages based on Defendants' above-described actions, which evidence wanton and reckless disregard for the safety of passengers like Plaintiff.

## CLAIM 4: NEGLIGENT FAILURE TO WARN

145. Plaintiff incorporates all prior allegations.

146. Lyft's conduct created a risk of physical or emotional harm to its passengers, including Plaintiff.

147.    In operating its business, Lyft knew and had reason to know that its passengers were at risk of sexual assault and abuse by Lyft's drivers since at least 2015. Since then, Lyft has received frequent passenger complaints about driver misbehavior, has been notified of police investigations of drivers' criminal conduct while acting in their capacity as Lyft drivers, and has been the subject of numerous civil suits alleging the sexual harassment and assault of Lyft's passengers by Lyft's drivers.

148.    Despite the knowledge of the danger its enterprise creates, Lyft did not alert its passengers, including Plaintiffs, to the risk of sexual harassment and assault by Lyft Drivers. In fact, Lyft continued to market itself as a service that provides "safe" rides, even to unaccompanied and/or intoxicated passengers.

149.    In February 2015, Lyft's website posted a blog post announcing it had partnered with It's On Us, an anti-sexual assault initiative, and offered free ride credits for new Lyft passengers during the Spring Break season, "making it easier to get a safe ride home even if you're in a new city." In November 2016, Lyft's website posted a blog post entitled "Get Home Safely with Lyft," again touting its partnership with It's On Us and offering college students free Lyft rides so that they "don't need to worry about finding a safe ride after going out." The insinuation of these articles is that Lyft prevents, and does not create, the risk of sexual assault. Nowhere on Lyft's website does Lyft discuss the occurrence or risk of sexual assault by Lyft's drivers.

150.    Lyft itself represented to its passengers that riding with Lyft is safe, implying it is free of risk from physical and/or sexual assault.

151.    Lyft did not warn that its criminal background checks of Lyft drivers were limited, nor did it warn that it sometimes allows drivers to continue driving for Lyft even after a passenger reports to Lyft that she was physically and/or sexually assaulted.

152.    Lyft had reason to know that passengers would be unaware of the risk of physical and/or sexual assault by Lyft drivers.

153.    A warning to its passengers that they were at risk of physical and/or sexual assault by Lyft drivers would have reduced the risk of harm to passengers, including Plaintiff, who could have arranged for alternative transportation or taken additional safety precautions and avoided the assaults they suffered at the hands of Lyft drivers.

154.    Plaintiff would not have ridden alone in a Lyft had Lyft provided an adequate warning regarding the risk of being assaulted, battered, harassed, and/or otherwise attacked by an Lyft driver.

155.    As a legal and proximate result of Lyft's actions and omissions, Plaintiff was assaulted, battered, harassed, and/or otherwise attacked by the Lyft driver, which humiliated, degraded, violated, and robbed Plaintiff of her dignity and personal safety. The depraved attack on Plaintiff caused Plaintiff to suffer physical and/or psychological harm from which she may never fully recover.

156.    As a direct and proximate result of Defendants' negligent failure to warn, Plaintiff suffered economic and non-economic damages.

157.    Plaintiff will seek actual and punitive damages based on Defendants' above-described actions, which evidence wanton and reckless disregard for the safety of passengers like Plaintiff.

**CLAIM 5: INTENTIONAL MISREPRESENTATION**

158.    Plaintiff incorporates all prior allegations.

159.    Lyft represented to Plaintiff and the general public that safety was Lyft's top priority, and it was Lyft's goal to make every ride safe, comfortable, and reliable. At the same

time, Lyft already knew that a number of its drivers had preyed on vulnerable female passengers by sexually molesting, assaulting, harassing, and/or raping them.

160.     Lyft made intentional misrepresentations of fact to all users of the Lyft App, including Plaintiff, that were known by Lyft to be false including the false statements Lyft made, stating it would provide Plaintiff with a safe ride to her destination.

161.     These representations regarding safety were made to Lyft customers, including Plaintiff, through periodic emails Lyft sent to its customers, social-media advertisements, and Lyft's own website and app. Plaintiff relied upon several advertisements and statements where Lyft proclaimed it would provide a safe ride.

162.     Prioritizing profits over passenger safety, Lyft made these intentional misrepresentations of material fact to induce women, including Plaintiff, to use Lyft's services.

163.     Lyft made these representations to Plaintiff and the general public despite knowing it had chosen not to take the measures necessary to provide a safe ride to her intended destination and, as a result, continued physical and/or sexual assault of its passengers by its drivers was a foreseeable occurrence.

164.     Lyft made these representations to induce women, like Plaintiff, to use Lyft's services and to derive profit from women like Plaintiff.

165.     In entering a Lyft vehicle, Plaintiff reasonably relied on Lyft's representations that it would get her safely to her destination.

166.     In trusting and relying on Lyft's representations, Plaintiff was placed in a uniquely vulnerable position that was taken advantage of by the Lyft driver who assaulted, battered, harassed, and/or otherwise attacked Plaintiff.

167.     As a direct and proximate result of Lyft's intentional misrepresentations, Plaintiff was assaulted, battered, harassed, and/or otherwise attacked by the Lyft driver, which humiliated,

degraded, violated, and robbed Plaintiff of her dignity and personal safety. The depraved attack on Plaintiff caused Plaintiff to suffer physical and/or psychological harm from which she may never fully recover.

168.    As a direct and proximate result of Lyft's intentional misrepresentations, Plaintiff suffered economic and non-economic damages.

169.    Plaintiff will seek actual and punitive damages based on Defendants' above-described actions, which evidence wanton and reckless disregard for the safety of passengers like Plaintiff.

## CLAIM 6: NEGLIGENT MISREPRESENTATION

170.    Plaintiff incorporates all prior allegations.

171.    Lyft represented to Plaintiff and the general public that safety is Lyft's top priority, and that it is Lyft's goal to make every ride safe, comfortable, and reliable. At the time of the assault alleged, Lyft knew that a number of its drivers had previously preyed on vulnerable female passengers by sexually molesting, assaulting, harassing, and/or raping them.

172.    Lyft continued to represent that its services were safe to further Lyft's own pecuniary interests.

173.    In choosing to represent to its customers/users that its services were safe, Lyft had a duty to provide correct and accurate information about the actual safety of its services.

174.    Lyft knew or should have known that it could not provide the safe ride that it represented it could.

175.    Knowing of the incidence of sexual assault of its passengers by its drivers and knowing that Lyft had not implemented adequate precautions, Lyft had no reasonable grounds for believing that it could provide Plaintiff and other passengers a safe ride as represented.

CASE NO.                                    31              PLAINTIFF'S ORIGINAL
                                                            COMPLAINT AND JURY DEMAND

176.     In getting into the Lyft, Plaintiff reasonably relied on Lyft's representations that it would get her safely to her intended destination.

177.     In trusting and relying on Lyft's representations, Plaintiff was placed in a uniquely vulnerable position that was taken advantage of by a Lyft employee, the Lyft driver, who assaulted, battered, harassed, and/or otherwise attacked Plaintiff.

178.     As a direct and proximate result of Lyft's conduct, Plaintiff was assaulted, battered, harassed, and/or otherwise attacked by the Lyft driver, which humiliated, degraded, violated, and robbed her of her dignity and personal safety. The depraved attack on Plaintiff caused her to suffer physical and/or psychological harm from which she may never fully recover.

179.     As a direct and proximate result of Lyft's negligent misrepresentations, Plaintiff suffered economic and non-economic damages.

180.     Plaintiff will seek actual and punitive damages based on Defendants' above-described actions, which evidence wanton and reckless disregard for the safety of passengers like Plaintiff.

## CLAIM 7: NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

181.     Plaintiff incorporates all prior allegations.

182.     For several years before Plaintiff was assaulted by the Lyft driver, Lyft was fully aware that other female passengers had been assaulted by Lyft drivers. Since at least 2015, Lyft has received frequent passenger complaints about driver misconduct, has been notified of police investigations of the criminal conduct of drivers acting within their capacity as Lyft drivers, and has been the subject of numerous civil suits alleging the sexual harassment and assault of Lyft's passengers by Lyft's drivers.

183.    Lyft made a conscious decision not to implement procedures that would effectively screen its drivers and monitor its drivers to identify and terminate drivers who were sexual predators.

184.    Safety precautions such as enhanced background checks, biometric fingerprinting, job interviews, electronic monitoring systems, warnings to passengers of the dangers of being attacked by Lyft drivers, and cooperation with law enforcement when a driver attacks a passenger would have cost Lyft money and reputational damage. Because of this, Lyft decided not to implement such precautions and instead continues to place its passengers at greater risk of assault and harassment by Lyft's own drivers.

185.    Additional safety precautions that Lyft chose not to make include but are not limited to: ongoing monitoring of Lyft drivers through available technology including cameras and GPS; a zero-tolerance policy for drivers who deviate from expected behavior by leaving the vehicle with passengers, or by deviating substantially from the assigned route; a zero-tolerance program for sexual assault and guidelines mandating immediate termination; creating and instituting a system encouraging customer reporting; and adequate monitoring of customer complaints by well-trained and effective customer-service representatives. Lyft chose not to implement such precautions, nor did it warn passengers of the risk of being physically and/or sexually assaulted given that these safety precautions had not been implemented.

186.    In failing to take these and other safety precautions designed to protect passengers from sexual predators driving for Lyft, Lyft breached its duty of reasonable care, negligently inflicting emotional harm upon Plaintiff, and acted recklessly and in conscious disregard of her safety.

187.    As a direct and proximate result of Lyft's negligent infliction of emotional distress, Plaintiff suffered economic and non-economic damages.

CASE NO.                                    33                PLAINTIFF'S ORIGINAL
                                                                COMPLAINT AND JURY DEMAND

188.    Plaintiff will seek actual and punitive damages based on Defendants' above-described actions, which evidence wanton and reckless disregard for the safety of passengers like Plaintiff.

## CLAIM 8: BREACH OF CONTRACT

189.    Plaintiff incorporates all prior allegations.

190.    Plaintiff entered a contract with Lyft. The essence of this commercial transaction was the payment of a fee to Lyft in exchange for safe and reasonable transportation to Plaintiff's destination.

191.    As a result of the conduct, acts, and omissions set forth above, Lyft breached its contract with Plaintiff, including breaching implied covenants inherent in such a contract.

192.    As a direct and proximate result of Lyft's breach of contract, Plaintiff suffered economic and non-economic damages.

## CLAIM 9: STRICT PRODUCT LIABILITY BASED ON DESIGN DEFECT OF THE LYFT APP AND FAILURE OF THE LYFT APP TO MEET MINIMUM REASONABLE CONSUMER SAFETY EXPECTATIONS

193.    Plaintiff incorporates all prior allegations.

194.    Lyft manufactured and distributed the Lyft App.

195.    The Lyft App did not perform as an ordinary consumer would have expected it to perform when used or misused in an intended or reasonably foreseeable way, because the Lyft App falsely led Plaintiff to form a reasonable minimum safety expectation that was not met.

196.    The Lyft App did not include safety features such as a GPS tracking system that would alert Lyft to the early termination of a ride, substantial deviation from the intended route, or a passenger continuing to travel in the Lyft vehicle after the driver ended the ride in the App. It also did not include the automatic activation of the camera in drivers' smart phones when a ride

is in progress. And it did not include automatic notification of law enforcement of suspicious circumstances that suggest a rider may be in danger.

197.    The Lyft App also failed to communicate with Plaintiff a true expectation of the lack of safety in using Lyft.

198.    These flaws in the design of the Lyft App, were a substantial factor in causing harm to the Plaintiff, including being assaulted, battered, harassed, and/or otherwise attacked by the Lyft driver, which humiliated, degraded, violated, and robbed Plaintiff of her dignity and personal safety. The depraved attack on Plaintiff caused Plaintiff to suffer physical and/or psychological harm from which she may never fully recover.

199.    As a direct and proximate result of Lyft's acts and omissions, Plaintiff suffered economic and non-economic damages.

200.    Plaintiff will seek actual and punitive damages based on Defendants' above-described actions, which evidence wanton and reckless disregard for the safety of passengers like Plaintiff.

## CLAIM 10: STRICT PRODUCT LIABILITY - FAILURE TO WARN

201.    Plaintiff incorporates all prior allegations.

202.    Lyft manufactured and distributed the Lyft App.

203.    The Lyft App presented potential risks of introducing each driver to a passenger who, because of the nature of the ridesharing arrangement created and facilitated by the Lyft App, could neither escape from the Lyft driver's vehicle nor control the place where the driver would take the passenger, which could result in the sexual assault of that passenger; these are risks that were known or knowable at the time of manufacture and distribution of the Lyft App.

204.    The potential risks presented a substantial danger when the Lyft App was used or misused in an intended or reasonably foreseeable way.

205.    Ordinary consumers such as Plaintiff would not have recognized the potential risks.

206.    Defendant Lyft failed to adequately warn consumers, including Plaintiff, of these potential risks.

207.    Lyft's failure to provide passengers, including Plaintiff, with sufficient warnings regarding the risk of harm to which they were being exposed with each Lyft ride was a substantial factor in causing the harm suffered by Plaintiff, including being assaulted, battered, harassed, and/or otherwise attacked by the Lyft driver which humiliated, degraded, violated, and robbed Plaintiff of her dignity and personal safety. The depraved attack on Plaintiff caused Plaintiff to suffer physical and or psychological harm from which she may never fully recover.

208.    As a direct and proximate result of Lyft's acts and omissions, Plaintiff suffered economic and non-economic damages.

209.    Plaintiff will seek actual and punitive damages based on Defendants' above-described actions, which evidence wanton and reckless disregard for the safety of passengers like Plaintiff.

**VICARIOUS LIABILITY FOR DRIVER'S TORTS**

210.    Plaintiff incorporates all prior allegations.

211.    Lyft is vicariously liable for the acts of its drivers by statute.

212.    Lyft is a transportation network company subject to California Public Utilities Code section 5354.

213.    Public Utilities Code section 5354 provides, in pertinent part, that the "act, omission, or failure of any . . . person offering to afford the authorized service [transportation] with the approval or consent of the permit or certificate holder [Lyft] is the act, omission, or failure of the permit or certificate holder [Lyft]."

CASE NO.                                        36                    PLAINTIFF'S ORIGINAL
                                                                     COMPLAINT AND JURY DEMAND

214. The Lyft driver, at all relevant times, was a person offering to afford the transportation service with the approval and consent of Lyft.

215. Lyft was, at all relevant times, a permit or certificate holder subject to Public Utilities Code section 5354.

216. At all relevant times, the Lyft driver was Lyft's employee for purposes of common law *respondeat superior* liability.

217. At all relevant times, Lyft exercised control over the Lyft driver's work by dispatching the Lyft driver to particular locations and passengers, instructing him regarding the route to use, instructing him regarding decals to place on his vehicle, setting the fares and rates, limiting his ability to see where he will be driving before he accepts a ride, instructing him via his conduct during passenger rides, monitoring his speed and route while rides were in progress, specifying the manner of payment, accepting payment on his behalf, gathering feedback from his passengers, tracking his performance, and reserving the right to terminate drivers with or without cause.

218. At all relevant times, Lyft supplied the equipment and tools of work to the Lyft driver by supplying the decals, map tools, communication tools, and payment acceptance tools, among other things.

219. The work that the Lyft driver was doing, namely providing transportation services, was part of Lyft's regular business in that Lyft was and is in the business of providing transportation.

220. Before he began doing rideshare work for Lyft, the Lyft driver had not been a professional driver. He did not have a distinct occupation or business as a professional driver. He was simply a lay person with a vehicle.

221.    The work performed by the Lyft driver did not require specialized or professional skill, in that he was simply driving passengers from one location to another.

222.    The Lyft driver was not hired to do one or several discrete projects but was rather hired to perform work for Lyft over a long, and even indefinite, period of time.

223.    At all relevant times, the Lyft driver was acting as an agent of Lyft in that Lyft had given him authority to transport passengers on its behalf, and he was acting within that authority while he was transporting Plaintiff.

224.    At all relevant times, the Lyft driver was acting within the scope of his employment and/or agency with Lyft.

225.    The nature of the Lyft driver's work gave him unique power over passengers like Plaintiff, including the ability to exercise general control over their liberty by activating locks or operating the vehicle in a manner that prevents the passenger from exiting the vehicle, thereby restraining and keeping her in an isolated setting (a private vehicle). The Lyft passengers, such as Plaintiff, have limited means to escape, thus increasing the risk for sexual violence.

226.    Lyft drivers, including the Lyft driver, occupied a unique position of trust in society insofar as Lyft riders like Plaintiff were trusting these drivers to take them from point A to point B without incident.

227.    At all relevant times, the Lyft driver was on duty as a Lyft driver.

228.    At all relevant times, Plaintiff was exposed to injury by the Lyft driver because of the unique power he exercised over her in his capacity as a Lyft driver, and because of the trust she placed in him because of his unique position of trust as a Lyft driver.

229.    The Lyft driver's assault, battery, harassment, and/or otherwise attack to Plaintiff were reasonably foreseeable in light of Lyft's business, including the situational risks presented by granting a large fleet of non-professional drivers control over a trusting population of

passengers who would ride alone and isolated in a vehicle, with their liberty potentially restrained by their drivers.

230.    At all relevant times, Lyft as a common carrier had an absolute duty to protect its passengers from assault by its own employees and agents and was therefore vicariously liable for the assault, battery, harassment, and/or otherwise attack which the Lyft driver perpetrated on Plaintiff, whether or not that conduct occurred in the course and scope of employment.

231.    At all relevant times, Lyft as a common carrier had a nondelegable duty for the safety of its passengers and was therefore liable for the assault, battery, harassment, and/or otherwise attack which the Lyft driver perpetrated on Plaintiff, whether or not that conduct occurred in the course and scope of employment.

232.    As a common carrier which owes its vulnerable passengers, such as Plaintiff, an utmost duty of heightened care, Lyft has a non-delegable duty to transport its passengers safely.

233.    The doctrine of nondelegable duty recognizes that, for public policy reasons, certain duties cannot be delegated to a third party. The doctrine recognizes that an entity may not delegate its duties to a contractor to evade its own responsibilities. This is especially so when allowing delegation would incentivize the employers to hire incompetent contractors to further the employer's pecuniary interests.

234.    In advertising to passengers, including Plaintiff, that Lyft provides them a safe ride to their destinations, and by profiting off women who use Lyft for that very purpose but then are attacked, Lyft has a duty to its passengers that cannot be delegated. To allow Lyft to delegate the liability for the assaults committed by its drivers to anyone else would encourage Lyft to continue to utilize the cheapest, fastest, and most haphazard safety procedures. Lyft would be disincentivized from hiring only competent drivers, since the more drivers Lyft has, the more money Lyft makes.

CASE NO.                                39          PLAINTIFF'S ORIGINAL
                                                    COMPLAINT AND JURY DEMAND

235.    Lyft drivers act as agents of and operate as extensions of Lyft. Lyft drivers represent Lyft's business and further Lyft's pecuniary interests.

236.    Lyft drivers display the Lyft logo when interacting with passengers, and in many cases Lyft drivers are the only people with whom Lyft's passengers have direct contact. Lyft drivers provide the service that Lyft claims to provide—transportation.

237.    The Lyft driver at all relevant times was acting as Lyft's ostensible agent.

238.    Through its advertising, Lyft intentionally encouraged its customers to identify the Lyft decal as indicating that a driver with a decal is a safe and authorized Lyft driver who had been vetted by Lyft and was being held out by Lyft as a trustworthy driver.

239.    Lyft gave the Lyft driver its decals and had him place the decals on his vehicle to identify himself as a Lyft driver.

240.    Lyft granted the driver the authority to transport its passengers and represent its business in doing so.

241.    By allowing Lyft drivers to represent Lyft's business, Lyft creates the impression that its drivers, including the Lyft driver at issue here, were Lyft's employees and/or agents.

242.    Plaintiff reasonably believed that the Lyft driver was an employee or agent of Lyft, and, relying on this belief, got in a vehicle with him in exchange for a fee and suffered harm as a result of her contact with the driver.

243.    As a direct and proximate result of the Lyft driver's tortious conduct, Plaintiff was assaulted, battered, harassed, and/or otherwise attacked, which humiliated, degraded, violated, and robbed Plaintiff of her dignity and personal safety. The depraved attack on Plaintiff caused Plaintiff to suffer physical and/or psychological harm from which she may never fully recover.

244.    As a direct and proximate result of Lyft driver's tortious conduct for which Lyft is legally liable, Plaintiff has suffered economic and general, non-economic damages according to proof.

245.    Plaintiff will seek actual and punitive damages based on Defendants' above-described actions, which evidence wanton and reckless disregard for the safety of passengers like Plaintiff.

### VICARIOUS LIABILITY FOR SEXUAL BATTERY

246.    Plaintiff incorporates all prior allegations.

247.    The Lyft driver made harmful and offensive contact with the Plaintiff. Plaintiff did not consent to the contact. Plaintiff was harmed and offended by the Lyft driver's contact. The Lyft driver intentionally and recklessly committed acts that resulted in harmful contact with Plaintiff's person, and/or touching of Plaintiff in a sexual manner.

248.    As a result of the Lyft driver's sexual battery of the Plaintiff, which occurred while in the course and scope of Lyft driver's employment, Plaintiff was humiliated, degraded, violated, and robbed of her dignity and personal safety. The depraved attack on Plaintiff caused Plaintiff to suffer physical and/or psychological harm from which she may never fully recover.

249.    As a legal result of the sexual battery committed by the Lyft driver, and Lyft's liability and vicarious liability for the same, Plaintiff suffered economic and non-economic damages.

250.    Plaintiff will seek actual and punitive damages based on Defendants' above-described actions, which evidence wanton and reckless disregard for the safety of passengers like Plaintiff.

### PUNITIVE DAMAGES

251.    Plaintiff incorporates all prior allegations.

252.    As stated above, Lyft knew that it faced an ongoing problem of sexual predators driving for Lyft and assaulting its passengers. As early as 2014, Lyft knew that its drivers were physically and/or sexually assaulting female passengers. Since 2014, Lyft has received frequent passenger complaints about driver physical and/or sexual misconduct, including physical and/or sexual assault and rape, it has been notified of police investigations of the criminal physical and/or sexual conduct of drivers acting within their capacity as Lyft drivers, and it has been the subject of numerous civil suits and/or arbitrations alleging the sexual harassment and physical and/or sexual assault of Lyft's passengers by Lyft's drivers.

253.    Nevertheless, even though Lyft was fully aware of its sexual predator problem it failed to take safety precautions to protect its passengers.

254.    Even after Lyft was aware some Lyft drivers were using driving for Lyft as an opportunity to get unsuspecting women into their vehicles and to physically and/or sexually assault them, Lyft and its executing officers made the conscious decision not to implement measures to thoroughly vet its drivers before and after hiring them.

255.    The decision not to implement more thorough and persistent background checks was driven by Lyft executives' desire for rapid expansion and increased profits, because the more drivers driving for Lyft, the more money there was to be made.

256.    Prioritizing profits over safety, Lyft and its executive officers also made the conscious decision not to warn its customers/users of the risk of being assaulted even after Lyft and its leadership were fully aware of this risk.

257.    Safety precautions such as enhanced background checks; biometric fingerprinting; job interviews; electronic monitoring systems; ongoing monitoring of Lyft drivers and rides through available technology including cameras and GPS; a zero-tolerance policy for drivers who deviate from expected behavior by leaving the vehicle with passengers or by deviating

CASE NO.                                    42              PLAINTIFF'S ORIGINAL
                                                            COMPLAINT AND JURY DEMAND

substantially from the assigned route; a warning system for when a driver significantly deviates from the intended route or prematurely terminates a ride; a system for checking in with and verifying a passenger's safety when a driver prematurely terminates a ride or significantly deviates from the intended route; a zero-tolerance program for sexual assault and guidelines mandating immediate termination; a zero-tolerance policy for fraternizing with passengers; creating and instituting a system encouraging customer reporting; adequate monitoring of customer complaints by well-trained and effective customer-service representatives; warnings to passengers of the dangers of being attacked by Lyft drivers; and cooperation with law enforcement when a driver attacks a passenger would have cost Lyft money and reputational damage. Because of this, Lyft, at the direction of its corporate officers, decided not to implement such precautions and instead has continued to place its passengers at greater risk of kidnapping, sexual assault, rape, and exploitation by Lyft's own drivers.

258.    Prioritizing profits over passenger safety, Lyft and its executive officers acted, and continue to act, recklessly and in knowing, conscious disregard of the safety of its passengers, including that of Plaintiff, and the public.

259.    As a direct and proximate result of the intentional, negligent, reckless, grossly negligent conduct of Lyft, Plaintiff was assaulted, battered, harassed, and/or otherwise attacked by the Lyft driver, which humiliated, degraded, violated, and robbed her of her dignity and personal safety.

260.    The depraved attack on Plaintiff caused Plaintiff to suffer serious emotional distress as well as physical and/or psychological harm from which she may never fully recover.

261.    As a result of Lyft's misconduct as stated above, Plaintiff seeks punitive damages to punish Lyft for its misconduct and to deter future misconduct.

**PRAYER FOR RELIEF**

Plaintiff prays for the following relief:

- Entry of judgment on each of her claims against Defendants jointly and severally;

- Past and future economic and non-economic damages including without limitation physical and mental pain and suffering, mental anguish, distress, anxiety, loss of enjoyment of life, medical expenses, lost earnings or earning capacity;

- Punitive damages;

- Pre- and post-judgment interest;

- The costs and expenses of litigation;

- Attorneys' fees;

- Equitable relief; and

- Such other relief as this Court may deem just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury on all issues so triable.

Dated: September 2, 2025      Respectfully submitted,

By: */s/ John Raggio*
By: */s/ Arati Furness*
John Raggio (CA Bar No. 338261)
Arati Furness (CA Bar No. 225435)
**NACHAWATI LAW GROUP**
5489 Blair Road
Dallas, Texas 75231
Telephone: (214) 890-0711
Fax: (214) 890-0712
Email: jraggio@ntrial.com
Email: afurness@ntrial.com

*Counsel for Plaintiff*