BETH A. STEWART
DAVID RANDALL J. RISKIN
A. JOSHUA PODOLL
**WILLIAMS & CONNOLLY LLP**
680 Maine Avenue, S.W.
Washington, DC 20024
Telephone:     (202) 434-5000
Facsimile:     (202) 434-5029
Email:  bstewart@wc.com
Email:  driskin@wc.com
Email:  apodoll@wc.com

WARREN METLITZKY
GABRIELA KIPNIS
**CONRAD | METLITZKY | KANE LLP**
217 Leidesdorff Street
San Francisco, CA  94111
Telephone:     (415) 343-7100
Facsimile:     (415) 343-7101
Email:  wmetlitzky@conmetkane.com
Email:  gkipnis@conmetkane.com

*Attorneys for Lyft, Inc.*

## BEFORE THE UNITED STATES JUDICIAL PANEL ON MULTIDISTRICT LITIGATION

| | |
|---|---|
| *In re Lyft, Inc. Passenger Sexual Assault Litigation* | **MDL No. 3171** |

## DECLARATION OF DAVID RANDALL J. RISKIN IN SUPPORT OF LYFT, INC.'S RESPONSE TO PLAINTIFF'S MOTION FOR TRANSFER

I, David Randall J. Riskin, declare as follows:

1.     I am an attorney at the law firm of Williams & Connolly LLP, attorneys of record for Lyft, Inc.  I am in good standing and a member of the Bar of the State of New York, among the bars of other jurisdictions.  I submit this declaration in support of Lyft's response to plaintiff's transfer motion.  I have personal knowledge of the facts stated herein, and if called upon, I could and would testify competently to them.

2.     Attached as Exhibit A is a true and correct copy of the coordination court's January 17, 2020 order that granted the petition to coordinate cases against Lyft in the Judicial Council Coordination Proceeding No. 5061, *In re Lyft Rideshare Cases*, CJC-20-005061.

3.     Attached as Exhibit B is a true and correct copy of the May 10, 2021 ruling in *In re Lyft Rideshare Cases* appointing leadership counsel.

4.     Attached as Exhibit C is a true and correct copy of the May 20, 2021 ruling in *In re Lyft Rideshare Cases* denying Lyft's *forum non conveniens* motion.

5.     To the best of my firm's knowledge as counsel to Lyft in the JCCP, as of today's date, there are 1,971 plaintiffs coordinated in the JCCP, 1,569 of whom assert claims arising from alleged incidents that took place outside of California.  392 plaintiffs in the JCCP allege an incident in California.  There are 10 plaintiffs in the JCCP for whom Lyft does not currently know the state where the incident is alleged to have occurred, which accounts for why the California and non-California totals do not equal the full total of JCCP plaintiffs.

6.     In the JCCP, plaintiffs have deposed more than 30 corporate witnesses (and many additional case-specific witnesses); Lyft has produced more than 200,000 documents in corporate discovery; and both plaintiffs and Lyft have litigated dozens of discovery disputes and briefed dispositive motions multiple times.  The parties were set to proceed with a bellwether

trial in the last week of October 2025, but it resolved just days before it was set to begin. The next bellwether trial is now scheduled for spring 2026.

      7.    As of today, to the best of my firm's knowledge, the chart below accurately reflects the plaintiffs the five law firms listed represent in the JCCP and at issue before the Judicial Panel on Multidistrict Litigation:

| Firm | Federal Plaintiffs | Federal Plaintiffs Alleging Non-California Incidents | JCCP Plaintiffs | JCCP Plaintiffs Alleging Non-California Incidents |
|---|---|---|---|---|
| Nachawati Law Group | 7 | 7 | 72 | 54 |
| Peiffer Wolf Carr Kane Conway & Wise LLP | 3 | 3 | 113 | 87 |
| Chaffin Luhana LLP | 1 | 1 | 234 | 187 |
| Clarkson Law Firm, P.C. | 1 | 1 | 31 | 23 |
| Nigh Goldenberg Raso & Vaugh PLLC | 2 | 2 | 6 | 6 |
| **Total** | **14** | **14** | **456** | **357** |

These totals include cases for which coordination is pending.

      8.    Since October 6, 2025, some of these same law firms have continued to file cases slated for coordination in the JCCP. Collectively, since that date, the firms have filed seven cases, comprising 31 plaintiffs, set for coordination in the JCCP.

      9.    Attached as Exhibit D is a demonstrative chart that compares allegations from complaints filed in the JCCP to complaints filed by the same law firms at issue in the transfer motion. The chart includes exemplar allegations; it is not all overlapping allegations.

      10.    Attached as Exhibit E is a true and correct copy of plaintiffs' JCCP leadership's July 3, 2025 motion for a common-benefit fund.

11.    Attached as Exhibit F is a true and correct copy of the September 2, 2025 opposition to the common-benefit fund motion.  The firms that signed the opposition collectively represent fifteen of the nineteen plaintiffs at issue in the transfer motion.

12.    Attached as Exhibit G is a true and correct copy of plaintiffs' JCCP leadership's September 5, 2025 reply in support of the common-benefit fund motion.


I declare under penalty of perjury that the foregoing is true and correct.

Executed on November 10, 2025 in Washington, DC.


*/s/ David Randall J. Riskin*
David Randall J. Riskin

# Exhibit A

1

2

3

4

5

6

7

*CONFORMED COPY*
*ORIGINAL FILED*
*Superior Court of California*
*County of Los Angeles*

*JAN 17 2020*

*Sherri R. Carter, Executive Officer/Clerk*
*By Berta Jauregui, Deputy*

8

# SUPERIOR COURT OF THE STATE OF CALIFORNIA

9

# FOR THE COUNTY OF LOS ANGELES

10

11  | Coordination Proceeding
12  | Special Title (Rule 3.550)
13  | IN RE: LYFT ASSAULT CASES

JCCP No. 5061

COURT'S RULING AND ORDER RE:
PETITION FOR COORDINATION

14

Hearing Date: January 8, 2020

15

16

17

18

**I.**

19

**BACKGROUND**

20

Plaintiffs have brought these cases (collectively, the "Included Cases")[1] against

21

22  [1] The Included Cases in the petition are the following:

23  1. *JILL BERQUIST, an individual, v. LYFT, INC., a Delaware Corporation; and DOES 1 through 50, Inclusive,* filed August 23, 2019 (San Francisco Sup. Ct. Case No. CGC-19-578643);

24
25  2. *MARGARITA BICANA, an individual, v. LYFT, INC., a Delaware Corporation; and DOES 1 through 50, Inclusive,* filed August 23, 2019 (San Francisco Sup. Ct. Case No. CGC-19-578645);

26  3. *GILLIAN C. v. LYFT, INC.; MATIN MAHDAVI; and DOES 1 through 50, Inclusive,* filed April 22, 2019 (LASC Case No. 19STCV13758);

27
28  4. *MARIANNE DITRANI, an individual, v. LYFT, INC., a Delaware Corporation; and DOES 1 through 50, Inclusive,* filed September 3, 2019 (San Francisco Sup. Ct. Case No. CGC-19-578933);

Defendant Lyft, Inc., a rideshare service. The cases allege that Plaintiffs were Lyft passengers who were sexually assaulted by sexual predators driving for Lyft after Lyft had been on actual notice of ongoing, sexual assaults by its drivers. According to the complaints, Lyft failed to respond to the sexual assaults by adopting and implementing the requisite hiring, monitoring and surveillance systems and procedures.

Plaintiffs have filed a petition to coordinate the Included Cases, and to have the coordinated proceeding heard in San Francisco Superior Court. For the reasons discussed *infra*, the petition for coordination is granted.

---

5. *JANE DOE 1, JANE DOE 2, JANE DOE 3, individually and on behalf of all others similarly situated v. LYFT, INC.; Jason Lamont Fenwick; and DOES 1 through 50, Inclusive,* filed July 24, 2019 (San Luis Obispo Sup. Ct. Case No. 19CV-0434);

6. *JANE DOE 1, an individual, v. LYFT, INC., a Delaware Corporation; and DOES 1 through 50, Inclusive,* filed August 1, 2019 (San Francisco Sup. Ct. Case No. CGC-19-578124);

7. *JANE DOE 2, an individual, v. LYFT, INC., a Delaware Corporation; and DOES 1 through 50, Inclusive,* filed August 1, 2019 (San Francisco Sup. Ct. Case No. CGC-19-578122);

8. *JANE DOE 3, an individual, v. LYFT, INC., a Delaware Corporation; and DOES 1 through 50, Inclusive,* filed August 8, 2019 (San Francisco Sup. Ct. Case No. CGC-19-578278);

9. *JANE DOE 4, an individual, v. LYFT, INC., a Delaware Corporation; and DOES 1 through 50, Inclusive,* filed August 8, 2019 (San Francisco Sup. Ct. Case No. CGC-19-578286);

10. *JANE DOE 5, an individual, v. LYFT, INC., a Delaware Corporation; and DOES 1 through 50, Inclusive,* filed August 30, 2019 (San Francisco Sup. Ct. Case No. CGC-19-578878);

11. *MARY ESPINOSA, an individual, v. LYFT, INC., a Delaware Corporation; and DOES 1 through 50, Inclusive,* filed August 8, 2019 (San Francisco Sup. Ct. Case No. CGC-19-578282);

12. *JENNIFER HARDIN, an individual, v. LYFT, INC., a Delaware Corporation; and DOES 1 through 50, Inclusive,* filed August 8, 2019 (San Francisco Sup. Ct. Case No. CGC-19-578280);

13. *JUSTIN KRAN, an individual, v. LYFT, INC., a Delaware Corporation; and DOES 1 through 50, Inclusive,* filed August 23, 2019 (San Francisco Sup. Ct. Case No. CGC-19-578647);

14. *INDIA MATHESON, an individual, v. LYFT, INC., a Delaware Corporation; and DOES 1 through 50, Inclusive,* filed August 1, 2019 (San Francisco Sup. Ct. Case No. CGC-19-578123); and

15. *STEPHANIE NAN, an individual, v. LYFT, INC., a Delaware Corporation; and DOES 1 through 50, Inclusive,* filed August 23, 2019 (San Francisco Sup. Ct. Case No. CGC-19-578640).

2

COURT'S RULING AND ORDER RE: PETITION FOR COORDINATION

## II.

## PETITION FOR COORDINATION

### 1. Complex Determination

Only cases that are "complex" as defined by Judicial Council standards may be coordinated. California Practice Guide, Civil Procedure Before Trial, ¶12:374.5 (The Rutter Group 2019); CCP §404 (stating in pertinent part that "[a] petition for coordination, or a motion for permission to submit a petition, shall be supported by a declaration stating facts showing that the actions are complex, as defined by the Judicial Council and that the actions meet the standards specified in Section 404.1").

"A 'complex case' is an action that requires exceptional judicial management to avoid placing unnecessary burdens on the court or the litigants and to expedite the case, keep costs reasonable, and promote effective decision making by the court, the parties, and counsel." CRC 3.400(a). "In deciding whether an action is a complex case under (a), the court must consider, among other things, whether the action is likely to involve: (1) Numerous pretrial motions raising difficult or novel legal issues that will be time-consuming to resolve; (2) Management of a large number of witnesses or a substantial amount of documentary evidence; (3) Management of a large number of separately represented parties; (4) Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court; or (5) Substantial postjudgment judicial supervision." CRC 3.400(b).

CRC 3.400(c) states that an action is provisionally a complex case if it involves one or more of the following types of claims:

    (1) Antitrust or trade regulation claims;

    (2) Construction defect claims involving many parties or structures;

    (3) Securities claims or investment losses involving many parties;

    (4) Environmental or toxic tort claims involving many parties;

3

COURT'S RULING AND ORDER RE: PETITION FOR COORDINATION

(5) Claims involving mass torts;

(6) Claims involving class actions; or

(7) Insurance coverage claims arising out of any of the claims listed in (c)(1) through (c)(6).

Here, the Included Actions are likely to involve numerous pretrial motions raising difficult or novel legal issues that will be time-consuming to resolve. An overriding issue in these cases will be whether the Lyft drivers are independent contractors or employees. This issue will likely require significant time to resolve at trial. Other issues will involve the technological feasibility of implementing additional safety features, causation, and challenges to the basis for vicarious liability for the intentional torts of Lyft drivers. Counsel Cutter Law, representing some of the Plaintiffs in these cases, state that they are aware of twenty-one total cases against Lyft (some of which will be subject to subsequent add-on petitions).

Further, these cases will likely involve a large number of witnesses, including potentially the individual drivers who committed the alleged assaults, the individual Plaintiffs, and officials with Lyft. Counsel Cutter Law also states that there are likely to be thousands of documents, studies, e-mails, and memoranda that are relevant to the claims and defenses in this case (and discovery will inevitably require a complex ESI order that will likely be the subject of significant contention). A complex court is especially equipped with several tools at its disposal to handle such issues, including staying discovery, staying portions of the case, obtaining stipulations that apply to the entire coordinated case, and selecting bellwether plaintiffs.

These factors under CRC 3.400(b) weigh in favor of a finding that the cases are complex.

**2. CRC 3.521 requirements**

CRC 3.521 requires the petition to be supported by a memorandum and declarations showing, *inter alia*, the following:

1) the name of each petitioner or, when the petition is submitted by a presiding or sole judge, the name of each real party in interest, and the name and address of each party's attorney of record, if any (CRC 3.521(a)(1));

2) the names of the parties to all included actions, and the name and address of each party's attorney of record, if any (CRC 3.521(a)(2));

3) whether the party's attorney has served the summons and complaint on all parties in all included actions in which the attorney has appeared (CRC 3.521(a)(3));

4) the complete title and case number, the date the complaint was filed, and the title of the court in which the action is pending (CRC 3.521(a)(4));

5) the complete title and case number of any other action known to the petitioner to be pending in a court of this state that shares a common question of fact or law with the included actions, and a statement of the reasons for not including the other action in the petition for coordination or a statement that the petitioner knows of no other actions sharing a common question of fact or law (CRC 3.521(a)(5));

6) the status of each included action, including the status of any pretrial or discovery motions or orders in that action, if known to petitioner (CRC 3.521(a)(6));

7) the facts relied on to show that each included action meets the coordination standards specified in Code of Civil Procedure section 404.1 (CRC 3.521(a)(7)); and

8) the facts relied on in support of a request that a particular site or sites be selected for a hearing on the petition for coordination.  (CRC 3.521(a)(8)).

The petition and the Declaration of Rachel Abrams (counsel at Levin Simes Abrams, LLP, which represents many of the Plaintiffs in this matter) address these factors.

As to Factor 5, counsel Cutter Law anticipates further add-on petitions for similar cases, and is aware of five more related cases that have been filed in the time since that petition was filed.[2]

With respect to Factor 6, counsel represents that no depositions have been taken, nor has any other discovery been conducted.[3]  These cases are all newly filed, and there has not been any significant activity as of yet.

Factors 7 (the §404.1 factors) and 8 (venue) are further discussed below.

---

[2] At the January 8, 2020 hearing on the petition, counsel for petitioners represented that there are now over 100 potential add-on cases.  See Reporter's Transcript of Proceedings, January 8, 2020 at 2:25-26.

[3] Levine Sims Abrams, LLP Petition at 18:26.

5

COURT'S RULING AND ORDER RE: PETITION FOR COORDINATION

1

### a. CRC 3.521(a)(7) – satisfaction of CCP §404.1

2

CRC 3.521(a)(7) – the factor addressing the facts relied on to show that each included

3

action meets the coordination standards specified in Code of Civil Procedure section 404.1 – is set

4

5

forth at ¶¶18-26 of the Abrams Declaration in Support of the Petition and at pages 17-19 of the

6

petition.

7

Substantively, petitions for coordination are generally governed by CCP §404.1, which

8

provides:

9

> Coordination of civil actions sharing a common question of fact or law is
> appropriate if one judge hearing all of the actions for all purposes in a selected site

10

> or sites will promote the ends of justice taking into account whether the common
> question of fact or law is predominating and significant to the litigation; the

11

> convenience of parties, witnesses, and counsel; the relative development of the
> actions and the work product of counsel; the efficient utilization of judicial facilities

12

> and manpower; the calendar of the courts; the disadvantages of duplicative and
> inconsistent rulings, orders, or judgments; and, the likelihood of settlement of the

13

> actions without further litigation should coordination be denied.

14

*See also McGhan Med. Corp. v. Sup.Ct. (Hogan)* (1992) 11 Cal.App.4th 804, 812.

15

### (1) Is there a common question of fact or law predominating and significant to the litigation?

16

17

The first consideration under the §404.1 analysis is whether there is a common question

18

of fact or law predominating and significant to the litigation. Here, as counsel argues, all of

19

these cases will turn on the same factual evidence as to whether Lyft adequately addressed the

20

ongoing sexual assault problem posed by sexual predators while driving for Lyft.[4] According to

21

counsel, the witnesses and documents pertinent to Lyft's hiring practices, Lyft's handling of

22

drivers who act inappropriately, and its driver monitoring and surveillance will be common to

23

every case.[5] Further, counsel states that the legal issues regarding the scope and extent of Lyft's

24

duty to its passengers and the causes of action in each complaint are the same.[6] Based on this, it

25

26

[4] Petition at 17:25-26.

27

[5] Petition at 17:26-8:1.

28

[6] Petition at 18:2-3.

COURT'S RULING AND ORDER RE: PETITION FOR COORDINATION

1  is evident that there are many common questions of fact and law that are predominating and

2  significant to these cases.

3

4      Defendant Lyft argues in opposition that each case arises from a different incident of

5  alleged sexual misconduct by a driver, involving a different passenger, and that case-specific

6  facts will predominate.[7]   However, in the Court's view, the issues in the coordinated case will

7  not center on the liability of the criminal defendants in the individual cases.  To the contrary, the

8  predominating legal and factual issues will examine Lyft's liability for allegedly failing to

9  institute a system to have prevented the assaults in these cases and potential future assaults.  The

10  Court agrees with Plaintiffs that this is not a case against the drivers; it is fundamentally a case

11  against Lyft.[8]  The best way to address the common allegations and conduct of Defendant Lyft is

12  through coordination.

13

14      Defendant Lyft references the ruling denying coordination in the *Massage Envy*

15  *Franchising Cases*, JCCP No. 4997 (Sup. Ct. Sacramento County, June 24, 2019) in arguing that

16  common questions of fact or law do not predominate.  The *Massage Envy* ruling was issued by a

17  state trial court.  It therefore has no precedential value.  *See Harrott v. County of Kings* (2001) 25

18  Cal.4th 1138, 1148.  Further, citation to trial court rulings from another case could be construed

19  as a violation of CRC 8.1115(a) (stating that, except when relevant to the law of the case

20  doctrine, res judicata, or collateral estoppel, or to certain criminal or disciplinary actions, an

21  unpublished opinion of a California Court of Appeal or superior court appellate division under

22  CRC 8.1115(b) may not be cited or relied on).[9]  The Court has therefore not considered the

23

24

25

[7] Defendant Lyft's Opposition to Petition at 6:6-11.

26

[8] Plaintiffs' Reply in Support of Petition at 1:23-24; see also Reporter's Transcript of Proceedings, January 8, 2020

27  at 4:4-6.

28  [9] The Court does not find that Defendant has, in fact, violated CRC 8.1115.

COURT'S RULING AND ORDER RE: PETITION FOR COORDINATION

1  *Massage Envy* cases in ruling on the instant petition. For the same reason, the Court denies

2  Defendant Lyft's request for judicial notice of the ruling in the *Massage Envy Franchising*

3  *Cases*, and sustains the Plaintiffs' objection to the request. *See, e.g., People v. Webster* (1991)

4

5  54 Cal.3d 411, 428, fn.4 (Rule of Court prohibiting citation to unpublished opinions cannot be

6  circumvented by request for judicial notice).

7  **(2) The convenience of parties, witnesses, and counsel**

8  The Court finds that coordination will promote the efficient use of judicial resources and

9  convenience of all counsel by preventing adjudication of the same or substantially similar

10  motions. It will also avoid duplicative testimony at trial and during depositions.[10] Given that

11  discovery and many witnesses will be the same in these cases, coordination will result in

12  convenience to counsel and the parties. This factor weighs in favor of coordination.

13  **(3) The relative development of the actions and the work product of counsel; (4) The**
14  **efficient utilization of judicial facilities and manpower; and (5) The calendar of the courts**

15  These cases are all relatively new, having been filed within the past few months. It

16  would be efficient to utilize a single courtroom for purposes of coordination, and it would

17  effectively free up several courtrooms from having to decide these issues.

18  These factors weigh in favor of coordination.

19  **(6) The disadvantages of duplicative and inconsistent rulings, orders, or judgments**

20  Given the similarity of the claims alleged against the Lyft drivers (specifically, the issues

21  involving Lyft's liability for failure to investigate those persons hired as Lyft drivers and to

22  prevent future incidents), there is a great risk of duplicative and inconsistent rulings if the cases

23  are not coordinated. Absent coordination, while the individual alleged assaults and

24  circumstances leading to the assaults will be different, various courts would be tasked with

25  deciding the same factual issues on the same types of motions. It would create confusion in the

26

27

28

---

[10] Petition at 18:11-14.

cases and not be in the interest of efficient resolution. It would also hinder the Court of Appeal's ability to hear challenges to inconsistent rulings, orders, and judgments (inevitably causing significant delays).

This factor weighs in favor of coordination.

**(7) The likelihood of settlement of the actions without further litigation should coordination be denied**

Plaintiffs argue that settlement is unlikely absent coordination. As Plaintiffs opine, settlement of one case may not end the litigation of others, leaving Defendants with a continued risk of adverse judgment and substantial litigation costs. It may be more difficult to settle these cases absent coordination for the reasons stated. This factor weighs in favor of coordination.

### Conclusion on §404.1 factors

For the foregoing reasons, the §404.1 factors warrant an order coordinating these cases.

### b. CRC 3.521(a)(8) – Venue

Finally, with respect to Factor 8 (venue), CRC 3.530(b) provides that the coordination motion judge may consider any relevant factors in making a recommendation for the site of the coordination proceedings, including the following:

(1) The number of included actions in particular locations;

(2) Whether the litigation is at an advanced stage in a particular court;

(3) The efficient use of court facilities and judicial resources;

(4) The locations of witnesses and evidence;

(5) The convenience of the parties and witnesses;

(6) The parties' principal places of business;

(7) The office locations of counsel for the parties; and

(8) The ease of travel to and availability of accommodations in particular locations.

Most of the Included Cases have been filed in San Francisco Superior Court. Lyft's

COURT'S RULING AND ORDER RE: PETITION FOR COORDINATION

1   corporate headquarters is in San Francisco, as are the majority of corporate witnesses and

2   documents.  Levine Simes Abrams, counsel for Plaintiffs, is a San Francisco law firm.  San

3   Francisco Superior Court would be easy for the parties to access, and the accommodations in the

4

5   Bay Area are more than adequate.  Further, San Francisco Superior Court uses e-filing, which

6   could potentially save the parties significant sums.

7          For all of these reasons, consistent with CCP §404.3, the Court recommends and

8   determines San Francisco County to be the appropriate venue for the coordinated matter to be

9   heard.  CRC 5.30(a); CCP §404.3.[11]

10         The Court selects the First Appellate District as the reviewing court with appellate

11  jurisdiction which will promote the ends of justice (the district having jurisdiction over San

12  Francisco County), as determined under CCP §404.1.  See CCP §404.2; CRC 3.505(a).

13

14

15                                          **III.**

16                              **RULING AND ORDER**

17         For the foregoing reasons, the petition for coordination is granted.  The Court

18  recommends San Francisco County as the appropriate venue for the coordinated matter to be

19  heard.  CCP §404.3.  The Court selects the First Appellate District as the reviewing court with

20  appellate jurisdiction which will promote the ends of justice (the district having jurisdiction over

21

22  San Francisco County), as determined under CCP §404.1.  See CCP §404.2; CRC 3.505(a).

23  ////

24  ////

25

26

27

28

---

[11] With that said, the Court acknowledges that there may be challenges to the San Francisco Superior Court handling the volume of cases which may be filed as add-on petitions in the coordinated *Lyft* proceeding.  The Los Angeles Superior Court is a suitable alternative forum to litigate the coordinated action, should the Judicial Council make that determination.

COURT'S RULING AND ORDER RE: PETITION FOR COORDINATION

1    The Court's order granting coordination is limited to those Included Cases identified in

2    the petition, as set forth *supra*.  The coordination trial judge will consider any add-on petitions.

3

4    Dated: January 17, 2020                      KENNETH R. FREEMAN

5    _____
                                                 Kenneth Freeman
6                                                Judge of the Superior Court

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

11
COURT'S RULING AND ORDER RE: PETITION FOR COORDINATION

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES
**Civil Division**
Central District, Spring Street Courthouse, Department 14

**JCCP5061**                                              January 17, 2020
**Lyft Assault Cases**                                         1:45 PM

Judge: Honorable Kenneth R. Freeman          CSR: None
Judicial Assistant: B. Guerrero              ERM: None
Courtroom Assistant: T. Lewis                Deputy Sheriff: None

**APPEARANCES:**

For Plaintiff(s): No Appearances

For Defendant(s): No Appearances

**NATURE OF PROCEEDINGS:** Ruling on Submitted Matter Heard on January 8, 2020;

The Court, having taken the matter under submission on 01/08/2020 for Hearing on Petition for Coordination on case JCCP5061, now rules as follows:

Pursuant to the Court's Ruling and Order Re: Petition for Coordination signed and filed this date.

By Order of the Chair of the Judicial Council, this Court was assigned as the Coordination Motion Judge for the purpose of hearing the Coordination Petition and, upon granting the Petition, to make a recommendation on the appropriate court site for assignment of a Coordination Trial Judge.

The Court, having reviewed and considered the Petition and all filings in response to the Petition, finds the cases subject to the Petition are complex cases within the meaning of California Rules of Court, rule 3.400, and that this is an appropriate matter for coordination pursuant to Code of Civil Procedure sections 404 and 404.1 and California Rules of Court, rules 3.501, et seq.

The Court recommends that a Coordination Trial Judge be assigned from the Complex Litigation Panel of the San Francisco Superior Court. The Court designates the First Appellate District as the designated District of the Court of Appeal to hear appeals in the coordinated proceedings.

All coordinated cases shall be stayed pending the assignment of a Coordination Trial Judge, provided that to the extent the parties have engaged in discovery and there are outstanding issues concerning the sufficiency of discovery responses, the stay shall not affect the parties' obligation to meet and confer in good faith with respect to outstanding discovery issues. The parties should complete their meet and confer efforts in sufficient time to permit the presentation of unresolved discovery issues to the Coordination Trial Judge at the time of the Initial Status Conference in the coordinated proceedings. The stay shall preclude the filing of any discovery motions or further proceedings on pleading challenges.

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES
## Civil Division
Central District, Spring Street Courthouse, Department 14

**JCCP5061**  
**Lyft Assault Cases**

January 17, 2020  
1:45 PM

Judge: Honorable Kenneth R. Freeman  
Judicial Assistant: B. Guerrero  
Courtroom Assistant: T. Lewis

CSR: None  
ERM: None  
Deputy Sheriff: None

Petitioner is ordered to give notice.

Counsel are reminded that in preparing future documents, all captions must include the Coordinated Case Number JCCP5061 along with the originally assigned case number.

Any future hearings on the newly coordinated case(s) are advanced to this date and vacated.

The following cases are subject to this order: 19STCV13758, CGC-19-578643, CGC-19-578933, CGC-19-578124, CGC-19-578122, CGC-19-578645, CGC-19-578278, CGC-19-578286, CGC-19-578878, CGC-19-578282, CGC-19-578280, CGC-19-578647, CGC-19-578123, CGC-19-578640, and 19CV-0434.

Certificate of Mailing is attached.

A copy of this minute order will append to the following coordinated cases under JCCP5061: 19CV-0434, 19STCV13758, CGC-19-578122, CGC-19-578123, CGC-19-578124, CGC-19-578278, CGC-19-578280, CGC-19-578282, CGC-19-578286, CGC-19-578640, CGC-19-578643, CGC-19-578645, CGC-19-578647, CGC-19-578878, and CGC-19-578933.

| SUPERIOR COURT OF CALIFORNIA COUNTY OF LOS ANGELES | Reserved for Clerk's File Stamp |
|---|---|
| COURTHOUSE ADDRESS:<br>Spring Street Courthouse<br>312 North Spring Street, Los Angeles, CA 90012 | **FILED**<br>Superior Court of California<br>County of Los Angeles<br>01/17/2020<br>Sherri R. Carter, Executive Officer / Clerk of Court<br>By:        Berta Jauregui        Deputy |
| PLAINTIFF/PETITIONER:<br>Lyft Assault Cases | |
| DEFENDANT/RESPONDENT:<br>Defendant | |
| **CERTIFICATE OF MAILING** | CASE NUMBER:<br>JCCP5061 |

I, the below-named Executive Officer/Clerk of the above-entitled court, do hereby certify that I am not a party to the cause herein, and that on this date I served the Minute Order (Ruling on Submitted Matter) of 01/17/2020  upon each party or counsel named below by placing the document for collection and mailing so as to cause it to be deposited in the United States mail at the courthouse in Los Angeles, California, one copy of the original filed/entered herein in a separate sealed envelope to each address as shown below with the postage thereon fully prepaid, in accordance with standard court practices.

Rachel Beth Abrams
Levin Simes Abrams LLP
1700 Montgomery St
Ste 250
San Francisco, CA  94111

Chair, Judicial Council of California
Attn: Court Operations
Special Services Office
455 Golden Gate Avenue, 5th Floor
San Francisco, Ca 94102-3688

Sherri R. Carter, Executive Officer / Clerk of Court

Dated: 01/17/2020

By:  Berta Jauregui
       Deputy Clerk

**CERTIFICATE OF MAILING**

Exhibit B

E-SERVICE
66587744
May 10 2021
03:29PM
File & ServeXpress

William A. Levin (SBN 98592)
Angela J. Nehmens (SBN 309433)
**LEVIN SIMES ABRAMS LLP**
1700 Montgomery Street, Suite 250
San Francisco, California 94111
Telephone: (415) 426-3000
Facsimile: (415) 426-3001
Email: wlevin@levinsimes.com
Email: anehmens@levinsimes.com

Stephen J. Estey, Esq. (SBN 163093)
R. Michael Bomberger, Esq. (SBN 169866)
Kristen K. Barton, Esq. (SBN 303228)
**ESTEY & BOMBERGER, LLP**
2869 India Street
San Diego, CA 92103
Telephone: (619) 295-0035
Facsimile: (619) 295-0172
Email: steve@estey-bomberger.com
Email: mike@estey-bomberger.com
Email: mbajo@estey-bomberger.com
Email: kristen@etsey-bombergerr.com

C. Brooks Cutter, Esq. (SBN 121407)
Celine Cutter, Esq. (SBN 312622)
**CUTTER LAW PC**
401 Watt Avenue
Sacramento, CA 95864
Telephone: (916) 290-9400
Facsimile: (916) 588-9330
Email: bcutter@cutterlaw.com
Email: ccutter@cutterlaw.com

*Attorneys for Plaintiffs*

F I L E D

San Francisco County Superior Cou.

MAY 10 2021

CLERK OF THE COURT

By: _____

Deputy Clerk

SUPERIOR COURT OF THE STATE OF CALIFORNIA
IN AND FOR THE COUNTY OF SAN FRANCISCO

| | |
|---|---|
| Coordination Proceeding<br>Special Title (Rule 3.550)<br><br><br><br>**In Re: LYFT RIDESHARE CASES**<br><br><br>This Document Relates to:<br><br>ALL ACTIONS | Case No.CJC-20-005061<br><br>JUDICIAL COUNCIL COORDINATION<br>PROCEEDING NO. 5061<br><br>*Case Assigned for All Purposes to the<br>Honorable Andrew Y.S. Cheng, Dept. 613*<br><br>[PROPOSED] **AMENDED ORDER RE:<br>APPOINTMENT OF PLAINTIFFS'<br>LEADERSHIP COUNSEL** |

Pursuant to Rule 3.541 of the California *Rules of Court,* having considered the stipulation submitted by the Parties, and the comments and proposals presented to the Court, and good cause appearing, IT IS HEREBY ORDERED:

## I.    ORGANIZATION OF PLAINTIFFS' COUNSEL

### A.    Plaintiffs' Co-Lead Counsel.

The Court designates the following to serve as members of the Plaintiffs' Co-Lead Counsel:

William A. Levin, Esq.
**LEVIN SIMES ABRAMS LLP**
1700 Montgomery Street, Suite 250
San Francisco, California 94111
Telephone: (415) 426-3000
Facsimile: (415) 426-3001
Email: wlevin@levinsimes.com

Kristen K. Barton, Esq.
**ESTEY & BOMBERGER, LLP**
2869 India Street
San Diego, CA 92103
Telephone: (619) 295-0035
Facsimile: (619) 295-0172
Email: kristen@etsey-bombergerr.com

Walt Cubberly, Esq.
**WILLIAMS HART BOUNDAS EASTERBY, LLP**
8441 Gulf Freeway, Suite 600
Houston, Texas 77017-5051
Telephone: (703) 230-2200
Facsimile: (713) 643-6226
Email: wcubberly@whlaw.com

### B.    Plaintiffs' Liaison Counsel

The Court designates the following to serve as Plaintiffs' Liaison Counsel:

C. Brooks Cutter, Esq.
**CUTTER LAW PC**
401 Watt Avenue
Sacramento, CA 95864
Telephone: (916) 290-9400
Facsimile: (916) 588-9330
Email: bcutter@cutterlaw.com

Angela J. Nehmens, Esq.
**LEVIN SIMES ABRAMS LLP**
1700 Montgomery Street, Suite 250
San Francisco, CA 94111
Telephone: (415) 426-3000
Facsimile: (415) 426-3001
Email: anehmens@levinsimes.com

[PROPOSED] AMENDED ORDER RE: APPOINTMENT OF PLAINTIFFS' LEADERSHIP COUNSEL

1

2     **C.**    **Plaintiffs' Steering Committee**

3     The Court designates the following to serve as members of the Plaintiffs' Steering

4 Committee:

5 William A. Levin, Esq.
   **LEVIN SIMES ABRAMS LLP**
6 1700 Montgomery Street, Suite 250
   San Francisco, California 94111
7 Telephone: (415) 426-3000
   Facsimile: (415) 426-3001
8 Email: wlevin@levinsimes.com

9 Angela J. Nehmens, Esq.
   **LEVIN SIMES ABRAMS LLP**
10 1700 Montgomery Street, Suite 250
   San Francisco, California 94111
11 Telephone: (415) 426-3000
   Facsimile: (415) 426-3001
12 Email: anehmens@levinsimes.com

13 Stephen J. Estey, Esq.
   **ESTEY & BOMBERGER, LLP**
14 2869 India Street
   San Diego, CA 92103
15 Telephone: (619) 295-0035
   Facsimile: (619) 295-0172
16 Email: steve@etsey-bombergerr.com

17 R. Michael Bomberger, Esq.
   **ESTEY & BOMBERGER, LLP**
18 2869 India Street
   San Diego, CA 92103
19 Telephone: (619) 295-0035
   Facsimile: (619) 295-0172
20 Email: mike@etsey-bombergerr.com

21 Kristen K. Barton, Esq.
   **ESTEY & BOMBERGER, LLP**
22 2869 India Street
   San Diego, CA 92103
23 Telephone: (619) 295-0035
   Facsimile: (619) 295-0172
24 Email: kristen@etsey-bombergerr.com

25 C. Brooks Cutter, Esq.
   **CUTTER LAW PC**
26 401 Watt Avenue
   Sacramento, CA 95864
27 Telephone: (916) 290-9400
   Facsimile: (916) 588-9330
28 Email: bcutter@cutterlaw.com

Celine Cutter, Esq.
**CUTTER LAW PC**
401 Watt Avenue

4

Sacramento, CA 95864
Telephone: (916) 290-9400
Facsimile: (916) 588-9330
Email: ccutter@cutterlaw.com

Walt Cubberly, Esq.
**WILLIAMS HART BOUNDAS EASTERBY, LLP**
8441 Gulf Freeway, Suite 600
Houston, Texas 77017-5051
Telephone: (703) 230-2200
Facsimile: (713) 643-6226
Email: wcubberly@whlaw.com

Margret Lecocke, Esq.
**WILLIAMS HART BOUNDAS EASTERBY, LLP**
8441 Gulf Freeway, Suite 600
Houston, Texas 77017-5051
Telephone: (703) 230-2200
Facsimile: (713) 643-6226
Email: mlecocke@whlaw.com

### D.   Responsibilities of Plaintiffs' Co-Lead Counsel

Co-Lead Counsel shall be responsible for coordinating the activities of the Plaintiffs during pretrial proceedings, and in consultation with the Court shall have the following duties and responsibilities. Counsel for any Plaintiff who objects to Co-Lead Counsel's execution of these duties and responsibilities preserve their right to raise their objections with the Court. For the avoidance of doubt, nothing stated herein shall in anyway abridge any Plaintiff's rights to participate in the litigation.   Accordingly, while Co-Lead Counsel will be responsible for the coordination of the tasks noted below, any individual Plaintiff or Plaintiff's Counsel may appear before the Court or at a deposition to address an issue pertaining to their individual case or clients and subject to the Protective Order, engage in settlement discussions on behalf of their client's case, or otherwise prosecute their case on any issue not common to all Plaintiffs:

1.  Appear before the Court and present the positions of Plaintiffs at all Case Management Conferences, Status Conferences, or other court ordered hearings;

2.  Direct and coordinate the briefing and argument of all motions directed at or brought by the Plaintiffs generally;

3.  Direct and coordinate the filing of opposing briefs and argue motions in proceedings initiated by other parties against Plaintiffs' Interest (except as to matters directed to specific Plaintiffs and their counsel);

4. Coordinate the bellwether process for Plaintiffs subject to the Court's guidance;

5. Enter into stipulations on behalf of the Plaintiffs, with opposing counsel as necessary for the conduct of the litigation;

6. To call regular meetings of Plaintiffs' counsel to inform them of the status of the case, discuss strategy and when appropriate and to consult with Plaintiffs Counsel on matters of common concern;

7. To designate additional Plaintiffs' subcommittees to perform services on behalf of Plaintiffs and designate additional Plaintiffs' counsel to serve on such committees; and

8. When appropriate, to chair and organize subcommittees as necessary to address specific issues of concern of the claims of Plaintiffs; and

9. Provide notice to all Plaintiffs' Counsel of litigation developments and scheduling.

**E.     Responsibilities of Plaintiffs' Liaison Counsel.**

Plaintiffs' Liaison Counsel shall have the following responsibilities:

1. To receive and distribute to plaintiffs' counsel, as appropriate, orders, notices and correspondence from the Court and from defendants;

2. To prepare and distribute to other Plaintiffs' counsel periodic status reports;

3. To maintain and to make available to plaintiffs' counsel, on reasonable notice and at reasonable times, a complete set of all pleadings, discovery and orders filed and/or served in these coordinated proceedings;

4. To coordinate the filing of notices and papers by Plaintiffs, to sign documents submitted to the Court, to communicate with Defendants' Lead Counsel (including regarding status conference statements and agendas in advance of each status conference), to negotiate case management orders, and to engage in meet and confer sessions; and

5. Appear before the Court and present the positions of Plaintiffs at all Case Management Conferences, Status Conferences, or other court ordered hearings.

**F.     Responsibilities of Plaintiffs' Steering Committee**

Plaintiffs' Steering Committee shall have the following responsibilities:

1. Perform such duties as may be necessary to the representation of Plaintiffs, proper

[PROPOSED] AMENDED ORDER RE: APPOINTMENT OF PLAINTIFFS' LEADERSHIP COUNSEL

coordination of Plaintiffs' activities or as authorized by further order of this Court;

2. Perform the investigation and discovery of common liability and damages matters for all Plaintiffs' counsel, and delegate specific tasks to other Plaintiffs Counsel, in a manner to ensure pretrial preparation for Plaintiffs is conducted effectively, efficiently and economically;

3. To coordinate and conduct exert discovery related to general liability discovery;

4. Initiate and coordinate all common discovery proceedings on behalf of all Plaintiffs, including propounded general liability written discovery, document production and the taking of oral depositions;

5. Coordinate the initiation of, and conduct discovery on behalf of Plaintiffs consistent with the requirements of California Code of Civil Procedure and Rules of Court related to discovery or any subsequent order of this Court; and

6. To coordinate Plaintiffs' pretrial activities and work performed by the Plaintiffs' Co-Lead and Liaison Counsel.


**IT IS SO ORDERED.**


Dated:  _5/10/21_

Honorable Andrew Y.S. Cheng
Superior Court Judge

[PROPOSED] AMENDED ORDER RE: APPOINTMENT OF PLAINTIFFS' LEADERSHIP COUNSEL

Exhibit C

E-SERVICE
66619297
May 20 2021
12:17PM
File & ServeXpress

# FILED

San Francisco County Superior Court

MAY 2 0 2021

CLERK OF THE COURT

BY: _____
Deputy Clerk

SUPERIOR COURT OF CALIFORNIA

COUNTY OF SAN FRANCISCO

DEPARTMENT 613

| | |
|---|---|
| COORDINATION PROCEEDING SPECIAL TITLE [RULE 3.550(c)] **LYFT RIDESHARE CASES** | Case No. CJC-20-005061 JUDICIAL COUNCIL COORDINATION PROCEEDING NO. 5061 |
| This Order Relates to All Cases. | ORDER DENYING DEFENDANT'S MOTION TO MOTION TO DISMISS OR STAY BASED ON *FORUM NON CONVENIENS* |

## INTRODUCTION

This matter came on regularly for hearing on May 4, 2021 in Department 613, the Honorable Andrew Y.S. Cheng, presiding. William Levin, Angela Nehmens, Michael Greenslade, Warren Metlitzky, Kristen K. Barton, Stephen J. Estey, Walt Cubberly, Margaret Lecocke, C. Brooks Cutter, and Celine Cutter appeared for plaintiffs. Beth Stewart, Heidi Hubbard, David Riskin, and Ana C. Reyes appeared for defendant. Having reviewed and considered the arguments, pleadings, and written submissions of all parties, the Court **DENIES** Lyft's Motion to Dismiss or Stay Based on *Forum Non Conveniens*.

## BACKGROUND

45 of the 72 cases of alleged sexual assault occurred outside of California. Lyft, with its principal

1  place of business in California, moves to dismiss or stay these 45 plaintiffs' cases on the grounds of
2  inconvenient forum and based on the representative exemplar case of plaintiff Stephanie Nan.

3  According to Lyft, plaintiff Stephanie Nan resides in New York. (Compl. ¶ 46.) Plaintiff alleges a
4  Lyft driver assaulted plaintiff in New York. (Compl. ¶ 36.) Lyft's records indicate that the driver is a
5  New York resident. (Metlitzky Decl., ¶ 5.) Witnesses to the alleged assault and/or with information
6  relevant to plaintiff's claims (including medical or psychological professionals) are "likely live in New
7  York." (*Id.*) Police reports were generated in New York, with police officers who investigated the
8  incident likely working and living in New York. (*Id.*)

9  ### LEGAL STANDARDS

10  When a court finds "in the interest of substantial justice an action should be heard in a forum
11  outside this state," it "shall stay or dismiss the action in whole or in part on any conditions that may be
12  just." (C.C.P. § 410.30(a).)

13  Under the traditional forum non conveniens analysis, the Court must first "determine whether a
14  suitable alternative forum exists." (*Nat'l Football League v. Fireman's Fund Ins. Co.* (2013) 216
15  Cal.App.4th 902, 917.) A suitable alternative forum is one where the defendant is subject to jurisdiction
16  (or otherwise stipulates) and the statute of limitations would not bar the plaintiff's case in that forum.
17  (*Stangvik v. Shiley, Inc.* (1991) 54 Cal.3d 744, 752.)

18  If there is a suitable alternative forum, the Court proceeds to the next step, balancing "the private
19  interests of the parties and the public interest in keeping the case in California." (*NFL, supra,* 216
20  Cal.App.4th at 917.) These factors must be balanced flexibly, and no single factor should be unduly
21  emphasized. (*Stangvik, supra,* 54 Cal.3d at 753.) An action should "be dismissed or stayed if a suitable
22  alternative exists and the balance of private and public interest factors weigh in favor of" the litigation
23  proceeding in an alternative forum. (*Hansen v. Owen-Corning Fiberglass Corp.* (1996) 51 Cal.App.4th
24  753, 758.) "[T]he defendant, as the moving party, bears the burden of proof" on a motion based on forum
25  non conveniens. (*Stangvik, supra,* 54 Cal.3d at 751.)

26  ### REQUEST FOR JUDICIAL NOTICE

27  Because they are court orders, the Court **GRANTS** Lyft's request for judicial notice pursuant to
28  Evid. Code § 452(d). (Compare Request for Judicial Notice in Support of Defendant Lyft, Inc.'s Motion

1   to Dismiss or Stay Based on Forum Non Conveniens, Exs. A-B [attaching one state court and one federal

2   court trial order], and Response to Plaintiffs' Objection to Request for Judicial Notice in Support of Lyft,

3   Inc.'s Motion to Dismiss or Stay Based on Forum Non Conveniens ("Response"), with Plaintiffs'

4   Opposition to Defendants Lyft, Inc.'s Request for Judicial Notice in support of its Motion to Dismiss or

5   Stay Based n Forum Non Conveniens ("Opposition").)  Plaintiffs object on two grounds: "First, the Uber

6   orders were issued in individual, not coordinated, cases and are therefore not analogous to, illustrative of,

7   or relevant to the issues pending before this Court with respect to Lyft's forum non conveniens motion.

8   Second, the orders hold no precedential value [because they are trial court orders or non-binding federal

9   cases] and the factual and legal issues contained in the Uber orders are disputed." (Opposition, 3.)  While

10  the Court will take judicial notice of these orders, it notes that state court trial rulings have no precedential

11  value, and may not be cited to under CRC 8.1115(b).  Therefore, the Court will not consider the state trial

12  court order in ruling on this motion.  Though, plaintiffs' arguments hold limited weight when plaintiffs

13  similarly submitted trial court orders in both its RFJN and evidence.[1]  (Response, 1:17-22.)

14      Because Lyft does not oppose plaintiffs' RFJN, the Court **GRANTS** plaintiffs' request for judicial

15  notice embedded in plaintiffs' Oppo.  (Compare Oppo., Ex. B with Response, fn. 2.)

16

17                          **DISCUSSION AND ANALYSIS**

18  **A. Relying on a Single, Out-of-State Plaintiff as the "Exemplar" Action for this Motion Does
     Not Satisfy Lyft's Burden.**

19      "A *case-by-case examination* of the parties, their dispute and the relationship of each to the state

20  of California is the heart of the required analysis." (*NFL*, *supra*, 216 Cal.App.4th at 921 [emphasis

21  supplied].)  A JCCP coordinates individual cases into one proceeding.  That separate, individual cases are

22  maintained requires Lyft to meet its burden on a per-plaintiff, and "case-by-case," basis (or for the 44

23  cases collectively). (*NFL*, *supra*, 216 Cal.App.4th at 921.)  By relying solely on the *Nan* case as a

24  "representative example," Lyft fails to sustain its burden as to the 44 other cases it seeks to dismiss.

25  Lyft's attempt to shift the burden to plaintiffs is controverted by settled authority. (Compare *id.* at 918

26

27  _____
    [1] For the same reasons, the Court does not consider the six trial court orders plaintiffs rely upon.
    (Nehmens Decl., Exs. G-L.)

28

["The defendant, as the moving party, bears the burden of proof on a motion based on forum non conveniens."] with Reply, 6:18-7:10 ["the Court's rationale for granting (or denying) the *forum non conveniens* motion will apply to those other Plaintiffs as well. If the Court grants the motion in Nan's case, however, it will remain open *to other Plaintiffs to try to show that their facts are materially different, yielding a different outcome.*"] [emphasis supplied].)

The motion is denied as to the 44 other cases besides *Nan*.

## B. Plaintiff Nan

### a. Suitable Alternative Forum.

"When a defendant moved to dismiss a multi-defendant action for forum non conveniens, the defendant is required to establish that an alternative forum exists in which the action could be brought against all defendants." (*David v. Medtronic, Inc.* (2015) 237 Cal.App.4th 734, 737.) Because Lyft consents to jurisdiction in New York, and agrees to toll the statute of limitations, the Court finds this factor met. (Compare MPA, 5:3-9 with *Chong v. Superior Court* (1997) 58 Cal.App.4th 1032, 1036-1037 ["A forum is suitable if there is jurisdiction and no statute of limitations bar to hearing the case on the merits."].)

### b. Private and Public Interests Weigh in Favor of Litigation in California

#### 1. Background Law

The second step in the *forum non conveniens* analysis is the balancing of the private interests of the parties and the public interest in keeping the case in California. (*NFL, supra*, 216 Cal.App.4th at 917.) "The private interest factors are those that make trial and the enforceability of the ensuing judgment expeditious and relatively inexpensive, such as the ease of access to sources of proof, the cost of obtaining the attendance of witnesses, and the availability of compulsory process for attendance of unwilling witnesses." (*Stangvik, supra*, 54 Cal.3d at 751.) "A case-by-case examination of the parties, their dispute and the relationship of each to the state of California is the heart of the required analysis." (*NFL, supra*, 216 Cal.App.4th at 921.) "The public interest factors include avoidance of overburdening local courts with congested calendars, protecting the interests of potential jurors so that they are not called upon to decide cases in which the local community has little concern, and weighing the competing interests of California and the alternate jurisdiction in the litigation." (*Stangvik, supra*, 54 Cal.3d at 751.)

1
2

### 2. Application

#### a. Nan's Choice of Forum and Convenience of the Parties.

Even after *Stangvik*, the First District Court of Appeal announced that a "plaintiff's choice of forum 'is entitled to *great weight even though the plaintiff is a nonresident*.' But a plaintiff's choice of forum can be disturbed if the balance is *strongly in favor of the defendant*. The defendant's residence is also a factor to be considered in the balancing process. [Though not dispositive, a] corporate defendant's state of incorporation and principal place of business is *presumptively a convenient forum*." (*Morris v. AGFA Corp.* (2006) 144 Cal.App.4th 1452, 1465 [emphasis supplied]; accord *Ford Motor Co. v. Insurance Co. of North America* (1995) 35 Cal.App.4th 604, 610-611 ["Notwithstanding defendants' argument to the contrary, it remains the case in this state that the plaintiff's choice of forum is entitled to great weight even though the plaintiff is a nonresident. Unless the balance is strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed. While the California Supreme Court in *Stangvik* did note in dicta that there appears to be some illogic in affording great deference to a nonresident plaintiff's choice of forum, it also declined to state a different rule, noting that this would be inconsistent with *Piper Aircraft Co.* and other United States Supreme Court cases. The only pertinent *holding* in *Stangvik* is that a foreign, noncitizen plaintiff's choice of forum is entitled to less deference."] [emphasis in original and citations omitted].)

Plaintiff Nan chose California as her forum. Lyft's principal place of business is in California; and Lyft claims no burden here. These factors weigh in favor of California as the appropriate forum.[2] Further, the balance is not "strongly in favor of" Lyft such that plaintiffs' choice of forum should be disturbed, nor do any other factors outweigh this deference.

#### b. Private Factors

##### i. Convenience of the Third-Party Witnesses (and Ease of Access to Evidence)

Regarding the convenience of third-party witnesses, Lyft's evidence is insufficient. First, there is no certainty on any witness' residence. (Metlitzky Decl., ¶ 5 [arguing third-party witnesses, including

---

[2] Plaintiff Nan also no longer lives in New York, lives abroad, and has "no plans to return to New York." (Nan Decl., ¶ 3.)

1  Nan's friends, the driver, and police officers, *may* be called to testify and *may* live or work in New

2  York][3]; cf. *Doe v. Uber Technologies, Inc.* (N.D. Cal., May 31, 2017) 2017 WL 2352032, at *5-6.)

3  Second, Lyft's emphasis on Nan-specific witnesses is misplaced because the liability phase of the

4  bellwether trials will concern Lyft's conduct. (See Nehmens Decl., Ex. A, 4, 6 ["An overriding issue in

5  these cases will be [1] whether the Lyft drivers are independent contractors or employees . . . [2]

6  technological feasibility for implementing additional safety features, causation, and challenges to the basis

7  for vicarious liability for intentional torts of Lyft drivers. . . . *all of these cases will turn on the same*

8  *factual evidence as to whether Lyft adequately addressed the ongoing sexual assault problem posed by*

9  *sexual predators while driving for Lyft* . . . the witnesses and documents pertinent to Lyft's hiring

10  practices, Lyft's handling of drivers who act inappropriately, and its driver monitoring and surveillance

11  will be common to every case . . . counsel states that the legal issues regarding the scope and extent of

12  Lyft's duty to its passengers and the causes of action in each complaint are the same."] [emphasis

13  supplied]; *id.* at 7 ["in the Court's view, the issues in the coordinated case *will not center* on the liability

14  of the criminal defendants in the individual cases. *To the contrary, the predominating legal and factual*

15  *issues will examine Lyft's liability for allegedly failing to institute a system to have prevented the assaults*

16  *in these cases and potential future assaults.*

17       The Court agrees with Plaintiffs that this is not a case against the drivers; it is fundamentally a

18  case against Lyft."] [emphasis supplied].) Unlike Lyft, plaintiffs provide specific facts relating to likely

19  witnesses on relevant[4] subject areas. Specifically, plaintiffs provide evidence that 373 of the 1,047

20  employees identified by Lyft with information in relevant subject areas[5] post-January 1, 2017 no longer

21

22  [3] Because plaintiff no longer resides in New York, the Court is especially unconvinced of the inference
    that plaintiffs' damages witnesses, who are "familiar with her daily life since the alleged incident . . .
23  likely also reside in New York." (*Id.*)

24  [4] Because Lyft has the burden here and fails to provide specific evidence as to the relevance of the
    purported witness's testimony, Lyft's argument that plaintiffs do not "substantiate th[eir] assertion[s]"
25  that certain witnesses' testimony will be admissible and relevant is not well taken. (Reply, 5-6.)

26  [5] These include "means driver background checks and training; LYFT's handling of sexual assault
    complaints; and, LYFT's response to the problem of sexual assaults including but not limited to driver
27  disciplinary action and safety measures which LYFT has considered in order to address the sexual assault
    problem, including audio and video surveillance and modification of the LYFT's application's features."
28  (Nehmens Supp. Decl., Ex. B.)

*Lyft Rideshare Cases* JCCP 5061 Order re: Forum Motion

1  work for Lyft and therefore are not subject to compulsory process, and 115 of them are California

2  residents; 170 of the remaining 701 employees who currently work for Lyft reside in California, with the

3  remaining 501 residing among 27 different states and internationally. (Nehmens Supp. Decl., Ex. C [Lyft

4  also stipulated there are a "significant number" of former Lyft employees relevant to the pre-January 1,

5  2017 subject areas].)

6          The non-party company Lyft hired to perform driver background checks, Checkr, Inc., has its

7  headquarters in San Francisco with nearly all of its employees involved in background checks from 2008-

8  August 2019 based in their San Francisco office. (Nehemens Supp. Decl., Ex. D, ¶¶ 3-6.) Some former

9  Checkr, Inc. employees who performed background checks also likely reside in California. (*Id.*) Further,

10 most of Lyft's 20 consultants are also not subject to the compulsory process. In sum, discovery has

11 confirmed that "there [will] be many important nonparty witnesses who reside in California and who are

12 not subject to compulsion." (Supp. Oppo., 6.)

13         Nan also testifies that her friends did not witness the incident. The police never followed up with

14 her after she filed a police report. (Nan Decl., ¶¶ 6-7.) It is also unclear if the driver's current residence is

15 in New York. (Nehmens Supp. Decl., Ex. C [last known address is five years old].) The convenience of

16 third-party witnesses weighs against transfer.

17                    **ii.  Availability of Compulsory Process (and Ease of Access to**

18                                              **Evidence)**

19         To the extent documents and deposition testimony of New York witnesses are needed, they can

20 still be obtained through out of state commissions. While New York witnesses cannot be compelled to

21 appear at a California trial, C.C.P. § 2025.620(d) allows for videotaped depositions of out-of-state

22 witnesses for use at trial or any other hearing. These facts render this factor neutral.[6]

23                                       **c.  Public Factors**

24                          **i.  Familiarity of Each Form with the Law**

25         Lyft's contract with Lyft's customers, such as the plaintiffs here, specifies that the interpretation of

26

27 ───────────────────────────────

[6] The effect of this factor is also minimized when Lyft's conduct will be at the center of this litigation, and
28 Lyft fails to show its claimed relevant witnesses reside in New York.

1    the plaintiffs' agreement with Lyft should be governed by California law.[7] (Nehmens Decl., Ex. F.)

2    However, there is no indication such interpretation will be ripe in this action. Even so, both New York

3    and California courts can apply California law effectively. (*Doe, supra*, 2017 WL 2352032, at *7.) This

4    factor is neutral.

### ii.  Local Interest in the Controversy

6    As with *Doe*, "[w]hile the California has some interest in seeing this case decided here, as [Lyft] is

7    headquartered in San Francisco, [New York]'s interest is more substantial because the activities alleged to

8    give rise to [Nan's] suit occurred there." (*Doe, supra*, 2017 WL 2352032, at *7-8.) This factor weighs in

9    favor of transfer.

### iii.  Relative Court Congestion

11    "To the extent that evidence of the injuries allegedly suffered by the nonresident plaintiffs may be

12    relevant and admissible to prove that [the defendant's conduct] similarly injured the California plaintiffs,

13    trying their cases together with those of nonresident plaintiffs could promote efficient adjudication of

14    California residents' claims." (*Bristol- Myers Squibb Co. v. Superior Court* (2016) 1 Cal.5th 783, 810,

15    rev'd on other grounds at 137 S.Ct. 1773.) "To be sure, a single court hearing the claims of hundreds of

16    plaintiffs is a significant burden on that court. But the overall savings of time and effort to the judicial

17    system, both in California and interstate, far outweigh the burden placed on the individual forum court."

18    (*Id.* at 811.) This Court will likely be more burdened by including the non-California cases in this JCCP.

19    The JCCP process alleviates the burden of non-California plaintiffs. On balance, the Court finds this

20    factor neutral.

21    Having considered all factors and the totality of the circumstances, the Court finds the private and

22    public interest factors weigh against transfer for plaintiff Nan.

23    ///

24    ///

25    ///

26    ///

27

28    _____
[7] These consultant contracts also state that California law governs.

1

## **CONCLUSION**

2    The Court **DENIES** Lyft's Motion to Dismiss or Stay Based on *Forum Non Conveniens* as to all

3    plaintiffs.

4

5    IT IS SO ORDERED.

6

7    Dated:  May 20, 2021

8    _____
     ANDREW Y.S. CHENG
     Judge of the Superior Court

**CERTIFICATE OF ELECTRONIC SERVICE**
(CCP 1010.6(6) & CRC 2.260(g))

I, DANIAL LEMIRE, a Deputy Clerk of the Superior Court of the County of San Francisco, certify that I am not a party to the within action.

On     MAY 2 0 2021     , I electronically served THE ATTACHED DOCUMENT via File & ServeXpress on the recipients designated on the Transaction Receipt located on the File & ServeXpress website.

Dated:    MAY 2 0 2021

T. Michael Yuen, Clerk

By: _____
DANIAL LEMIRE, Deputy Clerk

Exhibit D

Comparison of JCCP and Federal Complaints

| Nachawati Law Firm | |
| --- | --- |
| **JCCP Allegations** <br> *Jane Doe NLG 72 (A.G.) v. Lyft, Inc.*, CGC-25-621150 (Super. Ct., S.F. Cnty., filed Jan. 3, 2025) | **Federal Allegations** <br> *Jane Doe NLG (B.J.) v. Lyft, Inc.*, 3:25-cv-07369-SK (N.D. Cal., filed Sept. 2, 2025) |
| LYFT is a transportation company headquartered in San Francisco, California and is one of the fastest growing companies in the United States. As early as 2015, LYFT became aware that LYFT drivers were sexually assaulting and raping female passengers. Since 2015, sexual predators driving for LYFT have continued to assault and rape LYFT's female passengers. For at least five years, LYFT has known of the ongoing sexual assaults and rapes by LYFT drivers upon LYFT passengers. Complaints to LYFT by female passengers who have been attacked by LYFT drivers, combined with subsequent criminal investigations by law enforcement, clearly establish that LYFT has been fully aware of these continuing attacks by sexual predators driving for LYFT. <br><br> LYFT's response to this sexual predator crisis among drivers has been appallingly inadequate. LYFT continues to hire drivers without performing adequate background checks. LYFT continues to allow culpable drivers to keep driving for LYFT. And, most importantly, LYFT has failed to adopt and implement reasonable driver monitoring procedures designed to protect the safety of its passengers. Therefore, LYFT passengers continue to be victims of sexual assaults and rapes by LYFT drivers. <br><br> Compl., ¶¶ 1–2 (paragraph numbers omitted). | Lyft is a transportation company headquartered in San Francisco, California and is one of the fastest growing companies in the United States. As early as 2015, Lyft became aware that Lyft drivers were sexually assaulting and raping female passengers. Since 2015, sexual predators driving for Lyft have continued to assault and rape Lyft's female passengers. For more than eight years, Lyft has known of the ongoing sexual assaults and rapes by Lyft drivers upon Lyft passengers. Complaints to Lyft by female passengers who have been attacked by Lyft drivers, combined with subsequent criminal investigations by law enforcement, clearly establish that Lyft has been fully aware of these continuing attacks by sexual predators driving for Lyft. <br><br> Lyft's response to this sexual predator crisis amongst Lyft drivers has been appallingly inadequate. Lyft continues to hire drivers without performing adequate background checks. Lyft continues to allow culpable drivers to keep driving for Lyft. And, perhaps most importantly, Lyft has failed to adopt and implement reasonable driver monitoring procedures designed to ensure the safety of its passengers. Consequently, Lyft passengers continue to be victims of sexual assaults and rapes by Lyft drivers. <br><br> Compl., ¶¶ 2–3 (paragraph numbers omitted). |
| **INADEQUATE SAFETY PRECAUTIONS AND INADEQUATE SCREENING** <br><br> Even today, the hiring of LYFT drivers occurs without any real screening. Potential drivers merely fill out a form online. There is no interview either in person or through | *Lyft's Inadequate Safety Precautions and Inadequate Screening*… <br><br> For example, even today, the hiring of Lyft drivers occurs without any real screening. Potential drivers merely fill out a form online. There is no interview, either in person or |

Comparison of JCCP and Federal Complaints

| Nachawati Law Firm | |
|---|---|
| **JCCP Allegations** *Jane Doe NLG 72 (A.G.) v. Lyft, Inc.*, CGC-25-621150 (Super. Ct., S.F. Cnty., filed Jan. 3, 2025) | **Federal Allegations** *Jane Doe NLG (B.J.) v. Lyft, Inc.*, 3:25-cv-07369-SK (N.D. Cal., filed Sept. 2, 2025) |
| online platforms such as Skype or Zoom. There is no adequate background check and no biometric fingerprinting. Almost all online applicants are approved to become drivers. | through online platforms such as Skype or Zoom. There is no adequate background check and no biometric fingerprinting. Almost all online applicants become drivers. |
| Once a LYFT applicant becomes a driver, LYFT fails to utilize its own technology, including in-car cameras and GPS tracking, to ensure that drivers keep the camera running during the entire ride and that the driver remains on course to the passenger's destination. LYFT does not have a zero-tolerance policy for sexual misconduct and has allowed drivers who have been reported for misconduct to continue driving. | Once a Lyft applicant becomes a driver, Lyft fails to utilize its own technology, including in-car cameras and GPS tracking, to ensure that drivers keep the camera running during the entire ride and that the driver remains on course to the passenger's destination. Lyft does not have a zero-tolerance policy for sexual misconduct and has allowed drivers who have been reported for misconduct to continue driving. |
| LYFT does not require non-harassment training, nor does it adequately investigate passenger complaints of sexually inappropriate behavior or serious sexual assaults. Shockingly, a chatroom of rideshare drivers exists where they openly discuss and brag about the access that they have to "hot" young women. Notwithstanding LYFT's history of hiring sexual predators who have assaulted LYFT passengers, and notwithstanding the obvious and open subculture of LYFT drivers who harbor a sexual motivation for driving young female passengers, LYFT does nothing to warn its female passengers about this very serious and real danger. | Lyft does not require non-harassment training, nor does it adequately investigate passenger complaints of sexually inappropriate behavior or serious sexual assaults. Shockingly, a chatroom of rideshare drivers exists where they openly discuss and brag about the access that they have to "hot" young women. Notwithstanding Lyft's history of hiring sexual predators who have assaulted Lyft passengers, and notwithstanding the obvious and open subculture of Lyft drivers who harbor a sexual motivation for driving young female passengers, Lyft does nothing to warn its female passengers about this very serious and real danger. |
| Compl., ¶ 7 (paragraph numbers omitted and spacing added for ease of comparison). | Compl., ¶¶ 27–29 (paragraph numbers omitted). |
| **LYFT'S FINANCIAL MODEL** | *Lyft's Financial Model* |
| The key to LYFT's business model is getting as many new LYFT drivers on the road as possible. The more drivers, the more | The key to Lyft's business model is getting as many new Lyft drivers on the road as possible. The more drivers, the more rides, |

Comparison of JCCP and Federal Complaints

| Nachawati Law Firm | |
|---|---|
| **JCCP Allegations** | **Federal Allegations** |
| *Jane Doe NLG 72 (A.G.) v. Lyft, Inc.*, CGC-25-621150 (Super. Ct., S.F. Cnty., filed Jan. 3, 2025) | *Jane Doe NLG (B.J.) v. Lyft, Inc.*, 3:25-cv-07369-SK (N.D. Cal., filed Sept. 2, 2025) |
| rides, the more money LYFT makes. Unfortunately, more careful screening and supervision would result in fewer drivers and lower profits.<br><br>    LYFT also has a high turnover among its drivers because they are not well paid and often on to other jobs. As a result, and in order to keep the number of drivers on the road at a maximum level, LYFT's business model is designed to accept as many new drivers as possible and to keep as many existing drivers working for LYFT as possible. Unfortunately, LYFT prioritizes profits over passenger safety. That is why LYFT corporate management has made deliberate decisions to adopt inadequate initial screening procedures, inadequate safety monitoring, and has failed to warn passengers of the dangers of riding with LYFT.<br><br>Compl., ¶¶ 8–9 (paragraph numbers omitted). | the more money Lyft makes. Unfortunately, because more careful screening and supervision would result in fewer drivers and lower profits, Lyft has chosen not to implement those necessary procedures.<br><br>    Lyft also has a high turnover among its drivers because they are not well paid and often move on to other jobs. As a result, and to maximize the number of drivers on the road, Lyft's business model is designed to accept as many new drivers as possible and to keep as many existing drivers working for Lyft as possible. Unfortunately, Lyft prioritizes profits over passenger safety. That is why Lyft corporate management has made deliberate decisions to adopt inadequate initial screening procedures, inadequate safety monitoring, and has failed to warn passengers of the dangers of riding with Lyft.<br><br>Compl., ¶¶ 30–31 (paragraph numbers omitted). |
| **LYFT'S CONTROL OVER ITS DRIVERS**<br><br>    LYFT exercises significant control over its drivers. LYFT executives set all of the fare rates. Drivers have no input on the fares charged and no ability to negotiate fares with customers. Fees are standardized based on mileage and/or ride time, similar to taxis.<br><br>    LYFT collects a percentage fee for every ride. LYFT does not charge drivers a fee to become a LYFT driver and LYFT does not charge drivers to use the LYFT App.<br><br>    LYFT drivers are prohibited from answering passenger inquiries about booking rides outside of the LYFT App. | *Lyft's Control Over Its Drivers*<br><br>    Lyft exercises significant control over its drivers. Lyft executives set the fare rates. Drivers have no input on the fares charged and no ability to negotiate fares with customers. Fees are standardized based on mileage and/or ride time, similar to taxis.<br><br>    Lyft collects a percentage fee for every ride. Lyft does not charge drivers a fee to become a Lyft driver, and Lyft does not charge drivers to use the Lyft App.<br><br>    Lyft drivers are prohibited from answering passenger inquiries about booking rides outside of the Lyft App. |

Comparison of JCCP and Federal Complaints

| Nachawati Law Firm | |
|---|---|
| **JCCP Allegations**<br>*Jane Doe NLG 72 (A.G.) v. Lyft, Inc.*, CGC-25-621150 (Super. Ct., S.F. Cnty., filed Jan. 3, 2025) | **Federal Allegations**<br>*Jane Doe NLG (B.J.) v. Lyft, Inc.*, 3:25-cv-07369-SK (N.D. Cal., filed Sept. 2, 2025) |
|    LYFT has the power to terminate drivers with or without cause.<br><br>   LYFT drivers are expected to accept all ride requests while they are logged into the App. Drivers who reject or cancel too many ride requests risk facing discipline including suspension or termination.<br><br>   LYFT provides its drivers with and requires them to use and display LYFT branding materials in order to make their drivers easily identifiable as LYFT drivers.<br><br>Compl., ¶¶ 10–15 (paragraph numbers omitted). |    Lyft has the power to terminate drivers with or without cause.<br><br>   Lyft drivers are expected to accept all ride requests while they are logged into the App. Lyft drivers who reject or cancel too many ride requests risk facing discipline, including suspension or termination.<br><br>   Lyft provides its drivers with and requires them to use and display Lyft branding materials to make their drivers easily identifiable as Lyft drivers.<br><br>Compl., ¶¶ 32–37 (paragraph numbers omitted). |
| **<u>NO MONITORING OF RIDES</u>**<br><br>   Given LYFT's knowledge of the sexual assaults and rapes of its passengers by LYFT drivers, the company should have implemented a monitoring system in order to protect its passengers. As a technology company with access to a state-of-the-art in-app tracking system, as well as a camera within the required mobile device, LYFT could take the following steps towards the elimination of the sexual assaults by LYFT drivers:<br><br>• Adopt a zero-tolerance policy for improper conduct and inform all drivers of the policy;<br><br>• Maintain a surveillance camera and require its continuing operation during <u>all</u> rides and have footage saved and accessible for download for up to 72 hours after each ride; | ***Lyft's Failure to Monitor Rides***<br><br>   Given Lyft's knowledge of the sexual assaults and rapes of its passengers by Lyft drivers, the company should have implemented a monitoring system to protect its passengers. As a technology company with access to a state-of-the-art in-app tracking system, as well as a camera within the required mobile device, Lyft could take the following steps towards the elimination of<br>the sexual assaults by Lyft drivers:<br><br>• Adopt a zero-tolerance policy for improper conduct and inform all drivers of the policy;<br><br>• Maintain a surveillance camera and require its continuing operation during all rides;<br><br>• Maintain a surveillance camera and require its continuing operation during all rides; |

Comparison of JCCP and Federal Complaints

| **Nachawati Law Firm** | |
|---|---|
| **JCCP Allegations**<br>*Jane Doe NLG 72 (A.G.) v. Lyft, Inc.*, CGC-25-621150 (Super. Ct., S.F. Cnty., filed Jan. 3, 2025) | **Federal Allegations**<br>*Jane Doe NLG (B.J.) v. Lyft, Inc.*, 3:25-cv-07369-SK (N.D. Cal., filed Sept. 2, 2025) |
| • Inform drivers that if they turn off the surveillance system during a LYFT ride, they will never drive for LYFT again; | • Inform drivers that if they turn off the surveillance system during a Lyft ride, they will never drive for Lyft again; |
| • Inform their drivers that they may not leave the car and accompany a passenger to their home or to any other location outside the vehicle, other than to provide temporary and time-limited assistance to a passenger; | • Inform drivers that they may not leave the car and accompany a passenger to their home or to any other location outside the vehicle, other than to provide temporary and time-limited assistance to a passenger; |
| • Modify the functionality of the app so that LYFT can determine immediately if a driver deviates from these protocols. | • Modify the functionality of the Lyft app so that Lyft can determine immediately if a driver deviates from these protocols; |
| • Monitor rides and implement a system whereby passengers are required to confirm their intention to terminate a ride before reaching their destination. | • Monitor rides and implement a system whereby passengers are required to confirm their intention to terminate a ride before reaching their destination; and |
| • Monitor rides and implement a system whereby passengers are required to confirm their intention to change their destination or their intention to deviate significantly from the assigned route. | • Monitor rides and implement a system whereby passengers are required to confirm their intention to change their destination or their intention to deviate significantly from the assigned route. |
|     The ongoing sexual attacks by LYFT drivers are and have long been known to LYFT. Prior to the assaults on Plaintiffs, LYFT knew that a consequence of its business model has been exposing women, who are using the business for a safe ride home, to drivers that may take advantage of their vulnerable position. Despite being a company that holds itself out to the public as being engaged in the safe transportation of its passengers from place to place for compensation, LYFT has failed to take any reasonable precautions to attempt to prevent harm to its passengers. |     The ongoing sexual attacks by Lyft drivers are and have long been known to Lyft. Prior to Plaintiff's assault, Lyft knew that a consequence of its business model has been exposing women, who rely on Lyft for a safe ride home, to drivers that may take advantage of their vulnerable position. Despite holding itself out to the public as being engaged in the safe transportation of its passengers from place to place for compensation, Lyft has failed to take reasonable precautions to attempt to prevent harm to its passengers. |
| Compl., ¶¶ 18–19 (paragraph numbers omitted). | Compl., ¶¶ 40–41 (paragraph numbers omitted). |

Comparison of JCCP and Federal Complaints

| Peiffer Wolf Carr Kane Conway & Wise LLP | |
|---|---|
| **JCCP Allegations** *Jane Doe PWKG 023 v. Lyft, Inc.*, CGC-25-624794 (Super. Ct., S.F. Cnty., filed Apr. 28, 2025) | **Federal Allegations** *Tabatha Means v. Lyft, Inc.*, 3:24-cv-00177-MMC (N.D. Cal., filed Jan. 10, 2024) |
| LYFT is a transportation company headquartered in San Francisco, California and is one of the fastest growing companies in the United States. As early as 2015, LYFT became aware that LYFT drivers were sexually assaulting and raping female passengers. Since 2015, sexual predators driving for LYFT have continued to assault and rape LYFT's female passengers. For five years, LYFT has known of the ongoing sexual assaults and rapes by LYFT drivers upon LYFT passengers. Complaints to LYFT by female passengers who have been attacked by LYFT drivers, combined with subsequent criminal investigations by law enforcement, clearly establish that LYFT has been fully aware of these continuing attacks by sexual predators driving for LYFT.

LYFT's response to this sexual predator crisis amongst LYFT drivers has been appallingly inadequate. LYFT continues to hire drivers without performing adequate background checks. LYFT continues to allow culpable drivers to keep driving for LYFT. And, perhaps most importantly, LYFT has failed to adopt and implement reasonable driver monitoring procedures designed to protect the safety of its passengers. As a consequence, LYFT passengers continue to be victims of sexual assaults and rapes by LYFT drivers.

Compl., ¶¶ 1–2 (paragraph numbers omitted). | Lyft is a transportation company headquartered in San Francisco, California and is one of the fastest growing companies in the United States. As early as 2015, Lyft became aware that Lyft drivers were sexually assaulting and raping female passengers. Since 2015, sexual predators driving for Lyft have continued to assault and rape Lyft's female passengers. For more than eight years, Lyft has known of the ongoing sexual assaults and rapes by Lyft drivers upon Lyft passengers. Complaints to Lyft by female passengers who have been attacked by Lyft drivers, combined with subsequent criminal investigations by law enforcement, clearly establish that Lyft has been fully aware of these continuing attacks by sexual predators driving for Lyft.

Lyft's response to this sexual predator crisis amongst Lyft drivers has been appallingly inadequate. Lyft continues to hire drivers without performing adequate background checks. Lyft continues to allow culpable drivers to keep driving for Lyft. And, perhaps most importantly, Lyft has failed to adopt and implement reasonable driver monitoring procedures designed to ensure the safety of its passengers. Consequently, Lyft passengers continue to be victims of sexual assaults and rapes by Lyft drivers.

Compl., ¶¶ 2–3 (paragraph numbers omitted). |
| **LYFT'S FINANCIAL MODEL** | ***Lyft's Financial Model*** |

Comparison of JCCP and Federal Complaints

| Peiffer Wolf Carr Kane Conway & Wise LLP | |
|---|---|
| **JCCP Allegations** *Jane Doe PWKG 023 v. Lyft, Inc.*, CGC-25-624794 (Super. Ct., S.F. Cnty., filed Apr. 28, 2025) | **Federal Allegations** *Tabatha Means v. Lyft, Inc.*, 3:24-cv-00177-MMC (N.D. Cal., filed Jan. 10, 2024) |
| The key to LYFT's business model is getting as many new LYFT drivers on the road as possible. The more drivers, the more rides, the more money LYFT makes. Unfortunately, more careful screening and supervision would result in fewer drivers and lower profits. LYFT also has a high turnover among its drivers because they are not well paid and often move on to other jobs. As a result, and in order to keep the number of drivers on the road at a maximum level, LYFT's business model is designed to accept as many new drivers as possible and to keep as many existing drivers working for LYFT as possible. Unfortunately, LYFT prioritizes profits over passenger safety. That is why LYFT corporate management has made deliberate decisions to adopt inadequate initial screening procedures, inadequate safety monitoring, and has failed to warn passengers of the dangers of riding with LYFT. Compl., ¶¶ 17–18 (paragraph numbers omitted). | The key to Lyft's business model is getting as many new Lyft drivers on the road as possible. The more drivers, the more rides, the more money Lyft makes. Unfortunately, because more careful screening and supervision would result in fewer drivers and lower profits, Lyft has chosen not to implement those necessary procedures. Lyft also has a high turnover among its drivers because they are not well paid and often move on to other jobs. As a result, and to maximize the number of drivers on the road, Lyft's business model is designed to accept as many new drivers as possible and to keep as many existing drivers working for Lyft as possible. Unfortunately, Lyft prioritizes profits over passenger safety. That is why Lyft corporate management has made deliberate decisions to adopt inadequate initial screening procedures, inadequate safety monitoring, and has failed to warn passengers of the dangers of riding with Lyft Compl., ¶¶ 29–30 (paragraph numbers omitted). |
| **LYFT'S CONTROL OVER ITS DRIVERS** LYFT exercises significant control over its drivers. LYFT executives set all of the fare rates. Drivers have no input on the fares charged and no ability to negotiate fares with customers. Fees are standardized based on mileage and/or ride time, similar to taxis. LYFT collects a percentage fee for every ride. LYFT does not charge drivers a fee to become a LYFT driver and LYFT does not charge drivers to use the LYFT App. | *Lyft's Control Over Its Drivers* Lyft exercises significant control over its drivers. Lyft executives set the fare rates. Drivers have no input on the fares charged and no ability to negotiate fares with customers. Feesare standardized based on mileage and/or ride time, similar to taxis Lyft collects a percentage fee for every ride. Lyft does not charge drivers a fee to become a Lyft driver and Lyft does not charge drivers to use the Lyft App. |

Comparison of JCCP and Federal Complaints

| Peiffer Wolf Carr Kane Conway & Wise LLP | |
|---|---|
| **JCCP Allegations**<br>*Jane Doe PWKG 023 v. Lyft, Inc.*, CGC-25-624794 (Super. Ct., S.F. Cnty., filed Apr. 28, 2025) | **Federal Allegations**<br>*Tabatha Means v. Lyft, Inc.*, 3:24-cv-00177-MMC (N.D. Cal., filed Jan. 10, 2024) |
| LYFT drivers are prohibited from answering passenger inquiries about booking rides outside of the LYFT App.<br><br>LYFT has the power to terminate drivers with or without cause.<br><br>LYFT drivers are expected to accept all ride requests while they are logged into the App. Drivers who reject or cancel too many ride requests risk facing discipline, including suspension or termination.<br><br>LYFT provides its drivers with and requires them to use and display LYFT branding materials in order to make their drivers easily identifiable as LYFT drivers.<br><br>Compl., ¶¶ 17–18 (paragraph numbers omitted). | Lyft drivers are prohibited from answering passenger inquiries about booking rides outside of the Lyft App.<br><br>Lyft has the power to terminate drivers with or without cause.<br><br>Lyft drivers are expected to accept all ride requests while they are logged into the App. Lyft drivers who reject or cancel too many ride requests risk facing discipline, including suspension or termination.<br><br>Lyft provides its drivers with and requires them to use and display Lyft branding materials to make their drivers easily identifiable as Lyft drivers.<br><br>Compl., ¶¶ 31–36 (paragraph numbers omitted). |
| **LYFT'S MISREPRESENTATIONS AS TO SAFETY**<br><br>In addition to inadequate background check procedures, LYFT affirmatively induces passengers, particularly young, unaccompanied, intoxicated, and/or vulnerable women, to use its services with the expectation of safety, while LYFT simultaneously knows that sexual abuse of its passengers has been prevalent.<br><br>In February 2015, LYFT's website posted a blog post announcing it had partnered with It's On Us, an anti-sexual assault initiative, and offered free ride credits for new Lyft passengers during the Spring Break season, "making it easier to get a safe ride home even if you're in a new city." In November 2016, LYFT's website posted a blog post entitled | *Lyft's Misrepresentations as to Safety*<br><br>In addition to inadequate background check procedures, Lyft affirmatively induces passengers, particularly young, unaccompanied, intoxicated, and/or vulnerable women, to use its services with the expectation of safety, while Lyft simultaneously knows that sexual abuse of its passengers has been prevalent.<br><br>In February 2015, Lyft's website posted a blog post announcing it had partnered with It's On Us, an anti-sexual assault initiative, and offered free ride credits for new Lyft passengers during the Spring Break season, "making it easier to get a safe ride home even if you're in a new city." In November 2016, Lyft's website posted a blog |

| Peiffer Wolf Carr Kane Conway & Wise LLP | |
|---|---|
| **JCCP Allegations**<br>*Jane Doe PWKG 023 v. Lyft, Inc.*, CGC-25-624794 (Super. Ct., S.F. Cnty., filed Apr. 28, 2025) | **Federal Allegations**<br>*Tabatha Means v. Lyft, Inc.*, 3:24-cv-00177-MMC (N.D. Cal., filed Jan. 10, 2024) |
| "Get Home Safely with Lyft," again touting its partnership with It's On Us, and offering college students free LYFT rides so that they "don't need to worry about finding a safe ride after going out." The insinuation of these articles is that LYFT prevents, and does not create, the risk of sexual assault. Nowhere on LYFT's website does LYFT discuss the occurrence or risk of sexual assault by LYFT's drivers. As a result, many women, like Plaintiff, enter LYFT cars unaccompanied with the expectation that they will not be harassed, propositioned, kidnapped, attacked, stalked, raped, or worse, by LYFT's drivers.<br><br>Compl., ¶¶ 30–31 (paragraph numbers omitted). | post entitled "Get Home Safely with Lyft," again touting its partnership with It's On Us, and offering college students free Lyft rides so that they "don't need to worry about finding a safe ride after going out." The insinuation of these articles is that Lyft prevents, and does not create, the risk of sexual assault. Nowhere on Lyft's website does Lyft discuss the occurrence or risk of sexual assault by Lyft's drivers. As a result, many women, like Plaintiff, enter Lyft cars unaccompanied with the expectation that they will not be harassed, propositioned, kidnapped, attacked, stalked, raped, or worse, by their Lyft drivers.<br><br>Compl., ¶¶ 42–43 (paragraph numbers omitted). |
| **LYFT'S BACKGROUND CHECKS**<br><br>    LYFT relies on a quick, name-based background check process to screen its applicant drivers and has continuously refused to adopt an industry-standard, fingerprint-based background check qualification process.<br><br>    LYFT's background check process requires drivers to submit personal identifiers (driver's license and social security number) through an online webpage. LYFT, in turn, provides this information to third party vendors to perform a basic, name-based background check.<br><br>    Neither LYFT nor the third-party vendors it uses for background checks verifies that the information provided by applicants is accurate or complete. The turnaround time for a LYFT | ***Lyft's Inadequate Background Checks***<br><br>    Lyft relies on a quick, name-based background check process to screen its applicant drivers and has continuously refused to adopt an industry-standard, fingerprint-based background check qualification process.<br><br>    Lyft's background check process requires drivers to submit personal identifiers (driver's license and social security number) through an online webpage. Lyft, in turn, provides this information to third party vendors to perform a basic, name-based background check.<br><br>    Neither Lyft nor the third-party vendors it uses for background checks verify that the information provided by applicants is accurate or complete. The turnaround time for |

Comparison of JCCP and Federal Complaints

| Peiffer Wolf Carr Kane Conway & Wise LLP | |
|---|---|
| **JCCP Allegations** | **Federal Allegations** |
| *Jane Doe PWKG 023 v. Lyft, Inc.*, CGC-25-624794 (Super. Ct., S.F. Cnty., filed Apr. 28, 2025) | *Tabatha Means v. Lyft, Inc.*, 3:24-cv-00177-MMC (N.D. Cal., filed Jan. 10, 2024) |
| background check is typically between 3-5 days. Compl., ¶¶ 34–36 (paragraph numbers omitted). | a Lyft background check is typically between 3-5 days. Compl., ¶¶ 46–48 (paragraph numbers omitted). |

| Chaffin Luhana LLP | |
|---|---|
| **JCCP Allegations** | **Federal Allegations** |
| *Jane Doe PWKG 023 v. Lyft, Inc.*, CGC-25-623857 (Super. Ct., S.F. Cnty., filed Apr. 1, 2025) | *A.D. v. Lyft, Inc.*, 1:25-cv-12423-IT (D. Mass., filed Sept. 2, 2025) |
|    LYFT is a transportation company headquartered in San Francisco, California and is one of the fastest growing companies in the United States. As early as 2015, LYFT became aware that LYFT drivers were sexually assaulting and raping female passengers. Since 2015, sexual predators driving for LYFT have continued to assault and rape LYFT's female passengers. For five years, LYFT has known of the ongoing sexual assaults and rapes by LYFT drivers upon LYFT passengers. Complaints to LYFT by female passengers who have been attacked by LYFT drivers, combined with subsequent criminal investigations by law enforcement, clearly establish that LYFT has been fully aware of these continuing attacks by sexual predators driving for LYFT. <br><br>   LYFT's response to this sexual predator crisis amongst LYFT drivers has been appallingly inadequate. LYFT continues to hire drivers without performing adequate background checks. LYFT continues to allow culpable drivers to keep driving for LYFT. And, perhaps most importantly, LYFT has failed to adopt and implement reasonable driver monitoring procedures designed to protect the safety of its passengers. As a |    LYFT is a transportation company headquartered in San Francisco, California and is one of the fastest growing companies in the United States. As early as 2015, LYFT became aware that LYFT drivers were sexually assaulting and raping female passengers. Since 2015, sexual predators driving for LYFT have continued to assault and rape LYFT's female passengers. For five years, LYFT has known of the ongoing sexual assaults and rapes by LYFT drivers upon LYFT passengers. Complaints to LYFT by female passengers who have been attacked by LYFT drivers, combined with subsequent criminal investigations by law enforcement, clearly establish that LYFT has been fully aware of these continuing attacks by sexual predators driving for LYFT. <br><br>   LYFT's response to this sexual predator crisis amongst LYFT drivers has been appallingly inadequate. LYFT continues to hire drivers without performing adequate background checks. LYFT continues to allow culpable drivers to keep driving for LYFT. And, perhaps most importantly, LYFT has failed to adopt and implement reasonable driver monitoring procedures designed to |

Comparison of JCCP and Federal Complaints

| Chaffin Luhana LLP | |
|---|---|
| **JCCP Allegations**<br>*Jane Doe PWKG 023 v. Lyft, Inc.*, CGC-25-623857 (Super. Ct., S.F. Cnty., filed Apr. 1, 2025) | **Federal Allegations**<br>*A.D. v. Lyft, Inc.*, 1:25-cv-12423-IT (D. Mass., filed Sept. 2, 2025) |
| consequence, LYFT passengers continue to be victims of sexual assaults and rapes by LYFT drivers.… | protect the safety of its passengers. As a consequence, LYFT passengers continue to be victims of sexual assaults and rapes by LYFT drivers. |
|    Passengers pay LYFT a fee in exchange for safe passage to their destination. LYFT's public representations state that "safety is our top priority" and "it is our goal to make every ride safe, comfortable and reliable." Sadly, LYFT's priority is not passenger safety. Profits are LYFT's priority. As a result, Plaintiffs and other female and male passengers continue to be attacked by sexual predators driving for LYFT. |    Passengers pay LYFT a fee in exchange for safe passage to their destination. LYFT's public representations state that "safety is our top priority" and "it is our goal to make every ride safe, comfortable and reliable." Sadly, LYFT's priority is not passenger safety. Profits are LYFT's priority. As a result, Plaintiff and other female passengers continue to be attacked by sexual predators driving for LYFT. |
|    When faced with this sexual predator crisis, there are a number of potential safety procedures that a reasonable transportation company would implement in order to address this dangerous situation. Yet LYFT corporate management has failed to implement the most obvious and straightforward safety procedures in order to address the growing problem of sexual assault by those LYFT drivers who are sexual predators. |    When faced with this sexual predator crisis, there are a number of potential safety procedures that a reasonable transportation company would implement in order to address this dangerous situation. Yet LYFT corporate management has failed to implement the most obvious and straightforward safety procedures in order to address the growing problem of sexual assault by those LYFT drivers who are sexual predators. |
| Compl., ¶¶ 1–2, 4–5 (paragraph numbers omitted). | Compl., ¶¶ 2–5 (paragraph numbers and footnote omitted). |
| **<u>INADEQUATE SETY PRECAUTIONS AND INADEQUATE SCREENING</u>** | ***INADEQUATE SAFETY PRECAUTIONS AND INADEQUATE SCREENING…*** |
|    Even today, the hiring of LYFT drivers occurs without any real screening. Potential drivers merely fill out a form online. There is no interview either in person or through online platforms such as Skype or Zoom. There is no adequate background check and |    Even today, the hiring of LYFT drivers occurs without any real screening. Potential drivers merely fill out a form online. There is no interview either in person or through online platforms such as Skype or Zoom. There is no adequate background check and |

Comparison of JCCP and Federal Complaints

| Chaffin Luhana LLP | |
|---|---|
| **JCCP Allegations** | **Federal Allegations** |
| *Jane Doe PWKG 023 v. Lyft, Inc.*, CGC-25-623857 (Super. Ct., S.F. Cnty., filed Apr. 1, 2025) | *A.D. v. Lyft, Inc.*, 1:25-cv-12423-IT (D. Mass., filed Sept. 2, 2025) |
| no biometric fingerprinting. Almost all online applicants become drivers.

    Once a LYFT applicant becomes a driver, LYFT fails to utilize its own technology, including in-car cameras and GPS tracking, to ensure that drivers keep the camera running during the entire ride and that the driver remains on course to the passenger's destination. LYFT does not have a zero-tolerance policy for sexual misconduct and has allowed drivers who have been reported for misconduct to continue driving.

    LYFT does not require non-harassment training, nor does it adequately investigate passenger complaints of sexually inappropriate behavior or serious sexual assaults. Shockingly, a chatroom of rideshare drivers exists where they openly discuss and brag about the access that they have to "hot" young women. Notwithstanding LYFT's history of hiring sexual predators who have assaulted LYFT passengers, and notwithstanding the obvious and open subculture of LYFT drivers who harbor a sexual motivation for driving young female passengers, LYFT does nothing to warn its female passengers about this very serious and real danger.

Compl., ¶ 50 (paragraph number omitted, spaces added for ease of comparison). | no biometric fingerprinting. Almost all online applicants become drivers.

    Once a LYFT applicant becomes a driver, LYFT fails to utilize its own technology, including in-car cameras and GPS tracking, to ensure that drivers keep the camera running during the entire ride and that the driver remains on course to the passenger's destination. LYFT does not have a zero-tolerance policy for sexual misconduct and has allowed drivers who have been reported for misconduct to continue driving.

    LYFT does not require non-harassment training, nor does it adequately investigate passenger complaints of sexually inappropriate behavior or serious sexual assaults. Shockingly, a chatroom of rideshare drivers exists where they openly discuss and brag about the access that they have to "hot" young women. Notwithstanding LYFT's history of hiring sexual predators who have assaulted LYFT passengers, and notwithstanding the obvious and open subculture of LYFT drivers who harbor a sexual motivation for driving young female passengers, LYFT does nothing to warn its female passengers about this very serious and real danger.

Compl., ¶¶ 24–26 (paragraph numbers omitted). |
| **<u>LYFT'S FINANCIAL MODEL</u>**

    The key to LYFT's business model is getting as many new LYFT drivers on the road as possible. The more drivers, the more rides, the more money LYFT makes. Unfortunately, more careful screening and | ***LYFT'S FINANCIAL MODEL***

    The key to LYFT's business model is getting as many new LYFT drivers on the road as possible. The more drivers, the more rides, the more money LYFT makes. Unfortunately, more careful screening and |

Comparison of JCCP and Federal Complaints

| Chaffin Luhana LLP | |
|---|---|
| **JCCP Allegations** *Jane Doe PWKG 023 v. Lyft, Inc.*, CGC-25-623857 (Super. Ct., S.F. Cnty., filed Apr. 1, 2025) | **Federal Allegations** *A.D. v. Lyft, Inc.*, 1:25-cv-12423-IT (D. Mass., filed Sept. 2, 2025) |
| supervision would result in fewer drivers and lower profits.    LYFT also has a high turnover among its drivers because they are not well paid and often move on to other jobs. As a result, and in order to keep the number of drivers on the road at a maximum level, LYFT's business model is designed to accept as many new drivers as possible and to keep as many existing drivers working for LYFT as possible. Unfortunately, LYFT prioritizes  profits over passenger safety. That is why LYFT corporate management has made deliberate decisions to adopt inadequate initial screening procedures, inadequate safety monitoring, and has failed to warn passengers of the dangers of riding with LYFT.  Compl., ¶¶ 51–52 (paragraph numbers omitted). | supervision would result in fewer drivers and lower profits.    LYFT also has a high turnover among its drivers because they are not well paid and often move on to other jobs. As a result, and in order to keep the number of drivers on the road at a maximum level, LYFT's business model is designed to accept as many new drivers as possible and to keep as many existing drivers working for LYFT as possible. Unfortunately, LYFT prioritizes profits over passenger safety. That is why LYFT corporate management has made deliberate decisions to adopt inadequate initial screening procedures, inadequate safety monitoring, and has failed to warn passengers of the dangers of riding with LYFT.  Compl., ¶¶ 27–28 (paragraph numbers omitted). |
| **<u>LYFT'S CONTROL OVER ITS DRIVERS</u>**    LYFT exercises significant control over its drivers. LYFT executives set all of the fare rates. Drivers have no input on the fares charged and no ability to negotiate fares with customers. Fees are standardized based on mileage and/or ride time, similar to taxis.    LYFT collects a percentage fee for every ride. LYFT does not charge drivers a fee to become a LYFT driver and LYFT does not charge drivers to use the LYFT App.    LYFT drivers are prohibited from answering passenger inquiries about booking rides outside of the LYFT App. | ***LYFT'S CONTROL OVER ITS DRIVERS***    LYFT exercises significant control over its drivers. LYFT executives set all of the fare rates. Drivers have no input on the fares charged and no ability to negotiate fares with customers. Fees are standardized based on mileage and/or ride time, similar to taxis.    LYFT collects a percentage fee for every ride. LYFT does not charge drivers a fee to become a LYFT driver and LYFT does not charge drivers to use the LYFT App.    LYFT drivers are prohibited from answering passenger inquiries about booking rides outside of the LYFT App. |

Comparison of JCCP and Federal Complaints

| Chaffin Luhana LLP | |
|---|---|
| **JCCP Allegations** *Jane Doe PWKG 023 v. Lyft, Inc.*, CGC-25-623857 (Super. Ct., S.F. Cnty., filed Apr. 1, 2025) | **Federal Allegations** *A.D. v. Lyft, Inc.*, 1:25-cv-12423-IT (D. Mass., filed Sept. 2, 2025) |
|     LYFT has the power to terminate drivers with or without cause.<br><br>    LYFT drivers are expected to accept all ride requests while they are logged into the App. Drivers who reject or cancel too many ride requests risk facing discipline, including suspension or termination.<br><br>    LYFT provides its drivers with and requires them to use and display LYFT branding materials in order to make their drivers easily identifiable as LYFT drivers.<br><br>Compl., ¶¶ 53–58 (paragraph numbers omitted). |     LYFT has the power to terminate drivers with or without cause.<br><br>    LYFT drivers are expected to accept all ride requests while they are logged into the App. Drivers who reject or cancel too many ride requests risk facing discipline, including suspension or termination.<br><br>    LYFT provides its drivers with and requires them to use and display LYFT branding materials in order to make their drivers easily identifiable as LYFT drivers.<br><br>Compl., ¶¶ 29–34 (paragraph numbers omitted). |
| **<u>NO MONITORING OF RIDES</u>**<br><br>Given LYFT's knowledge of the sexual assaults and rapes of its passengers by LYFT drivers, the company should have implemented a monitoring system in order to protect its passengers. As a technology company with access to a state-of-the-art in-app tracking system, as well as a camera within the required mobile device, LYFT could take the following steps towards the elimination of the sexual assaults by LYFT drivers:<br><br>• Adopt a zero-tolerance policy for improper conduct and inform all drivers of the policy;<br><br>• Maintain a surveillance camera and rules requiring its continuing operation during all rides and have footage saved and accessible for download for up to 72 hours after each ride; | ***NO MONITORING OF RIDES***<br><br>    Given LYFT's knowledge of the sexual assaults and rapes of its passengers by LYFT drivers, the company should have implemented a monitoring system in order to protect its passengers. As a technology company with access to a state-of-the-art in-app tracking system, as well as a camera within the required mobile device, LYFT could take the following steps towards the elimination of the sexual assaults by LYFT drivers:<br><br>• Adopt a zero-tolerance policy for improper conduct and inform all drivers of the policy;<br><br>• Maintain a surveillance camera and rules requiring its continuing operation during all rides and have footage saved and accessible for download for up to 72 hours after each ride; |

14

Comparison of JCCP and Federal Complaints

| Chaffin Luhana LLP | |
|---|---|
| **JCCP Allegations**<br>*Jane Doe PWKG 023 v. Lyft, Inc.*, CGC-25-623857 (Super. Ct., S.F. Cnty., filed Apr. 1, 2025) | **Federal Allegations**<br>*A.D. v. Lyft, Inc.*, 1:25-cv-12423-IT (D. Mass., filed Sept. 2, 2025) |
| • Inform drivers that if they turn off the surveillance system during a LYFT ride, they will never drive for LYFT again; | • Inform drivers that if they turn off the surveillance system during a LYFT ride, they will never drive for LYFT again; |
| • Inform their drivers that they may not leave the car and accompany a passenger to their home or to any other location outside the vehicle, other than to provide temporary and time-limited assistance to a passenger; and | • Inform their drivers that they may not leave the car and accompany a passenger to their home or to any other location outside the vehicle, other than to provide temporary and time-limited assistance to a passenger; |
| • Modify the functionality of the app so that LYFT can determine immediately if a driver deviates from these protocols. | • Modify the functionality of the app so that LYFT can determine immediately if a driver deviates from these protocols; |
| • Monitor rides and implement a system whereby passengers are required to confirm their intention to terminate a ride before reaching their destination | • Monitor rides and implement a system whereby passengers are required to confirm their intention to terminate a ride before reaching their destination; and |
| • Monitor rides and implement a system whereby passengers are required to confirm their intention to change their destination or their intention to deviate significantly from the assigned route. | • Monitor rides and implement a system whereby passengers are required to confirm their intention to change their destination or their intention to deviate significantly from the assigned route. |
|    The ongoing sexual attacks by LYFT drivers are and have long been known to LYFT. Prior to Plaintiff's assault, LYFT has known that a consequence of its business model has been exposing women, who are using the business for a safe ride home, to drivers that may take advantage of their vulnerable position. Despite being a company that holds itself out to the public as being engaged in the safe transportation of its passengers from place to place for compensation, LYFT has failed to take any reasonable precautions to attempt to prevent harm to its passengers. |    The ongoing sexual attacks by LYFT drivers are and have long been known to LYFT. Prior to Plaintiff's assault, LYFT has known that a consequence of its business model has been exposing women, who are using the business for a safe ride home, to drivers that may take advantage of their vulnerable position. Despite being a company that holds itself out to the public as being engaged in the safe transportation of its passengers from place to place for compensation, LYFT has failed to take any reasonable precautions to attempt to prevent harm to its passengers. |

Comparison of JCCP and Federal Complaints

| Chaffin Luhana LLP | |
|---|---|
| **JCCP Allegations** <br> *Jane Doe PWKG 023 v. Lyft, Inc.*, CGC-25-623857 (Super. Ct., S.F. Cnty., filed Apr. 1, 2025) | **Federal Allegations** <br> *A.D. v. Lyft, Inc.*, 1:25-cv-12423-IT (D. Mass., filed Sept. 2, 2025) |
| At the time of the actions alleged in this complaint LYFT was aware of the established occurrence of sexual assault of its female passengers by its drivers but failed to take any reasonable action to protect its passengers from these assaults and violations. <br><br> Compl., ¶¶ 61–63 (paragraph numbers omitted). | At the time of the actions alleged in this complaint LYFT was aware of the established occurrence of sexual assault of its female passengers by its drivers but failed to take any reasonable action to protect its passengers from these assaults and violations. <br><br> Compl., ¶¶ 37–39 (paragraph numbers omitted). |
| **<u>MISREPRESENTATIONS AS TO SAFETY</u>** <br><br> In addition to inadequate background check procedures, LYFT affirmatively induces passengers, particularly young, unaccompanied, intoxicated, and/or vulnerable women, to use its services with the expectation of safety, while LYFT simultaneously knows that sexual abuse of its passengers has been prevalent. <br><br> In February 2015, LYFT's website posted a blog post announcing it had partnered with It's On Us, an anti-sexual assault initiative, and offered free ride credits for new Lyft passengers during the Spring Break season, "making it easier to get a safe ride home even if you're in a new city." In November 2016, LYFT's website posted a blog post entitled "Get Home Safely with Lyft," again touting its partnership with It's On Us, and offering college students free LYFT rides so that they "don't need to worry about finding a safe ride after going out." The insinuation of these articles is that LYFT prevents, and does not create, the risk of sexual assault. Nowhere on LYFT's website does LYFT discuss the occurrence or risk of sexual assault by LYFT's drivers. As a result, many women, like Plaintiff, enter LYFT cars unaccompanied | ***MISREPRESENTATIONS AS TO SAFETY*** <br><br> In addition to inadequate background check procedures, LYFT affirmatively induces passengers, particularly young, unaccompanied, intoxicated, and/or vulnerable women, to use its services with the expectation of safety, while LYFT simultaneously knows that sexual abuse of its passengers has been prevalent. <br><br> In February 2015, LYFT's website posted a blog post announcing it had partnered with It's On Us, an anti-sexual assault initiative, and offered free ride credits for new LYFT passengers during the Spring Break season, "making it easier to get a safe ride home even if you're in a new city." In November 2016, LYFT's website posted a blog post entitled "Get Home Safely with LYFT," again touting its partnership with It's On Us, and offering college students free LYFT rides so that they "don't need to worry about finding a safe ride after going out." The insinuation of these articles is that LYFT prevents, and does not create, the risk of sexual assault. Nowhere on LYFT's website does LYFT discuss the occurrence or risk of sexual assault by LYFT's drivers. As a result, many women, like Plaintiff, enter LYFT cars unaccompanied |

Comparison of JCCP and Federal Complaints

| Chaffin Luhana LLP | |
|---|---|
| **JCCP Allegations** *Jane Doe PWKG 023 v. Lyft, Inc.*, CGC-25-623857 (Super. Ct., S.F. Cnty., filed Apr. 1, 2025) | **Federal Allegations** *A.D. v. Lyft, Inc.*, 1:25-cv-12423-IT (D. Mass., filed Sept. 2, 2025) |
| with the expectation that they will not be harassed, propositioned, kidnapped, attacked, stalked, raped, or worse, by LYFT's drivers.<br><br>    Further, LYFT does not report statistics about sexual harassment or sexual assault by its drivers. LYFT does not disclose its policies or procedures on dealing with sexual assault by its drivers. LYFT does not properly train its customer service representatives on how to deal with serious allegations of driver misconduct. As a result, passengers who report sexual abuse by a driver have been later matched with the same driver, and dangerous drivers continue to drive with LYFT and assault passengers while LYFT profits from their actions. At the time of Plaintiff's attack, LYFT's guidelines for their drivers made no mention of sexual harassment or assault guidelines.<br><br>Compl., ¶¶ 64–66 (paragraph numbers omitted). | with the expectation that they will not be harassed, propositioned, kidnapped, attacked, stalked, raped, or worse, by LYFT's drivers.<br><br>    Further, LYFT does not report statistics about sexual harassment or sexual assault by its drivers. LYFT does not disclose its policies or procedures on dealing with sexual assault by its drivers. LYFT does not properly train its customer service representatives on how to deal with serious allegations of driver misconduct. As a result, passengers who report sexual abuse by a driver have been later matched with the same driver, and dangerous drivers continue to drive with LYFT and assault passengers while LYFT profits from their actions. At the time of Plaintiff's attack, LYFT's guidelines for their drivers made no mention of sexual harassment or assault guidelines.<br><br>Compl., ¶¶ 40–42 (paragraph numbers omitted). |
| **LYFT'S BACKGROUND CHECKS**<br><br>    LYFT relies on a quick, name-based background check process to screen its applicant drivers and has continuously refused to adopt an industry-standard, fingerprint-based background check qualification process.<br><br>    LYFT's background check process requires drivers to submit personal identifiers (driver's license and social security number) through an online webpage. LYFT, in turn, provides this information to third party vendors to perform a basic, name-based background check. | *LYFT'S BACKGROUND CHECKS*<br><br>    LYFT relies on a quick, name-based background check process to screen its applicant drivers and has continuously refused to adopt an industry-standard, fingerprint-based background check qualification process.<br><br>    LYFT's background check process requires drivers to submit personal identifiers (driver's license and social security number) through an online webpage. LYFT, in turn, provides this information to third party vendors to perform a basic, name-based background check. |

Comparison of JCCP and Federal Complaints

| Chaffin Luhana LLP | |
|---|---|
| **JCCP Allegations**<br>*Jane Doe PWKG 023 v. Lyft, Inc.*, CGC-25-623857 (Super. Ct., S.F. Cnty., filed Apr. 1, 2025) | **Federal Allegations**<br>*A.D. v. Lyft, Inc.*, 1:25-cv-12423-IT (D. Mass., filed Sept. 2, 2025) |
|    Neither LYFT nor the third-party vendors it uses for background checks verifies that the information provided by applicants is accurate or complete. The turnaround time for a LYFT background check is typically between 3-5 days.<br><br>   The difference between name-based background checks and fingerprint-based background checks is significant. While a name-based background check searches the applicant's reported name against various databases and compares records that have the same name, a fingerprint-based background check (or biometric check) uses the fingerprints of the individual to match against a law enforcement database, comparing records that have the same print, even if the names are different.<br><br>Compl., ¶¶ 68–71 (paragraph number omitted). |    Neither LYFT nor the third-party vendors it uses for background checks verifies that the information provided by applicants is accurate or complete. The turnaround time for a LYFT background check is typically between 3-5 days.<br><br>   The difference between name-based background checks and fingerprint-based background checks is significant. While a name-based background check searches the applicant's reported name against various databases and compares records that have the same name, a fingerprint-based background check (or biometric check) uses the fingerprints of the individual to match against a law enforcement database, comparing records that have the same print, even if the names are different.<br><br>Compl., ¶¶ 44–47 (paragraph number omitted). |

| Nigh Goldenberg Raso & Vaughn PLLC | |
|---|---|
| **JCCP Allegations**<br>*Jane Doe L.T. v. Lyft, Inc.*, CGC-24-612511 (Super. Ct., S.F. Cnty., filed Feb. 20, 2024) | **Federal Allegations**<br>*E.J. v. Lyft, Inc.*, 3:25-cv-02958-L (N.D. Tex., filed Oct. 30, 2025) |
|    LYFT is a transportation company headquartered in San Francisco, California and is one of the fastest growing companies in the United States. As early as 2015, LYFT became aware that LYFT drivers were sexually assaulting and raping female passengers. Since 2015, sexual predators driving for LYFT have continued to sexually assault, harass, kidnap, physically assault, and/or rape LYFT's female passengers. For five years, LYFT has known of the ongoing |    Lyft is a transportation and technology company headquartered in San Francisco, California and is one of the fastest growing companies in the United States. As early as 2015, Lyft became aware that Lyft drivers were sexually assaulting passengers. Since 2015, sexual predators driving for Lyft have continued to assault Lyft's passengers. For over ten years, Lyft has known of the ongoing sexual assaults Lyft passengers. Complaints to Lyft by passengers who have been sexually |

Comparison of JCCP and Federal Complaints

| Nigh Goldenberg Raso & Vaughn PLLC | |
|---|---|
| **JCCP Allegations** *Jane Doe L.T. v. Lyft, Inc.*, CGC-24-612511 (Super. Ct., S.F. Cnty., filed Feb. 20, 2024) | **Federal Allegations** *E.J. v. Lyft, Inc.*, 3:25-cv-02958-L (N.D. Tex., filed Oct. 30, 2025) |
| sexual assaults and rapes by LYFT drivers upon LYFT passengers. Complaints to LYFT by female passengers who have been attacked by LFT drivers, combined with subsequent criminal investigations by law enforcement, clearly establish that LYFT has been fully aware of these continuing attacks by sexual predators driving for LYFT. | harassed, assaulted, or otherwise attacked by Lyft drivers, combined with subsequent criminal investigations by law enforcement, clearly establish that Lyft has been fully aware of these continuing attacks by sexual predators driving for Lyft. |
|    LYFT's response to this sexual predator crisis amongst LYFT drivers has been appallingly inadequate. LYFT continues to hire drivers without performing adequate background checks. LYFT continues to allow culpable drivers to keep driving for LYFT. And, perhaps most importantly, LYFT has failed to adopt and implement reasonable driver monitoring procedures designed to protect the safety of its passengers. As a consequence, LYFT passengers continue to be victims of sexual assaults and rapes by LYFT drivers. |    Lyft's response to this sexual predator crisis amongst Lyft drivers has been appallingly inadequate. Lyft continues to hire drivers without performing adequate background checks. Lyft continues to allow culpable drivers to keep driving for Lyft. And, perhaps most importantly, Lyft has failed to adopt and implement reasonable driver monitoring procedures designed to protect the safety of its passengers. As a consequence, Lyft passengers continue to be victims of sexual assaults and rapes by Lyft drivers. |
| Compl., ¶¶ 1–2 (paragraph numbers omitted). | Compl., ¶¶ 1–2 (paragraph numbers omitted). |
|    Passengers pay LYFT a fee in exchange for safe passage to their destination. LYFT's public representations state that "safety is our top priority" and "it is our goal to make ever ride safe, comfortable and reliable." Sadly, LYFT's priority is not passenger safety. Profits are LYFT's priority. As a result, Plaintiff and other female passengers continue to be attacked by sexual predators driving for LYFT. |    Passengers pay Lyft a fee in exchange for safe passage to their destination. Lyft's public representations state that "safety is our top priority" and "it is our goal to make every ride safe, comfortable and reliable." Sadly, Lyft's priority is not passenger safety. Profits are Lyft's priority. As a result, Plaintiff and other passengers continue to be attacked by sexual predators driving for Lyft. |
|    When faced with this sexual predator crisis, there are a number of potential safety procedures that a reasonable transportation company would implement in order to address this dangerous situation. Yet LYFT corporate management has failed to |    When faced with this sexual predator crisis, there are a number of potential safety measures that a reasonable transportation or technology company would implement in order to address this dangerous situation. Yet Lyft corporate management has failed to |

Comparison of JCCP and Federal Complaints

| Nigh Goldenberg Raso & Vaughn PLLC | |
|---|---|
| **JCCP Allegations** | **Federal Allegations** |
| *Jane Doe L.T. v. Lyft, Inc.*, CGC-24-612511 (Super. Ct., S.F. Cnty., filed Feb. 20, 2024) | *E.J. v. Lyft, Inc.*, 3:25-cv-02958-L (N.D. Tex., filed Oct. 30, 2025) |
| implement the most obvious and straightforward safety procedures in order to address the growing problem of sexual assault by those LYFT drivers who are sexual predators.<br><br>    Corporate decision-making with respect to passenger safety issues is centered at LYFT's corporate headquarters in San Francisco. Decisions with respect to the vetting of LYFT drivers and the supervision of LYFT driver's *vis a vie* the safety of its passengers are made and implemented in its San Francisco, California headquarters….<br><br>Compl., ¶¶ 4–6 (paragraph numbers omitted). | implement the most obvious and straightforward safety procedures in order to address the growing problem of sexual assault by those Lyft drivers who are sexual predators.<br><br>    Corporate decision-making with respect to passenger safety issues is centered at Lyft's corporate headquarters in San Francisco. Decisions with respect to the vetting of Lyft drivers and the supervision of Lyft driver's vis a vis the safety of its passengers are made and implemented in its San Francisco, California headquarters.<br><br>Compl., ¶¶ 4–6 (paragraph numbers omitted). |
| **<u>LYFT'S FINANCIAL MODEL</u>**<br><br>    The key to LYFT's business model is getting as many new LYFT drivers on the road as possible. The more drivers, the more rides, the more money LYFT makes. Unfortunately, more careful screening and supervision would result in fewer drivers and lower profits.<br><br>    LYFT also has a high turnover among its drivers because they are not well paid and often more on to other jobs. As a result, and in order to keep the number of drivers on the road at a maximum level, LYFT's business model is designed to accept as many new drivers as possible and to keep as many existing drivers working for LYFT as possible. Unfortunately, LYFT prioritizes profits over passenger safety. That is why LYFT corporate management has made deliberate decisions to adopt inadequate initial screening procedures, inadequate safety monitoring, and has failed to warn passengers of the dangers of riding with LYFT. | **B. Lyft's Financial Model**<br><br>    The key to Lyft's business model is getting as many new Lyft drivers on the road as possible. The more drivers, the more rides, the more money Lyft makes. Unfortunately, more careful screening and supervision would result in fewer drivers and lower profits.<br><br>    Lyft also has a high turnover among its drivers because they are not well paid and often move on to other jobs. As a result, and in order to keep the number of drivers on the road at a maximum level, Lyft's business model is designed to accept as many new drivers as possible and to keep as many existing drivers working for Lyft as possible. Unfortunately, Lyft prioritizes profits over passenger safety. That is why Lyft corporate management has made deliberate decisions to adopt inadequate initial screening procedures, inadequate safety monitoring, and has failed to warn passengers of the dangers of riding with Lyft. |

Comparison of JCCP and Federal Complaints

| Nigh Goldenberg Raso & Vaughn PLLC | |
|---|---|
| **JCCP Allegations**<br>*Jane Doe L.T. v. Lyft, Inc.*, CGC-24-612511 (Super. Ct., S.F. Cnty., filed Feb. 20, 2024) | **Federal Allegations**<br>*E.J. v. Lyft, Inc.*, 3:25-cv-02958-L (N.D. Tex., filed Oct. 30, 2025) |
| Compl., ¶¶ 8–9 (paragraph numbers omitted). | Compl., ¶¶ 20–21 (paragraph numbers omitted). |
| **<u>LYFT'S CONTROL OVER ITS DRIVERS</u>**<br><br>LYFT exercises significant control over its drivers. LYFT executives set all of the fare rates. Drivers have no input on the fares charged and no ability to negotiate fares with customers. Fees are standardized based on mileage and/or ride time, similar to taxis.<br><br>LYFT collects a percentage fee for every ride. LYFT does not charge drivers a fee to become a LYFT driver and LYFT does not charge drivers to use the LYFT App.<br><br>LYFT drivers are prohibited from answering passenger inquiries about booking rides outside of the LYFT App.<br><br>LYFT has the power to terminate drivers with or without cause.<br><br>LYFT drivers are expected to accept all ride requests while they are logged into the App. Drivers who reject or cancel too many ride requests risk facing discipline, including suspension or termination.<br><br>LYFT provides its drivers with and requires them to use and display LYFT branding materials in order to make their drivers easily identifiable as LYFT drivers.<br><br>Compl., ¶¶ 10–15 (paragraph numbers omitted). | **C. Lyft's Control Over Its Drivers**<br><br>Lyft exercises significant control over its drivers. Lyft executives set all the fare rates. Drivers have no input on the fares charged and no ability to negotiate fares with customers. Fees are standardized based on mileage and/or ride time, similar to taxis.<br><br>Lyft collects a percentage fee for every ride. Lyft does not charge drivers a fee to become a Lyft driver and Lyft does not charge drivers to use the Lyft App.<br><br>Lyft drivers are prohibited from answering passenger inquiries about booking rides outside of the Lyft App.<br><br>Lyft has the power to terminate drivers with or without cause.<br><br>Lyft drivers are expected to accept all ride requests while they are logged into the App. Drivers who reject or cancel too many ride requests risk facing discipline, including suspension or termination.<br><br>Lyft provides its drivers with and requires them to use and display Lyft branding materials to make their drivers easily identifiable as Lyft drivers.<br><br>Compl., ¶¶ 23–28 (paragraph numbers omitted). |
| **<u>NO MONITORING OF RIDES</u>** | **D. No Monitoring of Rides** |

Comparison of JCCP and Federal Complaints

| Nigh Goldenberg Raso & Vaughn PLLC | |
|---|---|
| **JCCP Allegations** | **Federal Allegations** |
| *Jane Doe L.T. v. Lyft, Inc.*, CGC-24-612511 (Super. Ct., S.F. Cnty., filed Feb. 20, 2024) | *E.J. v. Lyft, Inc.*, 3:25-cv-02958-L (N.D. Tex., filed Oct. 30, 2025) |
| Given LYFT's knowledge of the sexual assaults, harassment, kidnapping, physical assaults, rapes, and/or other attacks of its passengers by LYFT drivers, the company should have implemented a monitoring system in order to protect its passengers. As a technology company with access to a state-of-the-art in-app tracking system, as well as a camera within the required mobile device, LYFT could take the following steps towards the elimination of the sexual assaults by LYFT drivers: | Given Lyft's knowledge of the sexual assaults and rapes of its passengers by Lyft drivers, the company should have implemented a monitoring system in order to protect its passengers. As a technology company with access to a state-of-the-art in-app tracking system, as well as a camera within the required mobile device, Lyft could take the following steps towards the elimination of sexual assaults by Lyft drivers: |
| • Adopt a zero-tolerance policy for improper conduct and inform all drivers of the policy; | • Adopt a zero-tolerance policy for improper conduct and inform all drivers of the policy; |
| • Maintain a surveillance camera and rules requiring its continuing operation during all rides and have footage saved and accessible for download for up to 72 hours after each ride; | • Maintain a surveillance camera and rules requiring its continuing operation during all rides and have footage saved and accessible for download for up to 72 hours after each ride; |
| • Inform drivers that if they turn off the surveillance system during a LYFT ride, they will never drive for LYFT again; | • Inform drivers that if they turn off the surveillance system during a Lyft ride, they will never drive for Lyft again; |
| • Inform their drivers that they may not leave the car and accompany a passenger to their home or to any other location outside the vehicle, other than to provide temporary and time-limited assistance to a passenger; and | • Inform their drivers that they may not leave the car and accompany a passenger to their home or to any other location outside the vehicle, other than to provide temporary and time-limited assistance to a passenger; and |
| • Modify the functionality of the app so that LYFT can determine immediately if a driver deviates from these protocols; | • Modify the functionality of the app so that Lyft can determine immediately if a driver deviates from these protocols…. |
| • Monitor rides and implement a system whereby passengers are required to confirm their intention to terminate a ride before reaching their destination; | • Monitor rides and implement a system whereby passengers are required to confirm their intention to terminate a ride before reaching their destination |

Comparison of JCCP and Federal Complaints

| Nigh Goldenberg Raso & Vaughn PLLC | |
|---|---|
| **JCCP Allegations** | **Federal Allegations** |
| *Jane Doe L.T. v. Lyft, Inc.*, CGC-24-612511 (Super. Ct., S.F. Cnty., filed Feb. 20, 2024) | *E.J. v. Lyft, Inc.*, 3:25-cv-02958-L (N.D. Tex., filed Oct. 30, 2025) |
| • Monitor rides and implement a system whereby passengers are required to confirm their intention to change their destination or their intention to deviate significantly from the assigned route. | • Monitor rides and implement a system whereby passengers are required to confirm their intention to change their destination or their intention to deviate significantly from the assigned route. |
|    The ongoing sexual attacks by LYFT drivers are and have been long been known to LYFT. Prior to Plaintiff's sexual assault, harassment, kidnapping, physical assault, rape, and/or other attacks by LYFT drivers, LYFT has known that a consequence of its business model has been exposing women, who are using the business for a safe ride, to drivers that may take advantage of their vulnerable position. Despite being a company that holds itself out to the public as being engaged in the safe transportation of its passengers from place to place for compensation, LYFT has failed to take any reasonable precautions to attempt to prevent harm to its passengers. |    The ongoing sexual attacks by Lyft drivers are and have long been known to Lyft. Prior to Plaintiff's assault, Lyft has known that a consequence of its business model has been exposing women, who are using the business for a safe ride home, to drivers that may take advantage of their vulnerable position. Despite being a company that holds itself out to the public as being engaged in the safe transportation of its passengers from place to place for compensation, Lyft has failed to take any reasonable precautions to attempt to prevent harm to its passengers. |
|    At the time of the actions alleged in this complaint LYFT was aware of the established occurrence of sexual assault of its female passengers by its drivers but failed to take any reasonable action to protect its passengers from these assaults and violations. |    At the time of the actions alleged in this complaint Lyft was aware of the established occurrence of sexual assault of its female passengers by its drivers but failed to take any reasonable action to protect its passengers from these assaults and violations. |
| Compl., ¶¶ 18–20 (paragraph numbers omitted). | Compl., ¶¶ 31–33 (paragraph numbers omitted). |
| **MISREPRESENTATIONS AS TO SAFETY** | **E. Misrepresentations As to Safety** |
|    In addition to inadequate background check procedures, LYFT affirmatively induces passengers, particularly young, accompanied, intoxicated, and/or vulnerable women, to use its services with the expectation of safety, while LYFT |    In addition to inadequate background check procedures, Lyft affirmatively induces passengers, particularly young, unaccompanied, intoxicated, and/or vulnerable women, to use its services with the expectation of safety, while Lyft |

Comparison of JCCP and Federal Complaints

| Nigh Goldenberg Raso & Vaughn PLLC | |
|---|---|
| **JCCP Allegations** | **Federal Allegations** |
| *Jane Doe L.T. v. Lyft, Inc.*, CGC-24-612511 (Super. Ct., S.F. Cnty., filed Feb. 20, 2024) | *E.J. v. Lyft, Inc.*, 3:25-cv-02958-L (N.D. Tex., filed Oct. 30, 2025) |
| simultaneously knows that sexual abuse of its passengers has been prevalent.<br><br>    In February 2015, LYFT's website posted a blog post announcing it had partnered with It's On Us, an anti-sexual assault initiative, and offered free ride credits for new Lyft passengers during the Spring Break season, "making it easier to get a safe ride home even if you're in a new city." In November 2016, LYFT's website posted a blog post entitled "Get Home Safely with Lyft," again touting its partnership with It's On Us, and offering college students free LYFT rides so that they "don't need to worry about finding a safe ride after going out." The insinuation of these articles is that LYFT prevents, and does not create, the risk of sexual assault. Nowhere on LYFT's website does LYFT discuss the occurrence or risk of sexual assault by LYFT's drivers. As a result, many women, like Plaintiff, enter LYFT cars unaccompanied and after drinking with the expectation that they will not be harassed, propositioned, kidnapped, attacked, stalked, raped, or worse, by LYFT's drivers.<br><br>Compl., ¶¶ 21–22 (paragraph numbers omitted). | simultaneously knows that sexual abuse of its passengers has been prevalent.<br><br>    In February 2015, Lyft's website posted a blog post announcing it had partnered with It's On Us, an anti-sexual assault initiative, and offered free ride credits for new Lyft passengers during the Spring Break season, "making it easier to get a safe ride home even if you're in a new city." In November 2016, Lyft's website posted a blog post entitled "Get Home Safely with Lyft," again touting its partnership with It's On Us, and offering college students free Lyft rides so that they "don't need to worry about finding a safe ride after going out." The insinuation of these articles is that Lyft prevents, and does not create, the risk of sexual assault. Nowhere on Lyft's website does Lyft discuss the occurrence or risk of sexual assault by Lyft's drivers. As a result, many women, like Plaintiff, enter Lyft cars unaccompanied with the expectation that they will not be harassed, propositioned, kidnapped, attacked, stalked, raped, or worse, by Lyft's drivers.<br><br>Compl., ¶¶ 34–35 (paragraph numbers omitted). |
| **<u>LYFT'S BACKGROUND CHECKS</u>**<br><br>    LYFT relies on a quick, name-based background check process to screen its applicant and has continuously refused to adopt an industry-standard, fingerprint-based background check qualification process.<br><br>    LYFT's background check process requires drivers to submit personal identifiers (driver's license and social security number) | **F. Lyft's Inadequate Background Checks**<br><br>    Lyft relies on a quick, name-based background check process to screen its applicant drivers and has continuously refused to adopt an industry-standard, fingerprint-based background check qualification process.<br><br>    Lyft's background check process requires drivers to submit personal identifiers (driver's |

Comparison of JCCP and Federal Complaints

| Nigh Goldenberg Raso & Vaughn PLLC | |
|---|---|
| **JCCP Allegations** <br> *Jane Doe L.T. v. Lyft, Inc.*, CGC-24-612511 (Super. Ct., S.F. Cnty., filed Feb. 20, 2024) | **Federal Allegations** <br> *E.J. v. Lyft, Inc.*, 3:25-cv-02958-L (N.D. Tex., filed Oct. 30, 2025) |
| through an online webpage. LYFT, in turn, provides this information to third party vendors to perform a basic, name-based background check. <br><br>    Neither LYFT nor the third-party vendors it uses for background checks verifies that the information provided by applicants is accurate or complete. The turnaround time for a LYFT background check is typically between 3-5 days. <br><br>    The difference between name-based background checks and fingerprint-based background checks is significant. While a name-based background check searches the applicant's reported name against various databases and compares records that have the same name, a fingerprint-based background check (or biometric check) uses the fingerprints of the individual to match against a law enforcement database, comparing records that have the same print, even if the names are different. <br><br> Compl., ¶¶ 25–28 (paragraph numbers omitted). | license and social security number) through an online webpage. Lyft, in turn, provides this information to third party vendors to perform a basic, name-based background check. <br><br>    Neither Lyft nor the third-party vendors it uses for background checks verifies that the information provided by applicants is accurate or complete. The turnaround time for a Lyft background check is typically between 3-5 days. <br><br>    The difference between name-based background checks and fingerprint-based background checks is significant. While a name-based background check searches the applicant's reported name against various databases and compares records that have the same name, a fingerprint-based background check (or biometric check) uses the fingerprints of the individual to match against a law enforcement database, comparing records that have the same print, even if the names are different. <br><br> Compl., ¶¶ 38–41 (paragraph numbers omitted). |

| Clarkson Law Firm, P.C. | |
|---|---|
| **JCCP Allegations** <br> *CLF 001, et al. v. Lyft, Inc.*, CGC-25-625863 (Super. Ct., S.F. Cnty., filed May 30, 2025) | **Federal Allegations** <br> *CLF L001 v. Lyft, Inc.*, 7:25-cv-08206-JGLC (S.D.N.Y., filed Oct. 3, 2025) |
|    Lyft is a transportation company headquartered in San Francisco, California and is one of the fastest growing companies in the United States. As early as 2015, Lyft became aware that Lyft drivers were sexually assaulting and raping its passengers. Since |    Lyft is a transportation company headquartered in San Francisco, California and is one of the fastest growing companies in the United States. As early as 2015, Lyft became aware that Lyft drivers were sexually assaulting and raping female passengers. |

Comparison of JCCP and Federal Complaints

| Clarkson Law Firm, P.C. | |
|---|---|
| **JCCP Allegations** *CLF 001, et al. v. Lyft, Inc.*, CGC-25-625863 (Super. Ct., S.F. Cnty., filed May 30, 2025) | **Federal Allegations** *CLF L001 v. Lyft, Inc.*, 7:25-cv-08206-JGLC (S.D.N.Y., filed Oct. 3, 2025) |
| 2015, sexual predators driving for Lyft have continued to assault and rape Lyft's passengers. For five years, Lyft has known of the ongoing sexual assaults and rapes by Lyft drivers upon Lyft passengers. Complaints to Lyft by passengers who have been attacked by Lyft drivers, combined with subsequent criminal investigations by law enforcement, clearly establish that Lyft has been fully aware of these continuing attacks by sexual predators driving for Lyft.

   Lyft's response to this sexual predator crisis amongst Lyft drivers has been appallingly inadequate. Lyft continues to hire drivers without performing adequate background checks. Lyft continues to allow culpable drivers to keep driving for Lyft. And, perhaps most importantly, Lyft has failed to adopt and implement reasonable driver monitoring procedures designed to protect the safety of its passengers. As a consequence, Lyft passengers continue to be victims of sexual assaults and rapes by Lyft drivers.

Compl., ¶¶ 1–2 (paragraph numbers omitted). | Since 2015, sexual predators driving for Lyft have continued to assault and rape Lyft's female passengers. For more than nine years, Lyft has known of the ongoing sexual assaults and rapes by Lyft drivers upon Lyft passengers. Complaints to Lyft by female passengers who have been attacked by Lyft drivers, combined with subsequent criminal investigations by law enforcement, clearly establish that Lyft has been fully aware of these continuing attacks by sexual predators driving for Lyft.

   Lyft's response to this sexual predator crisis amongst Lyft drivers has been appallingly inadequate. Lyft continues to hire drivers without performing adequate background checks. Lyft continues to allow culpable drivers to keep driving for Lyft. And, perhaps most importantly, Lyft has failed to adopt and implement reasonable driver monitoring procedures designed to ensure the safety of its passengers. Consequently, Lyft passengers continue to be victims of sexual assaults and rapes by Lyft drivers.

Compl., ¶¶ 1–2 (paragraph numbers omitted). |
| **B. Lyft's Finanial Model**

   The key to Lyft's business model is getting as many new Lyft drivers on the road as possible. The more drivers, the more rides, the more money Lyft makes. Unfortunately, more careful screening and supervision would result in fewer drivers and lower profits.

   Lyft also has a high turnover among its drivers because they are not well paid and often move on to other jobs. As a result, and | ***Lyft's Financial Model***

   The key to Lyft's business model is getting as many new Lyft drivers on the road as possible. The more drivers, the more rides, the more money Lyft makes. Unfortunately, because more careful screening and supervision would result in fewer drivers and lower profits, Lyft has chosen not to implement those necessary procedures.

Lyft also has a high turnover among its drivers because they are not well paid and often move on to other jobs. As a result, and |

Comparison of JCCP and Federal Complaints

| Clarkson Law Firm, P.C. | |
|---|---|
| **JCCP Allegations**<br>*CLF 001, et al. v. Lyft, Inc.*, CGC-25-625863<br>(Super. Ct., S.F. Cnty., filed May 30, 2025) | **Federal Allegations**<br>*CLF L001 v. Lyft, Inc.*, 7:25-cv-08206-JGLC<br>(S.D.N.Y., filed Oct. 3, 2025) |
| in order to keep the number of drivers on the road at a maximum level, Lyft's business model is designed to accept as many new drivers as possible and to keep as many existing drivers working for Lyft as possible. Unfortunately, Lyft prioritizes profits over passenger safety. That is why Lyft corporate management has made deliberate decisions to adopt inadequate initial screening procedures, inadequate safety monitoring, and has failed to warn passengers of the dangers of riding with Lyft.<br><br>Compl., ¶¶ 48–49 (paragraph numbers omitted). | to maximize the number of drivers on the road, Lyft's business model is designed to accept as many new drivers as possible and to keep as many existing drivers working for Lyft as possible. Unfortunately, Lyft prioritizes profits over passenger safety. That is why Lyft corporate management has made deliberate decisions to adopt inadequate initial screening procedures, inadequate safety monitoring, and has failed to warn passengers of the dangers of riding with Lyft.<br><br>Compl., ¶¶ 30–31 (paragraph numbers omitted). |
| **C. Lyft's Control Over Its Drivers**<br><br>    Lyft exercises significant control over its drivers. Lyft executives set all the fare rates. Drivers have no input on the fares charged and no ability to negotiate fares with customers. Fees are standardized based on mileage and/or ride time, similar to taxis.<br><br>    Lyft collects a percentage fee for every ride. Lyft does not charge drivers a fee to become a Lyft driver, and Lyft does not charge drivers to use the Lyft App.<br><br>    Lyft drivers are prohibited from answering passenger inquiries about booking rides outside of the Lyft App.<br><br>    Lyft has the power to terminate drivers with or without cause.<br><br>    Lyft drivers are expected to accept all ride requests while they are logged into the App. Drivers who reject or cancel too many ride | ***Lyft's Control Over Its Drivers***<br><br>    Lyft exercises significant control over its drivers. Lyft executives set the fare rates. Drivers have no input on the fares charged and no ability to negotiate fares with customers. Fees are standardized based on mileage and/or ride time, similar to taxis.<br><br>    Lyft collects a percentage fee for every ride. Lyft does not charge drivers a fee to become a Lyft driver and Lyft does not charge drivers to use the Lyft App.<br><br>    Lyft drivers are prohibited from answering passenger inquiries about booking rides outside of the Lyft App.<br><br>    Lyft has the power to terminate drivers with or without cause.<br><br>    Lyft drivers are expected to accept all ride requests while they are logged into the App. Lyft drivers who reject or cancel too many |

Comparison of JCCP and Federal Complaints

| Clarkson Law Firm, P.C. | |
|---|---|
| **JCCP Allegations**<br>*CLF 001, et al. v. Lyft, Inc.*, CGC-25-625863<br>(Super. Ct., S.F. Cnty., filed May 30, 2025) | **Federal Allegations**<br>*CLF L001 v. Lyft, Inc.*, 7:25-cv-08206-JGLC<br>(S.D.N.Y., filed Oct. 3, 2025) |
| requests risk facing discipline, including suspension or termination.<br><br>   Lyft provides its drivers with and requires them to use and display Lyft branding materials in order to make their drivers easily identifiable as Lyft drivers.<br><br>Compl., ¶¶ 51–56 (paragraph numbers omitted). | ride requests risk facing discipline, including suspension or termination.<br><br>   Lyft provides its drivers with and requires them to use and display Lyft branding materials to make their drivers easily identifiable as Lyft drivers.<br><br>Compl., ¶¶ 32–37 (paragraph numbers omitted). |
| **D. Lyft Does Not Monitor its Rides**<br><br>   Given Lyft's knowledge of the sexual assaults and rapes of its passengers by Lyft drivers, the company should have implemented a monitoring system in order to protect its passengers. As a technology company with access to a state-of-the-art in-app tracking system, as well as cameras within the required mobile devices, Lyft could take the following steps towards the elimination of the sexual assaults by Lyft drivers:<br><br>• Adopt a zero-tolerance policy for improper conduct and inform all drivers of the policy;<br><br>• Maintain a surveillance camera and rules requiring its continuing operation during all rides and have footage saved and accessible for download for up to 72 hours after each ride;<br><br>• Inform drivers that if they turn off the surveillance system during a Lyft ride, they will never drive for Lyft again;<br><br>• Inform their drivers that they may not leave the car and accompany a passenger to their home or to any other location outside the | *Lyft's Failure to Monitor Rides*<br><br>   Given Lyft's knowledge of the sexual assaults and rapes of its passengers by Lyft drivers, the company should have implemented a monitoring system to protect its passengers. As a technology company with access to a state-of-the-art in-app tracking system, as well as a camera within the required mobile device, Lyft could take the following steps towards the elimination of the sexual assaults by Lyft drivers:<br><br>• Adopt a zero-tolerance policy for improper conduct and inform all drivers of the policy;<br><br>• Maintain a surveillance camera and require its continuing operation during all rides;<br><br>• Save camera footage and make it accessible for up to 72 hours after each ride;<br><br>• Inform drivers that if they turn off the surveillance system during a Lyft ride, they will never drive for Lyft again;<br><br>• Inform drivers that they may not leave the car and accompany a passenger to their home or to any other location outside the vehicle, |

Comparison of JCCP and Federal Complaints

| Clarkson Law Firm, P.C. | |
|---|---|
| **JCCP Allegations**<br>*CLF 001, et al. v. Lyft, Inc.*, CGC-25-625863<br>(Super. Ct., S.F. Cnty., filed May 30, 2025) | **Federal Allegations**<br>*CLF L001 v. Lyft, Inc.*, 7:25-cv-08206-JGLC<br>(S.D.N.Y., filed Oct. 3, 2025) |
| vehicle, other than to provide temporary and time-limited assistance to a passenger;<br><br>• Modify the functionality of the app so that Lyft can determine immediately if a driver deviates from these protocols;<br><br>• Monitor rides and implement a system whereby passengers are required to confirm their intention to terminate a ride before reaching their destination; and<br><br>• Monitor rides and implement a system whereby passengers are required to confirm their intention to change their destination or their intention to deviate significantly from the assigned route.<br><br>   The ongoing sexual attacks by Lyft drivers are and have long been known to Lyft. Prior to the assaults of Plaintiffs, Lyft has known that a consequence of its business model has been exposing men and women, who are using the business for a safe ride home, to drivers that may take advantage of their vulnerable position. Despite being a company that holds itself out to the public as being engaged in the safe transportation of its passengers from place to place for compensation, Lyft has failed to take any reasonable precautions to attempt to prevent harm to its passengers.<br><br>   At the time of the actions alleged in this complaint Lyft was aware of the established occurrence of sexual assault of its passengers by its drivers but failed to take any reasonable action to protect its passengers from these assaults and violations.<br><br>Compl., ¶¶ 59–61 (paragraph numbers omitted). | other than to provide temporary and time-limited assistance to a passenger;<br><br>• Modify the functionality of the Lyft app so that Lyft can determine immediately if a driver deviates from these protocols;<br><br>• Monitor rides and implement a system whereby passengers are required to confirm their intention to terminate a ride before reaching their destination; and<br><br>• Monitor rides and implement a system whereby passengers are required to confirm their intention to change their destination or their intention to deviate significantly from the assigned route.<br><br>   The ongoing sexual attacks by Lyft drivers are and have long been known to Lyft. Prior to Plaintiff's assault, Lyft knew that a consequence of its business model has been exposing women, who rely on Lyft for a safe ride home, to drivers that may take advantage of their vulnerable position. Despite holding itself out to the public as being engaged in the safe transportation of its passengers from place to place for compensation, Lyft has failed to take reasonable precautions to attempt to prevent harm to its passengers.<br><br>   At the time of the actions alleged in this complaint, Lyft was aware of the established occurrence of sexual assault of its female passengers by its drivers but failed to take reasonable action to protect its passengers from these assaults and violations.<br><br>Compl., ¶¶ 40–42 (paragraph numbers omitted). |

Comparison of JCCP and Federal Complaints

| Clarkson Law Firm, P.C. | |
|---|---|
| **JCCP Allegations**<br>*CLF 001, et al. v. Lyft, Inc.*, CGC-25-625863 (Super. Ct., S.F. Cnty., filed May 30, 2025) | **Federal Allegations**<br>*CLF L001 v. Lyft, Inc.*, 7:25-cv-08206-JGLC (S.D.N.Y., filed Oct. 3, 2025) |
| **E. Lyft Misrepresents the Safety of its Platform**<br><br>   In addition to inadequate background check procedures, Lyft affirmatively induces passengers, particularly young, unaccompanied, intoxicated, and/or vulnerable women, to use its services with the expectation of safety, while Lyft simultaneously knows that sexual abuse of its passengers has been prevalent.<br><br>   In February 2015, Lyft's website posted a blog post announcing it had partnered with It's On Us, an anti-sexual assault initiative, and offered free ride credits for new Lyft passengers during the Spring Break season, "making it easier to get a safe ride home even if you're in a new city." In November 2016, Lyft's website posted a blog post entitled "Get Home Safely with Lyft," again touting its partnership with It's On Us, and offering college students free Lyft rides so that they "don't need to worry about finding a safe ride after going out." The insinuation of these articles is that Lyft prevents, and does not create, the risk of sexual assault. Nowhere on Lyft's website does Lyft discuss the occurrence or risk of sexual assault by Lyft's drivers. As a result, many individuals, like Plaintiffs, enter Lyft cars unaccompanied with the expectation that they will not be harassed, propositioned, kidnapped, attacked, stalked, raped, or worse, by Lyft's drivers.<br><br>Compl., ¶¶ 62–63 (paragraph numbers omitted). | *Lyft's Misrepresentations as to Safety*<br><br>   In addition to inadequate background check procedures, Lyft affirmatively induces passengers, particularly young, unaccompanied, intoxicated, and/or vulnerable women, to use its services with the expectation of safety, while Lyft simultaneously knows that sexual abuse of its passengers has been prevalent.<br><br>   In February 2015, Lyft's website posted a blog post announcing it had partnered with It's On Us, an anti-sexual assault initiative, and offered free ride credits for new Lyft passengers during the Spring Break season, "making it easier to get a safe ride home even if you're in a new city." In November 2016, Lyft's website posted a blog post entitled "Get Home Safely with Lyft," again touting its partnership with It's On Us, and offering college students free Lyft rides so that they "don't need to worry about finding a safe ride after going out." The insinuation of these articles is that Lyft prevents, and does not create, the risk of sexual assault. Nowhere on Lyft's website does Lyft discuss the occurrence or risk of sexual assault by Lyft's drivers. As a result, many women, like Plaintiff, enter Lyft cars unaccompanied with the expectation that they will not be harassed, propositioned, kidnapped, attacked, stalked, raped, or worse, by their Lyft drivers.<br><br>Compl., ¶¶ 43–44 (paragraph numbers omitted). |

Comparison of JCCP and Federal Complaints

| Clarkson Law Firm, P.C. | |
|---|---|
| **JCCP Allegations**<br>*CLF 001, et al. v. Lyft, Inc.*, CGC-25-625863 (Super. Ct., S.F. Cnty., filed May 30, 2025) | **Federal Allegations**<br>*CLF L001 v. Lyft, Inc.*, 7:25-cv-08206-JGLC (S.D.N.Y., filed Oct. 3, 2025) |
| **F. Lyft's Insufficient Background Checks** | ***Lyft's Inadequate Background Checks*** |
| Lyft relies on a quick, name-based background check process to screen its applicant drivers and has continuously refused to adopt an industry-standard, fingerprint-based background check qualification process. | Lyft relies on a quick, name-based background check process to screen its applicant drivers and has continuously refused to adopt an industry-standard, fingerprint-based background check qualification process. |
| Lyft's background check process requires drivers to submit personal identifiers (driver's license and social security number) through an online webpage. Lyft, in turn, provides this information to third party vendors to perform a basic, name-based background check. | Lyft's background check process requires drivers to submit personal identifiers (driver's license and social security number) through an online webpage. Lyft, in turn, provides this information to third party vendors to perform a basic, name-based background check. |
| Neither Lyft nor the third-party vendors it uses for background checks verify that the information provided by applicants is accurate or complete. The turnaround time for a Lyft background check is typically between three to five days. | Neither Lyft nor the third-party vendors it uses for background checks verify that the information provided by applicants is accurate or complete. The turnaround time for a Lyft background check is typically between 3-5 days. |
| The difference between name-based background checks and fingerprint-based background checks is significant. While a name-based background check searches the applicant's reported name against various databases and compares records that have the same name, a fingerprint-based background check (or biometric check) uses the fingerprints of the individual to match against a law enforcement database, comparing records that have the same print, even if the names are different. | The difference between name-based background checks and fingerprint-based background checks is significant. While a name-based background check searches the applicant's reported name against various databases and compares records that have the same name, a fingerprint-based background check (or biometric check) uses the fingerprints of the individual to match against a law enforcement database, comparing records that have the same print, even if the names are different. |
| Compl., ¶¶ 65–68 (paragraph numbers omitted). | Compl., ¶¶ 47–50 (paragraph numbers omitted). |

Comparison of JCCP and Federal Complaints

| Wagstaff Law Firm, P.C. | |
|---|---|
| **JCCP Allegations** *Jane Doe L.T. v. Lyft, Inc.*, CGC-24-612511 (Super. Ct., S.F. Cnty., filed Feb. 2, 2024) | **Federal Allegations** *Jane Doe 1 v. Lyft, Inc.*, 1:25-cv-03325-STV (D. Colo., filed Oct. 21, 2025) |
| LYFT is a transportation company headquartered in San Francisco, California and is one of the fastest growing companies in the United States. As early as 2015, LYFT became aware that LYFT drivers were sexually assaulting and raping female passengers. Since 2015, sexual predators driving for LYFT have continued to sexually assault, harass, kidnap, physically assault, and/or rape LYFT's female passengers. | Lyft, Inc. is a transportation company headquartered in San Francisco, California, and is among the fastest-growing companies in the United States. As early as 2015, Lyft became aware that certain Lyft drivers were engaging in sexual assaults and rapes of female passengers. Since that time, sexual predators operating as Lyft drivers have continued to commit such assaults against female passengers. |
| For five years, LYFT has known of the ongoing sexual assaults and rapes by LYFT drivers upon LYFT passengers. Complaints to LYFT by female passengers who have been attacked by LFT drivers, combined with subsequent criminal investigations by law enforcement, clearly establish that LYFT has been fully aware of these continuing attacks by sexual predators driving for LYFT. | For more than eight years, Lyft has had knowledge of these ongoing acts of sexual violence committed by its drivers. Complaints lodged by female passengers, together with subsequent criminal investigations conducted by law enforcement, conclusively demonstrate that Lyft has been fully aware of the persistent and continuing assaults perpetrated by sexual predators driving for Lyft. |
| LYFT's response to this sexual predator crisis amongst LYFT drivers has been appallingly inadequate. LYFT continues to hire drivers without performing adequate background checks. LYFT continues to allow culpable drivers to keep driving for LYFT. And, perhaps most importantly, LYFT has failed to adopt and implement reasonable driver monitoring procedures designed to protect the safety of its passengers. As a consequence, LYFT passengers continue to be victims of sexual assaults and rapes by LYFT drivers. | Lyft's response to the sexual predator crisis within its driver workforce has been grossly inadequate. The company continues to hire drivers without conducting sufficient background checks, permits drivers accused of misconduct to remain on the platform, and, most critically, has failed to implement and enforce reasonable driver monitoring measures necessary to safeguard passengers. As a direct result of these omissions, Lyft passengers remain vulnerable and continue to be subjected to sexual assaults and rapes by Lyft drivers. |
| Compl., ¶¶ 1–2 (paragraph numbers omitted and spacing adjusted for ease of comparison). | Compl., ¶¶ 2–4 (paragraph numbers omitted). |
| **LYFT'S FINANCIAL MODEL** | ***Lyft's Financial Model*** |

Comparison of JCCP and Federal Complaints

| Wagstaff Law Firm, P.C. | |
| --- | --- |
| **JCCP Allegations**<br>*Jane Doe L.T. v. Lyft, Inc.*, CGC-24-612511<br>(Super. Ct., S.F. Cnty., filed Feb. 2, 2024) | **Federal Allegations**<br>*Jane Doe 1 v. Lyft, Inc.*, 1:25-cv-03325-STV<br>(D. Colo., filed Oct. 21, 2025) |
|     The key to LYFT's business model is getting as many new LYFT drivers on the road as possible. The more drivers, the more rides, the more money LYFT makes. Unfortunately, more careful screening and supervision would result in fewer drivers and lower profits.<br><br>    LYFT also has a high turnover among its drivers because they are not well paid and often more on to other jobs. As a result, and in order to keep the number of drivers on the road at a maximum level, LYFT's business model is designed to accept as many new drivers as possible and to keep as many existing drivers working for LYFT as possible. Unfortunately, LYFT prioritizes profits over passenger safety. That is why LYFT corporate management has made deliberate decisions to adopt inadequate initial screening procedures, inadequate safety monitoring, and has failed to warn passengers of the dangers of riding with LYFT.<br><br>Compl., ¶¶ 8–9 (paragraph numbers omitted). |     The key to Lyft's business model is getting as many new Lyft drivers on the road as possible. The more drivers, the more rides, the more money Lyft makes. Unfortunately, because more careful screening and supervision would result in fewer drivers and lower profits, Lyft has chosen not to implement those necessary procedures.<br><br>    Lyft also has a high turnover among its drivers because they are not well paid and often move on to other jobs. As a result, and to maximize the number of drivers on the road, Lyft's business model is designed to accept as many new drivers as possible and to keep as many existing drivers working for Lyft as possible. Unfortunately, Lyft prioritizes profits over passenger safety. That is why Lyft corporate management has made deliberate decisions to adopt inadequate initial screening procedures, inadequate safety monitoring, and has failed to warn passengers of the dangers of riding with Lyft.<br><br>Compl., ¶¶ 26–27 (paragraph numbers omitted). |
| **LYFT'S CONTROL OVER ITS DRIVERS**<br><br>    LYFT exercises significant control over its drivers. LYFT executives set all of the fare rates. Drivers have no input on the fares charged and no ability to negotiate fares with customers. Fees are standardized based on mileage and/or ride time, similar to taxis.<br><br>    LYFT collects a percentage fee for every ride. LYFT does not charge drivers a fee to become a LYFT driver and LYFT does not charge drivers to use the LYFT App. | *Lyft's Control Over Its Drivers*<br><br>    Lyft exercises significant control over its drivers. Lyft executives set the fare rates. Drivers have no input on the fares charged and no ability to negotiate fares with customers. Fees are standardized based on mileage and/or ride time, similar to taxis.<br><br>    Lyft collects a percentage fee for every ride. Lyft does not charge drivers a fee to become a Lyft driver and Lyft does not charge drivers to use the Lyft App. |

Comparison of JCCP and Federal Complaints

| Wagstaff Law Firm, P.C. | |
|---|---|
| **JCCP Allegations**<br>*Jane Doe L.T. v. Lyft, Inc.*, CGC-24-612511<br>(Super. Ct., S.F. Cnty., filed Feb. 2, 2024) | **Federal Allegations**<br>*Jane Doe 1 v. Lyft, Inc.*, 1:25-cv-03325-STV<br>(D. Colo., filed Oct. 21, 2025) |
| LYFT drivers are prohibited from answering passenger inquiries about booking rides outside of the LYFT App.<br><br>LYFT has the power to terminate drivers with or without cause.<br><br>LYFT drivers are expected to accept all ride requests while they are logged into the App. Drivers who reject or cancel too many ride requests risk facing discipline, including suspension or termination.<br><br>LYFT provides its drivers with and requires them to use and display LYFT branding materials in order to make their drivers easily identifiable as LYFT drivers.<br><br>Compl., ¶¶ 10–15 (paragraph numbers omitted). | Lyft drivers are prohibited from answering passenger inquiries about booking rides outside of the Lyft App.<br><br>Lyft has the power to terminate drivers with or without cause.<br><br>Lyft drivers are expected to accept all ride requests while they are logged into the App. Lyft drivers who reject or cancel too many ride requests risk facing discipline, including suspension or termination.<br><br>Lyft provides its drivers with and requires them to use and display Lyft branding materials to make their drivers easily identifiable as Lyft drivers.<br><br>Compl., ¶¶ 28–33 (paragraph numbers omitted). |
| **<u>NO MONITORING OF RIDES</u>**<br><br>Given LYFT's knowledge of the sexual assaults, harassment, kidnapping, physical assaults, rapes, and/or other attacks of its passengers by LYFT drivers, the company should have implemented a monitoring system in order to protect its passengers. As a technology company with access to a state-of-the-art in-app tracking system, as well as a camera within the required mobile device, LYFT could take the following steps towards the elimination of the sexual assaults by LYFT drivers:<br><br>• Adopt a zero-tolerance policy for improper conduct and inform all drivers of the policy;<br><br>• Maintain a surveillance camera and rules requiring its continuing operation during all rides and have footage saved and accessible | ***Lyft's Failure to Monitor Rides***<br><br>Given Lyft's knowledge of the sexual assaults and rapes of its passengers by Lyft drivers, the company should have implemented a monitoring system to protect its passengers. As a technology company with access to a state-of-the-art in-app tracking system, as well as a camera within the required mobile device, Lyft could take the following steps towards the elimination of sexual assaults by Lyft drivers:<br><br>• Adopt a zero-tolerance policy for improper conduct and inform all drivers of the policy;<br><br>• Maintain a surveillance camera and require its continuing operation during all rides; |

34

Comparison of JCCP and Federal Complaints

| Wagstaff Law Firm, P.C. | |
|---|---|
| **JCCP Allegations** *Jane Doe L.T. v. Lyft, Inc.*, CGC-24-612511 (Super. Ct., S.F. Cnty., filed Feb. 2, 2024) | **Federal Allegations** *Jane Doe 1 v. Lyft, Inc.*, 1:25-cv-03325-STV (D. Colo., filed Oct. 21, 2025) |
| for download for up to 72 hours after each ride; | • Save camera footage and make it accessible for up to 72 hours after each ride; |
| • Inform drivers that if they turn off the surveillance system during a LYFT ride, they will never drive for LYFT again; | • Inform drivers that if they turn off the surveillance system during a Lyft ride, they will never drive for Lyft again; |
| • Inform their drivers that they may not leave the car and accompany a passenger to their home or to any other location outside the vehicle, other than to provide temporary and time-limited assistance to a passenger; and | • Inform drivers that they may not leave the car and accompany a passenger to their home or to any other location outside the vehicle, other than to provide temporary and time-limited assistance to a passenger; |
| • Modify the functionality of the app so that LYFT can determine immediately if a driver deviates from these protocols; | • Modify the functionality of the Lyft app so that Lyft can determine immediately if a driver deviates from these protocols; |
| • Monitor rides and implement a system whereby passengers are required to confirm their intention to terminate a ride before reaching their destination; | • Monitor rides and implement a system whereby passengers are required to confirm their intention to terminate a ride before reaching their destination; and |
| • Monitor rides and implement a system whereby passengers are required to confirm their intention to change their destination or their intention to deviate significantly from the assigned route. | • Monitor rides and implement a system whereby passengers are required to confirm their intention to change their destination or their intention to deviate significantly from the assigned route. |
|    The ongoing sexual attacks by LYFT drivers are and have been long been known to LYFT. Prior to Plaintiff's sexual assault, harassment, kidnapping, physical assault, rape, and/or other attacks by LYFT drivers, LYFT has known that a consequence of its business model has been exposing women, who are using the business for a safe ride, to drivers that may take advantage of their vulnerable position. Despite being a company that holds itself out to the public as being engaged in the safe transportation of its passengers from place to place for compensation, LYFT has failed to take any |    The ongoing sexual attacks by Lyft drivers are and have long been known to Lyft. Prior to Plaintiff's assault, Lyft knew that a consequence of its business model has been exposing women, who rely on Lyft for a safe ride home, to drivers that may take advantage of their vulnerable position. Despite holding itself out to the public as being engaged in the safe transportation of its passengers from place to place for compensation, Lyft has failed to take reasonable precautions to attempt to prevent harm to its passengers. |

Comparison of JCCP and Federal Complaints

| Wagstaff Law Firm, P.C. | |
|---|---|
| **JCCP Allegations** *Jane Doe L.T. v. Lyft, Inc.*, CGC-24-612511 (Super. Ct., S.F. Cnty., filed Feb. 2, 2024) | **Federal Allegations** *Jane Doe 1 v. Lyft, Inc.*, 1:25-cv-03325-STV (D. Colo., filed Oct. 21, 2025) |
| reasonable precautions to attempt to prevent harm to its passengers.<br><br>   At the time of the actions alleged in this complaint LYFT was aware of the established occurrence of sexual assault of its female passengers by its drivers but failed to take any reasonable action to protect its passengers from these assaults and violations.<br><br>Compl., ¶¶ 18–20 (paragraph numbers omitted). | At the time of the actions alleged in this complaint, Lyft was aware of the established occurrence of sexual assault of its female passengers by its drivers but failed to take reasonable action to protect its passengers from these assaults and violations.<br><br>Compl., ¶¶ 36–38 (paragraph numbers omitted). |
| **MISREPRESENTATIONS AS TO SAFETY**<br><br>   In addition to inadequate background check procedures, LYFT affirmatively induces passengers, particularly young, accompanied, intoxicated, and/or vulnerable women, to use its services with the expectation of safety, while LYFT simultaneously knows that sexual abuse of its passengers has been prevalent.<br><br>   In February 2015, LYFT's website posted a blog post announcing it had partnered with It's On Us, an anti-sexual assault initiative, and offered free ride credits for new Lyft passengers during the Spring Break season, "making it easier to get a safe ride home even if you're in a new city." In November 2016, LYFT's website posted a blog post entitled "Get Home Safely with Lyft," again touting its partnership with It's On Us, and offering college students free LYFT rides so that they "don't need to worry about finding a safe ride after going out." The insinuation of these articles is that LYFT prevents, and does not create, the risk of sexual assault. Nowhere on LYFT's website does LYFT discuss the occurrence or risk of sexual assault by | *Lyft's Misrepresentations as to Safety*<br><br>   In addition to inadequate background check procedures, Lyft affirmatively induces passengers, particularly young, unaccompanied, intoxicated, and/or vulnerable women, to use its services with the expectation of safety, while Lyft simultaneously knows that sexual abuse of its passengers has been prevalent.<br><br>   In February 2015, Lyft's website posted a blog post announcing it had partnered with It's On Us, an anti-sexual assault initiative, and offered free ride credits for new Lyft passengers during the Spring Break season, "making it easier to get a safe ride home even if you're in a new city." In November 2016, Lyft's website posted a blog post entitled "Get Home Safely with Lyft," again touting its partnership with It's On Us, and offering college students free Lyft rides so that they "don't need to worry about finding a safe ride after going out." The insinuation of these articles is that Lyft prevents, and does not create, the risk of sexual assault. Nowhere on Lyft's website does Lyft discuss the occurrence or risk of |

Comparison of JCCP and Federal Complaints

| Wagstaff Law Firm, P.C. | |
|---|---|
| **JCCP Allegations** *Jane Doe L.T. v. Lyft, Inc.*, CGC-24-612511 (Super. Ct., S.F. Cnty., filed Feb. 2, 2024) | **Federal Allegations** *Jane Doe 1 v. Lyft, Inc.*, 1:25-cv-03325-STV (D. Colo., filed Oct. 21, 2025) |
| LYFT's drivers. As a result, many women, like Plaintiff, enter LYFT cars unaccompanied and after drinking with the expectation that they will not be harassed, propositioned, kidnapped, attacked, stalked, raped, or worse, by LYFT's drivers.<br><br>Compl., ¶¶ 21–22 (paragraph numbers omitted). | sexual assault by Lyft's drivers. As a result, many women, like Plaintiff, enter Lyft cars unaccompanied with the expectation that they will not be harassed, propositioned, kidnapped, attacked, stalked, raped, or worse, by their Lyft drivers.<br><br>Compl., ¶¶ 39–40 (paragraph numbers omitted). |
| **<u>LYFT'S BACKGROUND CHECKS</u>**<br><br>    LYFT relies on a quick, name-based background check process to screen its applicant and has continuously refused to adopt an industry-standard, fingerprint-based background check qualification process.<br><br>    LYFT's background check process requires drivers to submit personal identifiers (driver's license and social security number) through an online webpage. LYFT, in turn, provides this information to third party vendors to perform a basic, name-based background check.<br><br>    Neither LYFT nor the third-party vendors it uses for background checks verifies that the information provided by applicants is accurate or complete. The turnaround time for a LYFT background check is typically between 3-5 days.<br><br>    The difference between name-based background checks and fingerprint-based background checks is significant. While a name-based background check searches the applicant's reported name against various databases and compares records that have the same name, a fingerprint-based background check (or biometric check) uses the | ***Lyft'S Inadequate Background Checks***<br><br>    Lyft relies on a quick, name-based background check process to screen its applicant drivers and has continuously refused to adopt an industry-standard, fingerprint-based background check qualification process.<br><br>    Lyft's background check process requires drivers to submit personal identifiers (driver's license and social security number) through an online webpage. Lyft, in turn, provides this information to third party vendors to perform a basic, name-based background check.<br><br>    Neither Lyft nor the third-parties it uses for background checks verify that the information provided by applicants is accurate or complete. The turnaround time for a Lyft background check is typically between 3-5 days.<br><br>    The difference between name-based background checks and fingerprint-based background checks is significant. While a name-based background check searches the applicant's reported name against various databases and compares records that have the same name, a fingerprint-based background check (or biometric check) uses the |

Comparison of JCCP and Federal Complaints

| Wagstaff Law Firm, P.C. | |
|---|---|
| **JCCP Allegations**<br>*Jane Doe L.T. v. Lyft, Inc.*, CGC-24-612511<br>(Super. Ct., S.F. Cnty., filed Feb. 2, 2024) | **Federal Allegations**<br>*Jane Doe 1 v. Lyft, Inc.*, 1:25-cv-03325-STV<br>(D. Colo., filed Oct. 21, 2025) |
| fingerprints of the individual to match against a law enforcement database, comparing records that have the same print, even if the names are different.<br><br>Compl., ¶¶ 25–28 (paragraph numbers omitted). | fingerprints of the individual to match against a law enforcement database, comparing records that have the same print, even if the names are different.<br><br>Compl., ¶¶ 43–46 (paragraph numbers omitted). |

Exhibit E

1  William A. Levin, Esq. (SBN 98592)
2  **LEVIN SIMES LLP**
   1700 Montgomery Street, Suite 250
3  San Francisco, California 94111
   Telephone: (415) 426-3000
4  Facsimile: (415) 426-3001
   Email: wlevin@levinsimes.com

5  Stephen J. Estey, Esq. (SBN 163093)
   R. Michael Bomberger, Esq. (SBN 169866)
6  Angela J. Nehmens, Esq. (SBN 309433)
   **ESTEY & BOMBERGER, LLP**
7  2869 India Street
   San Diego, CA 92103
8  Telephone: (619) 295-0035
   Facsimile: (619) 295-0172
9  Email: steve@estey-bomberger.com
   Email: mike@estey-bomberger.com
10 Email: angela@estey-bomberger.com

11 Walt Cubberly, Esq. (SBN 325163)
   **WILLIAMS HART & BOUNDAS, LLP**
12 8441 Gulf Freeway, Suite 600
   Houston, Texas 77017
13 Telephone: (713) 230-2200
   Facsimile: (713) 643-6226
14 Email: wcubberly@whlaw.com

15 ATTORNEYS FOR PLAINTIFFS; PLAINTIFFS' LEADERSHIP COUNSEL

ELECTRONICALLY
**F I L E D**
*Superior Court of California,*
*County of San Francisco*

**07/03/2025**
**Clerk of the Court**
BY: JUDITH NUNEZ
Deputy Clerk

16                SUPERIOR COURT OF THE STATE OF CALIFORNIA

17                        COUNTY OF SAN FRANCISCO

18 Coordination Proceeding                  JUDICIAL COUNCIL COORDINATION PRO-
19 Special Title (Rule 3.550)               CEEDING NO. 5061

20 **IN RE LYFT RIDESHARE CASES**           *Case Assigned to the Honorable Jeffrey S. Ross, Dept.*
                                            *606*
21 This Document Relates to:
                                            **PLAINTIFFS' NOTICE OF MOTION AND**
22 ALL ACTIONS                              **MOTION TO ENTER AN ORDER**
                                            **GOVERNING COMMON BENEFIT WORK**
23                                          **AND EXPENSES; MEMORANDUM OF**
                                            **POINTS AND AUTHORITIES IN SUPPORT**
24
25                                          Judge:   Hon. Jeffrey S. Ross
                                            Dept:    606
26                                          Date:    July 29, 2025
                                            Time:    9:00 AM
27
28                                          *Hearing Date Approved By Department 606*

CASE NO. CJC-20-005061
NOTICE OF MOTION AND MOTION TO ENTER A PROPOSED COMMON BENEFIT ORDER

1    **TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

2         **PLEASE TAKE NOTICE** that on July 29, 2025, at 9:00 AM, or as soon thereafter as the matter

3    may be heard in Department 606 of the above-entitled Court, Plaintiffs will and hereby do move, for a

4    Common Benefit Order entering a protocol and procedure for timekeeping and expenses.

5         This Motion is based on this Notice of Motion and Motion, the accompanying Declaration, the

6    records and files herein, and such other matters as the Court may consider at the hearing.

7    Dated:   July 3, 2025

8                                         Respectfully Submitted,

9                                         **LEVIN SIMES LLP**

10

11                                        William A. Levin
                                          *Co-Lead Counsel for Plaintiffs*

12

13                                        **WILLIAMS HART & BOUNDAS LLP**

14

15                                        Walt Cubberly
                                          *Co-Lead Counsel for Plaintiffs*

16

17                                        **ESTEY & BOMBERGER, LLP**

18

19                                        Stephen J. Estey
                                          *Co-Lead Counsel for Plaintiffs*

20

21

22                                        **CUTTER LAW, P.C.**

23

24                                        Celine E. Cutter
                                          *Liaison Counsel for Plaintiffs*

25

26

27

28

- 1 -

CASE NO. CJC-20-005061
NOTICE OF MOTION AND MOTION TO ENTER A PROPOSED COMMON BENEFIT ORDER

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.    INTRODUCTION

Plaintiffs Leadership Group hereby submits a Proposed Common Benefit Order attached to Mr. Levin's declaration as **Exhibit A** (hereinafter "Levin Decl."). The Proposed Common Benefit Order (hereinafter "Proposed Order") is modeled upon, and consistent with, the substance and structure of the Common Benefit Orders entered in by Judge Schulman *In re Uber Rideshare Cases*, JCCP No. 5188 litigation, and by Judge Breyer *In Re: Uber Technologies, Inc. Passenger Sexual Assault Litigation,* MDL No. 3084. Those orders are attached to Mr. Levin's declaration as **Exhibit B** and **C**, respectively.

Plaintiffs Leadership Group has met and conferred with counsel for Lyft concerning this Proposed Order and has made certain revisions to the initial draft at Lyft's request. Lyft has been provided with a copy of **Exhibit A** and has no objections, either to the form of the order, or its substance. After incorporating the changes suggested by Lyft, Plaintiffs Leadership Group circulated **Exhibit A** to all counsel representing Plaintiffs within the JCCP. Thereafter, certain Plaintiffs firms informed Leadership that they would object to the entry of this Common Benefit Order. Consequently, we are proceeding by noticed motion in lieu of stipulation.

In Section III, we discuss the jurisprudence which supports the Proposed Common Benefit Order. While the objectors will obviously have an opportunity to formally present their objections to the Court, it does not appear that the objecting firms will be disputing the legal foundation which supports common benefit awards generally. Instead, the objections appear to run to process and timing issues. Before we address those concerns specifically, we believe it would be helpful to discuss the procedural history which preceded this motion.

### II.    FACTUAL BACKGROUND

On January 17, 2020, the Judicial Council of California created the *In Re: Lyft Rideshare Cases,* JCCP No. 5061("the JCCP Proceeding") in order to coordinate numerous actions against Lyft, Inc., arising from the sexual assault of Lyft passengers by Lyft drivers in California State Courts. On May 10, 2021, the Court appointed Plaintiffs' Co-Lead[1] Counsel and Liaison Counsel[2].  Pursuant to these orders, lead counsel and liaison counsel are charged with responsibility for prosecuting the In Re *Lyft Rideshare*

---

[1]Cutter Law, PC, Estey & Bomberger, LLP, and Levin Simes LLP
[2]Cutter Law, PC, Estey & Bomberger, LLP, Levin Simes LLP, and Williams Hart Boundas, LLP

*Cases* on behalf of all JCCP Plaintiffs. As we sit here today, firms outside the Leadership group represent 408 Plaintiffs within the JCCP, roughly twenty-two percent of the cases.

Since the outset of the JCCP proceeding, the four leadership firms have performed substantial work and have advanced all litigation expenses on behalf of all Plaintiffs in the JCCP. The Leadership Group incurred more than $500,000 in out of pocket costs, apart from the costs incurred in connection with specific cases.  These costs include the hosting of an electronic discovery platform which supports more than 195,000 documents that were produced by Lyft, the depositions of over 30 corporate witnesses, discovery master fees, expert witness fees, expenses associated with bellwether discovery and trial preparation for the bellwether trial set cases. Obviously, it will be necessary to continue performing work and incurring expenses for the benefit of all Plaintiffs.

When the Plaintiffs Leadership Group was appointed by Judge Cheng in May of 2021, only four plaintiffs were represented by the by firms other than the four leadership firms. At the time, since almost all of the Plaintiffs were represented by leadership firms, the four firms decided to self-fund the litigation and work together without a formal common benefit order. At the time Judge Cheng stayed all of the cases in April of 2023, there were only nineteen Plaintiffs whom were represented by firms other than the four leadership firms. During the stay, the number of Plaintiffs represented by other firms grew considerably. The stay lasted fourteen months. As a result of these developments, the four leadership firms began discussing whether to propose a common benefit order which would address both litigation funding and compensation for work performed on behalf of all Plaintiffs. At the first case management conference on August 16, 2024, after the stay was lifted, there were 103 Plaintiffs represented by other counsel, more than a fivefold increase.

Thereafter, Plaintiffs Leadership Group began drafting a Proposed Common Benefit Order for the purpose of providing a reimbursement mechanism to compensate the leadership firms for both hard costs and for the time devoted to developing the liability case for all Plaintiffs. After the stay was lifted, the leadership group began meeting and conferring with Lyft counsel concerning the Proposed Common Benefit Order. On April 18, 2025, Lyft confirmed that it had no objection and wasn't taking a position as to this Proposed Order. (*See* Levin Decl. Exhibit D) Three days after obtaining the sign-off from Lyft, the leadership group emailed a copy of the Proposed Order to the non-leadership firms, with the expectation that there would be no objection because it was modeled after the common benefit orders in the Uber JCCP and MDL.  Notably, some of the non-leadership firms in this case hold leadership positions

in the Uber MDL and were involved in drafting the common benefit order that serves as the basis for the Proposed Order.  However, counsel for one of the other firms raised certain concerns about the timing of the Proposed Order. Leadership responded to those concerns (*See* Levin Decl. Exhibit E) Approximately one month later, the leadership group again reached out to the firm who had raised such concerns in order to determine if those concerns were still at issue. (*See* Levin Decl. Exhibit E). Counsel confirmed they were still planning on objecting on May 23, 2025. (*See* Levin Decl. Exhibit E)

## III.    LEGAL ARGUMENT

### A.  Common Benefit Orders Are Common in Coordinated Proceedings

"The equitable common fund/common benefit doctrine 'authorizes attorney fees only when the litigants preserve or create a common fund for the benefit of others as well as themselves." (*Vizcaino v. Microsoft Corp.* (9th Cir. 2002) 290 F.3d 1043, 1051–52 (9th Cir. 2002).)

> Courts have recognized an inherent authority to establish and operate common funds, to assess parties and their counsel, and to apportion and distribute the pooled monies. As its name suggests, a common benefit fund (CBF) is meant to compensate attorneys for the costs borne and work performed for the common benefit of all plaintiffs and their counsel. Hence, the primary theory underlying such funds is the common benefit doctrine, which holds that persons who obtain the benefits of a lawsuit without contributing to defraying its costs are unjustly enriched at the successful litigant's expense.[3]

The "common benefit" exception is an extension of the "common fund" exception, which is rooted in the power of a court of equity to control the disposition of an identifiable fund within its jurisdiction that has been created or preserved by the actions of a litigant. (*See generally Hall v. Cole* (1973) 412 U.S. 1.)

Common Benefit funds in coordinated actions are common in order to ensure that the attorneys who are primarily handling the litigation are compensated for the investment of their time. (*Vizcaino*, 290 F. 3d at 1051-52.) Here, the leadership firms have been operating without a common benefit order since the litigation started. However, the time has come to bring this motion in order establish such a fund as the litigation progresses toward the October 9, 2025 trial date. Use of the common benefit doctrine to compensate attorneys who work for the common good of all plaintiffs is necessary for JCCPs to

---

[3] Bolch Judicial Institute, *Guidelines and Best Practices for Large and Mass Tort MDLs (Second Edition)*, 64 (September 2018).

- 4 -

be an effective means for the timely and economic resolution of cases. (5 William Rubenstein, et. al., NEW-BERG ON CLASS ACTIONS § 15.116 (5th ed. 2013).) Management of complex JCCPs would be impossible without court-appointed counsel. If court-appointed counsel are to be an effective tool, the court must have the means at its disposal to order appropriate compensation for them.

Courts have properly exercised their inherent case management authority to apply the common benefit doctrine and implemented such orders. For example, the following other coordinated actions enacted similar orders: *In re Johnson & Johnson Talcum Power Products Litigation*, MDL 16-2738, *In Re JUUL Labs*, 3:19-md-02913, *In re JUUL Labs*, JCCP 5052; *see also In re CookMedical, Inc., Pelvic Repair Systems*, 365 F. Supp. 3d 685, 695 (MDL No. 2440) (S.D.W.V. 2019)(collecting cases); *In re MGM Grand Hotel Fire Litig.*, 660 F. Supp. 522, 525-29 (D. Nev. 1987);*In re Air Crash Case* 3:19-md-02913; Case No. 3:19-md-02913-*WHO Disaster at FloridaEverglades* on December 29,1972, 549 F.2d 1006, 1019-21 (5th Cir. 1977); *In re Zyprexa Prods.Liab. Litig.* (MDL No. 1596), 467 F. Supp. 2d 256, 265-267 (E.D.N.Y. 2009); *In re Sulzer HipProsthesis and Knee Prosthesis Prods. Liab. Litig.*, 268 F.Supp.2d 907 (N.D. Ohio 2003), affirmed, (6th Cir. 2005.) 398 F.3d 778.

Further, the Proposed Order is consistent with common practice in similar litigations, as it identifies the categories of work that qualify as common benefit and establishes a clear mechanism for submitting time entries tied to objectively verifiable tasks with a defined time frame. Common benefit work includes, *inter alia*, the review of Lyft corporate documents as assigned by the leadership firms; the retention and preparation of expert witnesses; preparation for and participation in corporate witness depositions; preparation for and attendance at case management conferences; motion practice on issues affecting all Plaintiffs; and bellwether case-specific discovery and trial preparation. This work was and is critical to the overall liability case against Lyft, and the majority of it has already been performed.

Finally, the holdback percentage is in line with other JCCPs and MDL which other Courts have implemented. For example, in the In re JUUL Labs JCCP 5052, the holdback percentage is 7%, with 2% attributable to costs. In *In re Johnson & Johnson Talcum Power Products Litigation MDL*-16-2738, there was no specific defined holdback percentage in the ordinal common benefit order, PTO No. 7. Here, the holdback percentage is 5%, with 1% attributable to case costs. This is reasonable and lower than the holdback in the JUUL JCCP.

**B.**  **California Courts Have Broad Authority To Regulate And Compensate Common Benefit Work.**

Under California Code of Civil Procedure §404.1 and the California Rules of Court (Rules 3.500–3.550), the coordination judge is granted broad discretion to make case management orders to promote efficiency and fairness in coordinated proceedings. These rules were designed precisely for mass tort or multi-jurisdictional litigation like the present JCCP.

The coordination judge may issue "any appropriate orders to ensure the just and efficient conduct of the coordinated actions." (Cal. Rules of Court, Rule 3.530(a)(1).) This includes the ability to super-vise counsel, manage the allocation of work, and enter orders concerning the sharing of expenses and compensation for leadership roles. (*See Johnson v. GlaxoSmithKline, Inc.* (2008) 166 Cal.App.4th 1497, 1509 [trial court has discretion to approve and manage fee and cost-sharing arrangements in coordinated mass tort proceedings].) There is no California authority barring the establishment of a common benefit fund after the majority of discovery has taken place. Instead, California courts have long exercised dis-cretion to enter equitable orders at any point in the litigation where justice, fairness, and judicial effi-ciency so demand.

Moreover, with respect to the process of the reconstruction of common benefit time, the Pro-posed Order preserves all objections to any actual common benefit award. As such, should any counsel choose to object to a particular time entry or benefit conferred, it can do so. However, co-lead counsel seeks only time accounts that are tied to specific events in the litigation that are documented. For exam-ple, court hearings, depositions, co-lead meetings, etc. In effect, the actual time submitted to the Court for common benefit consideration will likely be far less than the time that was actually spent. The notion that contemporaneous time is more reliable than time compiled later may be true in terms of capturing all time spent. However, the issue of time reconstruction, as presented by the other firms here, is related to time padding rather than the complete capture of time. The Proposed Order here seeks to minimize that concern as it ties the time to a specific event that can be objectively identified such as a case man-agement conference, deposition, etc. Further under the Proposed Common Order—and consistent with the two similar orders already entered in the Uber proceedings—Plaintiffs have proposed a structured and fair process for review of common benefits submissions. An appointed neutral will evaluate all time and expense submissions. This process allows for challenges to both the reasonableness of time and ex-pense entries and the substantive question of whether the work performed actually conferred a common benefit. These determinations are expressly deferred and resolved in accordance with the procedures set

- 6 -

forth in the Proposed Order.

### i. The Court's Inherent and Equitable Authority Permit The Relief Requested.

California courts are empowered to issue retroactive orders where warranted by equity. (*Estate of Reade* (1948) 31 Cal.2d 669, 671.) Equitable doctrines like **unjust enrichment** and **quantum meruit** permit compensation for benefits conferred upon others without prior agreement, particularly where work was done for the benefit of a broader class. As the California Supreme Court has recognized, trial courts may fashion equitable relief to prevent unjust results where services were performed with a reasonable expectation of compensation and conferred a clear benefit. (*See Day v. Alta Bates Med. Center* (2002) 98 Cal.App.4th 243, 248–250; *Maglica v. Maglica* (1998) 66 Cal.App.4th 442, 449–450.)

The Restatement (Third) of the Law Governing Lawyers observes, counsel has a right to recover 'a fair fee in quantum meruit' when 'a client and lawyer have not made a valid contract providing for another measure of compensation." (E.C. Burch, Mass Tort Deals, CAMBRIDGE UNIVERSITY PRESS (2019), (citing Restatement (Third) of the Law Governing Lawyers § 39 (Am. Law Inst. 2000)).) Common Benefit funds in coordinated actions are common in order to ensure that the attorneys who are primarily handling the litigation are compensated for the investment of their time. (Vizcaino, 290 F. 3d at 1051-52.)  While "the law concerning the substantive right to a common benefit fee and the procedures for establishing that fee are noticeably sparce," quantum meruit is a theory of equitable relief that aligns with attorneys' fees jurisprudence more generally. (5 William Rubenstein, et. al., NEWBERG ON CLASS ACTIONS § 15.116 (5th ed. 2013); Id.)

Although this JCCP proceeding may not yet involve a formal common benefit fund, the governing principles remain the same: the leadership firms have undertaken substantial work and incurred significant costs for the benefit of all Plaintiffs. Fundamental fairness dictates that they should not shoulder that burden alone. Denying equitable compensation while other firms and Plaintiffs benefit from their efforts—without contributing—would undermine the very principles of fairness and equity that these proceedings are meant to uphold. (See *Boeing*, 444 U.S. 472, 480-82 (1980) (stating that without an effective method to compensating counsel for helping litigants recover, "class members would…be unjustly enriched.").)

Even if it has not yet applied explicitly in the JCCP context, California law supports such relief where counsel has rendered substantial services for the benefit of a collective group. (*Estate of Reade*

CASE NO. CJC-20-005061

NOTICE OF MOTION AND MOTION TO ENTER A PROPOSED COMMON BENEFIT ORDER

(1948) 31 Cal.2d 669; *Day v. Collingwood* (2002) 98 Cal.App.4th 243; *Maglica v. Maglica* (1998) 66 Cal.App.4th 442.) In addition, federal MDLs routinely authorize both retroactive and prospective common benefit orders as a matter of course, and California courts have often looked to such federal authority for guidance where state precedent is limited.

**D.  The Parties Have Met and Conferred About the Proposed Order**

Plaintiffs have sent a draft of the Proposed Order to Defendants. On April 18, 2025, Counsel for Lyft stated that Lyft has no objection to the Proposed Order. (*See* Levin Decl. Exhibit D) Plaintiffs forwarded a draft of the Motion and Declaration to Defendants on July 2, 2025. On July 3, 2025, Counsel for Lyft stated that Lyft has no position on the Motion and Declaration.

**IV.    CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully request this Court enter the Proposed Common Benefit Order entering a protocol and procedure for work performed and expenses incurred that inure to the common benefit of Plaintiffs in the JCCP Proceeding.

Dated: July 3, 2025

Respectfully Submitted,

**LEVIN SIMES LLP**

William A. Levin
*Co-Lead Counsel for Plaintiffs*

**WILLIAMS HART & BOUNDAS LLP**

Walt Cubberly
*Co-Lead Counsel for Plaintiffs*

**ESTEY & BOMBERGER, LLP**

Stephen J. Estey
Angela J. Nehmens
*Co-Lead Counsel for Plaintiffs*

- 8 -

**CUTTER LAW, P.C.**

_____

Celine E. Cutter
_Liaison Counsel for Plaintiffs_

Exhibit F

1  Sommer Luther (PHV Pending)
   sluther@wagstafflawfirm.com
2  Benjamin Gillig (SBN 327873)
   bgillig@wagstafflawfirm.com
3  WAGSTAFF LAW FIRM
   940 Lincoln Street
4  Denver, CO 80203
   Telephone: 303-376-6360
5  Facsimile: 888-875-2889

6  [Additional Counsel Listed on Signature Page]

7

8

9          IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

10                  COUNTY OF SAN FRANCISCO

11

12 | *Coordination Proceeding*          | CASE NO. CJC-20-005061
   | *Special Title (Rule 3.550)*       |
13 |                                    | JUDICIAL COUNCIL COORDINATED
   |                                    | PROCEEDING NO. 5061
14 | **IN RE LYFT RIDESHARE CASES**     |
   |                                    | **NON-LEADERSHIP PLAINTIFFS'**
15 | This Document Relates to:          | **OBJECTIONS AND OPPOSITION TO**
   |                                    | **PROPOSED COMMON BENEFIT ORDER**
16 |     ALL ACTIONS                    |
   |                                    | [*Filed Concurrently with Declarations of Sommer*
17 |                                    | *Luther, Nicholas Farnolo, Rachel Abrams and*
   |                                    | *Paige Boldt*]
18 |                                    |
   |                                    | Judge: Hon. Jeffrey S. Ross
19 |                                    | Dept. 606

20

21

22         The firms in the Plaintiffs' Leadership Group have proposed a common benefit order of sweeping

23 scope. As outlined in detail below, the non-leadership plaintiffs represented by at least seven undersigned

24 firms must respectfully object to the unlawful, inequitable, and unworkable features of the Leadership

25 Group's plan. While the Non-Leadership Plaintiffs' Firms and the JCCP Leadership Group meaningfully

26 met and conferred, the parties were unable to reach agreement on three key features that merit the Court's

27 attention.

28         First, the Leadership Group's proposal, as written, would apply to cases that this Court has no

                                              1

authority to tax. In particular, the Leadership Group asks the Court to reach beyond the cases in this JCCP and capture cases with no connection to this coordinated state-court proceeding. The Court must limit the scope of any common benefit order to cases filed and litigated in this JCCP. It has no jurisdiction to stray further afield.

Second, the Leadership Group's plan to retroactively tax JCCP cases is both unworkable and inequitable. This consolidation is over five years old, not only will it be difficult (if not impossible) to reconstruct time and expenses from half a decade ago, but the Leadership Group's proposal also makes no provision for the many JCCP cases that have already settled. This is a fatal oversight. Taxing some JCCP cases but not others based on nothing more than the Leadership Group's delay in seeking a common benefit order is profoundly inequitable. The Court should either refuse retroactive application altogether or, in the alternative, require an accounting for prior settlements that should have been taxed.

Third, the amount of common benefit assessment, if any, should be determined at a later time following conferrals between the Leadership Group and non-leadership plaintiffs' counsel (and Defendants, if necessary). Given the lateness of this request, there is simply no reason to carve the hold-back percentage into stone now.

The undersigned respectfully submit a revised proposed common benefit order with this filing, which incorporates the changes necessary to deal with these objections in redline. Declaration of Sommer Luther, Exhibit A (hereinafter "Alternative CBO"). The Alternative CBO incorporates a Participation Agreement by reference. *Id.* at Exhibit B (hereinafter "Participation Agreement"). A clean copy of the Alternative CBO (with all edits accepted) is also filed. *Id.* at Exhibit C.

## I.     The Court Lacks Authority to Impose a Common Benefit Order on Cases Beyond Those Filed in and Coordinated into This JCCP

The Leadership Group proposes a CBO that, in addition to cases filed or coordinated into this JCCP, would cover all "Counsel who have filed at least one case in the JCCP and all claimants who are represented by such counsel wherein Plaintiffs['] counsel or claims represented by such counsel have benefitted from Common Benefit Work performed within the JCCP." Declaration of Sommer Luther, Exhibit D

(hereinafter "Leadership CBO") at 2.[1] This broad definition purports to include "[c]ases and claims filed in other jurisdictions" and "[a]ll unfiled cases and claims" that have benefited from common benefit work. *Id.* Apart from being vague to the point of unworkability, this definition appears calibrated to sweep in cases that this Court has no authority to tax. The Court should reject it.

### A.    The Leadership CBO's Scope "Definitions" Are Too Vague to Implement

At the outset, the Leadership CBO's definition of scope is unworkably vague, and the Leadership Group have made no attempt to articulate the limits of their proposed definition. For instance, the Leadership CBO is written to apply to "claimants" represented by a lawyer who also represents "at least one case in the JCCP." *See* Leadership CBO at 2. But the Leadership Group does not tell us who the "claimants" are. Is it any person who retains a lawyer who happens to have a JCCP case? Just the clients who (at some point) file a case somewhere (anywhere)? And who counts as "counsel" for the purposes of this inclusion criterion? The individual lawyers listed on the complaint? That lawyer's entire firm? Affiliated firms and local counsel?

These are all material questions the answers to which will dictate who is and who is not bound by the Leadership CBO. But the Leadership Group's proposal does not even attempt to supply responses. Instead, they appear to simply seek a CBO applicable nationwide to current, future, and past cases irrespective of where (or whether) filed, raising serious comity and due process concerns. As explained below, the Leadership CBO runs afoul of both law and equity in the process.

### B.    The Leadership CBO Calls on the Court to Exceed its Authority and Tax Cases Outside its Jurisdiction

Even if the Leadership CBO was not so vague as to be unworkable, its inclusion criteria would still be unlawful and fundamentally inequitable.

### 1.    It is Unlawful to Tax Cases Outside of This Court's Jurisdiction

The Leadership Group is (apparently) asking the Court to tax every case or claim that is represented by a lawyer who also represents a JCCP case. Leadership CBO at 2. This request is unlawful, and the

---

[1] This is the revised Leadership CBO sent to the Court on August 19, 2025, via email. It includes redlines changing the language from the proposal filed on July 7, 2025. The revised, redlined proposal was not filed on the JCCP's docket and so is submitted here via declaration. This brief uses the Leadership CBO's pagination.

1    Leadership Group does not really suggest otherwise.

2    Due process principles limit the scope of this Court's orders to those parties over which it has

3    personal jurisdiction. *Brue v. Al Shabaab*, 54 Cal. App. 5th 578, 586 (2020) (noting that "a trial court lacks

4    jurisdiction in a fundamental sense when it lacks personal jurisdiction over a part" rendering "any ensuing

5    judgment is void and 'vulnerable to direct or collateral attack at any time'" (citations omitted)). A plaintiff

6    who *files* her claim in a court consents to that court's personal jurisdiction over that claim as well as any

7    related claims she has. *Nobel Floral, Inc. v. Pasero*, 106 Cal. App. 4th 654, 658 (2003) ("The United States

8    Supreme Court has also long recognized that when a nonresident plaintiff commences an action, he submits

9    to the court's personal jurisdiction on" certain related actions (citation omitted)). Thus, the question

10   becomes whether, in this JCCP, unfiled or elsewhere-filed plaintiffs' claims become "related" to those

11   filed by JCCP plaintiffs simply because the two plaintiffs are represented by the same lawyer(s).

12   The answer to that question is clearly no. In directly-on-point persuasive authority, federal courts

13   in California have concluded that "the type of holdback order contemplated [by the Leadership CBO] is

14   tenuous at best," and only enforceable "when (1) counsel for [non-JCCP] claimants voluntarily consents

15   to the [trial] court's authority by signing, or otherwise entering into, a participation agreement requiring

16   contributions in exchange for access to common benefit work product, (2) that participation agreement is

17   incorporated into a court order, and (3) as a result of entering the participation agreement, counsel receives

18   access to common benefit work product." *In re Bard IVC Filters Prod. Liab. Litig.*, 81 F.4th 897, 901 (9th

19   Cir. 2023); *In re Roundup Prods. Liab. Litig.*, 544 F. Supp. 3d 950, 963 (N.D. Cal. 2021).[2]

20   None of these prerequisites to extra-JCCP application of a CBO are present in the Leadership CBO.

21   No non-leadership plaintiff (or their lawyer) has consented to be bound by the Leadership CBO or any

22   other CBO entered in this JCCP. No participation agreement has been incorporated into a court order.

23   Indeed, this is the first time that the Leadership Group has asked for a CBO, more than five years after

24   creation of this JCCP and after a 14-month delay that the Leadership Group firms ostensibly instigated for

25   the exclusive benefit of their own clients. *See also infra* Part II. And the Leadership Group does not even

26

27   _____

28   [2] An appeal of the *In re Roundup* decision was dismissed by the Ninth Circuit as unripe (i.e., challenging a non-final order). The Ninth Circuit went on to address the issues raised in the *Roundup* opinion in *Bard*, where the appellate court cited Judge Chhabria's *Roundup* order favorably. *See Bard*, 81 F.4th at 907.

pretend that any non-leadership plaintiff (or their lawyer) has received access to common benefit work. All the Leadership CBO papers (vaguely) suggest is that the Leadership Group may have *done* some common benefit work by reviewing a small (relative to the Uber MDL) corpus of documents. *See* Leadership CBO Motion (filed July 3, 2025) at 3. There is nothing in this case supporting the sweeping CBO that the Leadership Group wants.

Indeed, the Leadership CBO's provisions are similar to those rejected in *Roundup*. As that trial judge explained: "if one understands the power to order holdbacks as coming from the inherent docket management authority, it becomes even more obvious that a district court lacks the authority to apply holdbacks to a dispute outside the [consolidated proceeding] merely because the plaintiff in that dispute happened to hire a lawyer who represents a plaintiff within the [consolidated proceeding]." *Roundup*, 544 F. Supp. 3d at 963. That is because trial "courts merely have the power to manage 'their' dockets, and the purpose of this power is 'the efficient and expedient resolution of cases.'" *Id.* (citations omitted). "It's one thing to require holdbacks in your own cases for the purpose of ensuring those cases are litigated and adjudicated properly; it's quite another to insist that you need to manage your docket by issuing orders affecting disputes that are not before you." *Id.*

The Leadership Group may well argue that these persuasive authorities are inapposite because they come from federal courts. But this argument ignores the core commonality between federal and state CBO jurisprudence: it is based on well-established principles of equity, as the Leadership Group themselves acknowledge. *See Bard*, 81 F.4th at 905 & n.8; Leadership Group CBO Motion at 5-6 (listing California case-management/equity authorities generally authorizing entry of a CBO on equitable grounds). And as both *Bard* and *Roundup* recognize, there is nothing about a court's inherent authority that authorizes it to reach out and capture cases beyond those actually filed in the coordinated proceeding that it manages. *See Roundup*, 544 F. Supp. 3d at 963.

Indeed, the basic and unanimous agreement among trial courts that they lack the power to order around parties not on their own dockets is likely the reason that the Leadership Group cited *zero* authorities to support their overbroad CBO. Instead, the Leadership Group cites only cases that speak to the general authority courts have to create CBOs in coordinated proceedings and then refers to their own request as novel. Leadership Group CBO Motion at 7 (admitting that the motion asks for relief "not yet applied

explicitly in the JCCP context"). But as the above authorities show, the Leadership CBO is not novel. It is simply wrong.

If this Court is going to issue a CBO, it must significantly curtail its scope to cases filed and litigated here plus any lawyer that signs a participation agreement blessed by the Court. *See supra*. But since the Leadership Group has all but removed any reference to a participation agreement from their proposed CBO, the latter approach seems out of the question. *See* Leadership CBO at 4 (removing the section called "participation agreement and eligible participating counsel"). Perhaps recognizing the complexity of getting the extra-jurisdictional application of a CBO right, the Uber MDL judge (in addition to providing for a participation agreement) carved out any case in the Uber JCCP proceeding. *In re: Uber Technologies Inc. Passenger Sexual Assault Litig*, 23-md-03084 (N.D. Cal. May 23, 2024), Dkt. 1754 at 5, 9.

## 2. It is Also Unequitable to Tax Cases Whose Inclusion in a CBO is Not Foreseeable

Even if this Court had the authority to reach out and tax cases not on its docket "merely because the plaintiff in that dispute happened to hire a lawyer who represents a plaintiff within the [consolidated proceeding]," it should decline to do so on equitable grounds. *Roundup*, 544 F. Supp. 3d at 963. As explained above, the Leadership Group admits that the *entire* basis for the common benefit doctrine is in equity: it is inequitable to allow free-riding plaintiffs outside of leadership to benefit from the leadership's work without giving them equitable compensation. *See supra*. But, as the authorities above hold, it is also inequitable to bind plaintiffs to a CBO order just because their lawyers have one case venued in a consolidated proceeding.

Those inequities are doubled in *this* JCCP because the Leadership Group inexplicably waited half a decade to seek a CBO.[3] Had the Leadership CBO been entered at the outset of this litigation, plaintiffs would have at least been on notice that they were (purportedly) binding other clients to the CBO if they

---

[3] The Leadership CBO Motion suggests that the Leadership Group didn't think a CBO was needed because they had all the cases in the JCCP. Leadership CBO Motion at 2-3. But, after they asked for and got a 14-month stay, it turned out there were other people in this JCCP too. *Id*. Far from excusing the Leadership Group's delay, this highlights are far more fundamental problem: the Leadership Group has been operating this JCCP for the near-exclusive benefit of their own clients to the exclusion of everyone else. This is another reason the Court must introduce safeguards to ensure any CBO distribution is based solely on common benefits actually conferred. *See infra*.

ended up in the JCCP. But no such notice was given here and, as a result, there was no opportunity to be heard at the outset of this coordinated proceeding. Instead, the Leadership Group's delay means that their overbroad CBO was unknown and unforeseeable to plaintiffs who filed in California state court. This lack of notice and foreseeability offends basic notions of equity and due process alike. As the Ninth Circuit recently recognized in *Bard*, non-consolidated cases *may* be subject to a CBO entered by a judge in a consolidated proceeding. But before being bound, "(1) counsel for [non-consolidated] claimants [must] voluntarily consent[] to the [trial] court's authority by signing, or otherwise entering into, a participation agreement requiring contributions in exchange for access to common benefit work product, (2) that participation agreement is incorporated into a court order, and (3) as a result of entering the participation agreement, counsel receives access to common benefit work product." *Bard*, 81 F.4th at 901. None of that happened here (or will happen under the Leadership CBO).

The Leadership Group may argue that their most recent revisions—namely the addition of the phrase "that have benefitted from the Common Benefit work performed and expenses"—fix any problems with their CBO's scope. Not so. Though the addition of this reference to common benefit work is welcome, it still does not cure any of the consent issues that exist in any extra-JCCP application of a CBO, and are even more acute in this case where the CBO is being considered (many) years into the litigation. The Ninth Circuit supplied a model for implementing a CBO equitably in *Bard*. And the Leadership CBO simply doesn't cut it. The equities prohibit entry of the Leadership CBO without substantial revisions to the CBO's definition of scope. Such revisions follow.

## C. The Court Should Limit Any CBO to the Cases Filed in this JCCP that Utilize Common Benefit Work

If the Court is inclined to issue a CBO at this late juncture, *see infra* Part II, it should define the CBO's scope as set out in the Alternative CBO:

"This Order applies to cases filed in this JCCP, including:

(1) All cases or claims filed, coordinated into this JCCP and subject to the jurisdiction of this Court;

(2) All cases or claims in which any counsel associated signs a Participation Agreement;

(2) All cases or claims who elect to participate in a JCCP-negotiated or supervised

settlement agreement; and

(3) All filed cases or claims, where counsel for the claimant seeks common benefit fees or expenses in this JCCP.

This Order does not apply to the following cases:

(1) Any unfiled Lyft claims or cases.

(2) Any case or claim now pending, or later filed in, transferred to, or removed to, a federal court and treated as part of an MDL.

(3) Any case or claim subject to a separate common benefit order.

(4) Any cases or claims filed and litigated in other state or federal courts."[4]

Alternative CBO at 2-3.

Reference to a Lyft MDL is particularly important, given the growing number of cases being filed in federal courts throughout the country. Though not created yet, the likelihood that a federal multi-district litigation is in the offing has increased. *See* Luther Declaration at ¶ 9; *see also* Declarations of Nicholas Farnolo, Rachel Adams, and Paige Boldt. It would be improper for this Court to impose common benefit obligations on cases filed in an MDL simply because those cases are represented by (some of) the same lawyers as cases in this JCCP, just as it would by improper for an MDL court to impose common benefit obligations on cases filed here.

## II.    Retroactive Common Benefit Taxation is Unworkable

The Leadership CBO plans to look backward five years to the start of this litigation. This is fundamentally unworkable in two principal ways.

### A.    Accounting for Fees and Expenses Dating Back Five Years Will be Difficult if Not Impossible

Despite not recording their time or maintaining detailed records of their costs, the Leadership Group proposes to reconstruct their fees and costs going back to the start of this JCCP. California courts disfavor such backward-looking forensic accounting in fee/cost calculations for obvious reasons: it too often leads to inaccurate assessments and requires extraordinary amounts of court time to figure out. *See In re: Social*

---

[4] Additional exclusions may be necessary. *See infra* Part II.

*Addiction* (JCCP no. 5225) Stipulated Agreement as to Plaintiffs' Common Benefit Fees and Expenses at ¶ 32 (setting 6-month outer deadline for submission of costs, even if delays are outside the plaintiffs' control); *see also In re: Uber Technologies Inc. Passenger Sexual Assault Litig*, 23-md-03084 (N.D. Cal. May 23, 2024), Dkt. 558 at 13 (setting a 3-month outer deadline for submitting common benefit expenses). The Leadership Group appears to acknowledge at least some of these problems. The Leadership CBO submitted to the Court on August 19 includes a comment: "it is difficult to recreate time from 5 years prior to present and ability to assess prep time taken or time to review documents." Leadership CBO at 5. True. Further, the Leadership Group proposes to only charge for time spent in hearings and other "objectively variable [sic]" tasks (whatever that means), but this only underlines the need for a neutral referee. *See Id.* at 15. The Court should thus appoint a special master to consider applications for common benefit funds, and permit non-leadership plaintiffs and their lawyers with notice and an opportunity to be heard by both the special master and the Court.

### B.    The Leadership CBO Makes No Provision for Already-Settled Cases

Many cases in this JCCP have already settled, including many represented by the Leadership Group firms. Yet the Leadership Group makes no provision for those cases. Instead, they propose that expenses and common benefit fees stemming from those settled cases be assessed against the existing cases alone.

Doing so would be profoundly inequitable. The Court must make provision for settled cases to ensure that the expenses and fees are carried by all the cases to which they apply. Those provisions could take either of two alternate forms. First, the Court could refuse retroactive application of the CBO altogether. That way, only expenses and fees going forward (which are properly accounted for, *see supra*) are charged against the recovery of plaintiffs still in the JCCP. This is by far the simpler option. Second, the Court could require that any eventual CBO disbursement to the Leadership Group be reduced based on the amount of fees that would have been held back if the Court had entered the CBO at the outset of the JCCP. This approach will certainly require considerably more time and effort, as well as disclosure of information about pre-CBO settlements. Either way, the Court must make a provision for already-settled cases.

### C.    The Court Must Impose Robust Oversight and Deal With Settled Cases

The undersigned lawyers and firms respectfully suggest the following changes to the CBO to

address these concerns.

*First*, the provisions regarding the special master should be amended to add: "Within forty-five days (45) of the Court Appointment, the Special Master shall meet with JCCP Leadership and other interested Plaintiffs' counsel with the goal of identifying any additional protocols, standards, or procedures which may be helpful to further effectuate the goals set forth in this order. To the extent JCCP Leadership and other interested Plaintiffs' counsel identify any such additional protocols, standards, or procedures JCCP Leadership will keep the Court apprised of and may seek additional Orders if appropriate." *See* Alternative CBO at 24. Further, the Court should explicitly require that time and expense claims be analyzed for timeliness, and authorize the Special Master to reject them on that basis. *See* Alternative CBO at 22.

*Second*, the Court should decide whether it wishes to apply the CBO retroactively. If not, it should add the following to the list of exclusions from the CBO's scope: "This Order does not apply to any expenses or fees incurred prior to the entry of this Order. This Order applies prospectively only." *See* Alternative CBO at 3 (section on exclusions; note that this language is not included in the Alternative CBO). If the Court is open to retrospective application, however, it should enter the Alternative CBO, which directs the Leadership Group to "apply to the Court for specific Common Benefit Fee and Common Benefit Cost assessment amounts at a time to be determined in the future. Additionally, before any assessment is made pursuant to this Order, this Court shall determine an offset approach to account for cases already resolved that benefited from Common Benefit Work where Common Benefit Fees and Common Benefit Costs were not assessed. JCCP Leadership and the Non-Leadership Firms shall meet and propose an offset approach to this Court within 45 days if the entry of this Order." *Id*. at 15.

## III.    The Hold Back Percentages Can Be Decided Later

Finally, in the interest of efficiency and expeditious resolution of these important common benefit issues, the Court should defer decision on the precise holdback percentages until the special master is able to begin their work analyzing the common benefit charges. It could well be that so few of the Leadership Group's expenses and fees are actually for the common benefit that the holdback percent can be set quite low. This is another side effect of waiting so long to ask for a CBO: the special master will be in the best position to make a recommendation after hearing from all the plaintiffs' lawyers and analyzing at least the

initial claims from the Leadership Group. As set out in the Alternative CBO, the Court should simply state that holdback percentages are "to be determined at a later time." Alternative CBO at 18.

## IV.    Conclusion

The Court must significantly change the scope and calculations of the CBO in order to avoid the unlawful, unworkable, and inequitable features of the Leadership Group's proposed CBO.

Dated:  September 2, 2025                                              Respectfully submitted,

/s/ Sommer Luther
Sommer Luther (PHV Pending)
Benjamin Gillig (SBN 327873)
WAGSTAFF LAW FIRM
940 Lincoln Street
Denver, CO 80203
Telephone: 303-376-6360
sluther@wagstafflawfirm.com
bgillig@wagstafflawfirm.com

/s/ Nicholas Farnolo (with permission)
Roopal Luhana (Entered Pro Hac Vice)
Nicholas Farnolo (*Pro Hac Vice* to be submitted)
CHAFFIN LUHANA, LLP
600 Third Ave., 12th Floor
New York, New York 10016
Tel: (888) 480-1123
farnolo@chaffinluhana.com

/s/ Rachel Abrams (with permission)
RACHEL B. ABRAMS
PEIFFER WOLF CARR KANE
CONWAY & WISE, LLP
555 Montgomery Street, Suite 820
San Francisco, CA 94111
Telephone: (415) 426-5641
rabrams@peifferwolf.com

/s/ Paige Boldt (with permission)
ANAPOL WEISS
Alexandra M. Walsh
14 Ridge Square, 3rd Floor
Washington, DC 20016
Phone: (771) 224-8065
awalsh@anapolweiss.com
Holly Dolejsi
60 S. 6th St., Suite 2800
Minneapolis, MN 55402
Phone: (651) 376-2872
hdolejsi@anapolweiss.com
Paige Boldt (CA Bar# 308772)

11

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

325 N Saint Paul St, Suite 3100
Dallas, TX 75201
Phone: (202) 773-0381
pboldt@anapolweiss.com

/s/ Steven Schulte (with permission)
Steven Schulte (admitted PHV)
NACHAWATI LAW GROUP
5489 Blair Rd.
Dallas, TX 75231
Telephone: (469) 638-6824
schulte@ntrial.com

/s/ Marlene J. Goldenberg (with permission)
Marlene J. Goldenberg
NIGH GOLDENBERG RASO & VAUGHN PLLC
14 Ridge Square NW
Third Floor
Washington, DC 20016
Telephone: (202) 792-7927
mgoldenberg@nighgoldenberg.com

/s/ Tracey B. Cowan (with permission)
CLARKSON LAW FIRM, P.C.
Tracey B. Cowan (SBN 250053)
tcowan@clarksonlawfirm.com
Jamie M. Powers (SBN 329439)
jpowers@clarksonlawfirm.com
95 3rd Street, 2nd Floor
San Francisco, CA 94103
Tel: (213) 788-4050

*Counsel for Plaintiffs in Various Actions in this JCCP*

Non-Leadership Plaintiffs' Objections and Opposition to Proposed Common Benefit Order

## PROOF OF SERVICE

I certify that I am over the age of 18 and not a party to the within action; my business address is 940 Lincoln Street, Denver, Colorado 80203. On September 2, 2025, I served the foregoing document described as:

**NON-LEADERSHIP PLAINTIFFS' OBJECTIONS AND OPPOSITION TO PROPOSED COMMON BENEFIT ORDER**
**DECLARATIONS OF SOMMER LUTHER, NICHOLAS FARNOLO, RACHEL ABRAMS, AND PAIGE BOLDT**

Service was effectuated by forwarding the above-noted document in the following manner:

☒    **BY NOTICE OF ELECTRONIC FILING:** I electronically filed the document(s) by submitting an electronic version of the document(s) to File & ServeXpress through the user interface at www.FileandServeXpress.com.

Executed on September 2, 2025 in Denver, Colorado.

_/s/Emma Guidry_____
Emma Guidry, Senior Paralegal

Exhibit G

William A. Levin, Esq. (SBN 98592)
**LEVIN SIMES LLP**
1700 Montgomery Street, Suite 250 San
Francisco, California 94111
Telephone: (415) 426-3000
Facsimile: (415) 426-3001
Email: wlevin@levinsimes.com

Stephen J. Estey, Esq. (SBN 163093)
R. Michael Bomberger, Esq. (SBN 169866)
Angela Nehmens, Esq. (SBN 309433)
**ESTEY & BOMBERGER, LLP**
2869 India Street
San Diego, CA 92103
Telephone: (619) 295-0035
Facsimile: (619) 295-0172
Email: steve@estey-bomberger.com
Email: mike@estey-bomberger.com
Email: angela@estey-bomberger.com

Walt Cubberly, Esq. (SBN 325163)
**WILLIAMS HART & BOUNDAS, LLP**
8441 Gulf Freeway, Suite 600
Houston, Texas 77017
Telephone: (713) 230-2200
Facsimile: (713) 643-6226
Email: wcubberly@whlaw.com

ATTORNEYS FOR PLAINTIFFS;
PLAINTIFFS' LEADERSHIP COUNSEL

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF SAN FRANCISCO

| | |
|---|---|
| Coordination Proceeding<br>Special Title (Rule 3.550)<br><br>**IN RE LYFT RIDESHARE CASES**<br><br>This Document Relates to:<br><br>ALL ACTIONS | CASE NO. CJC-20-005061<br><br>JUDICIAL COUNCIL COORDINATION<br>PROCEEDING NO. 5061<br><br>*Case Assigned to the Honorable Jeffrey S. Ross,*<br>*Dept. 606*<br><br>**REPLY IN SUPPORT OF COMMON BENEFIT**<br>**TIMEKEEPING AND EXPENSE PROTOCOL** |

## I.  <u>INTRODUCTION</u>

On January 17, 2020, the Judicial Council of California created In Re Lyft Rideshare Cases, JCCP No. 5061 (the "JCCP Proceeding") in order to coordinate numerous actions against Lyft arising from the sexual assault of Lyft passengers by Lyft drivers. On November 9, 2020, the Court appointed Plaintiffs' Interim Co-Lead Counsel[1]. On May 10, 2021, the Court appointed Plaintiffs' Co-Lead[2] and Liaison Counsel.[3]

Pursuant to these orders, lead counsel and liaison counsel are charged with responsibility for prosecuting the *In re Lyft Rideshare* cases on behalf of all JCCP Plaintiffs. To date, the four JCCP Co-Lead firms have performed work on behalf of all JCCP Plaintiffs and have been funding expenses incurred on behalf of all JCCP Plaintiffs. As the litigation continues forward, it will be necessary to continue to perform work and incur expenses on behalf of all Plaintiffs in the JCCP.

It is fair and reasonable that counsel be compensated for such work and reimbursed for such expenses. At this juncture, JCCP Co-Lead and Liaison Counsel (collectively hereinafter referred to as "JCCP Leadership") seek a Common Benefit Order which provides for the submission of time and expenses, with respect to the work performed, and costs incurred, on behalf of all Plaintiffs in the JCCP. The Order is intended to provide timekeeping procedures for the submission of common benefit time and protocols for the submission of the expense reports.

## II.  <u>JCCP LEADERSHIP HAS DONE ALL THE WORK, TAKEN ALL THE RISK, AND WILL BE TAXED ALONG WITH ALL NON-LEADERSHIP FIRMS</u>

At the outset of the litigation, the four firms in plaintiffs' leadership represented the vast majority of plaintiffs. The leadership firms agreed, without court intervention, to share costs for the common benefit. In addition to costs, these firms undertook a tremendous amount of work for the common benefit: over 30 corporate witnesses deposed; nearly 200,000 documents reviewed; discovery disputes adjudicated before Referee Quinn on a monthly (and sometimes weekly) basis; extensive briefing on dispositive motions, including two rounds of motions for

---

[1] Levin Simes, LLP, Estey Bomberger, LLP and Cutter Law, PC
[2] Levin Simes, LLP, Williams Hart Boundas, LLP, Estey-Bomberger, LLP.
[3] Cutter Law PC

summary judgment; and cases brought to the eve of trial not once, but twice now.

While all this work has been getting done, a number of other firms have filed cases. The most recent tracker indicates, for example, that Chaffin Luhana have 155 filed cases, Peiffer Wolf Carr Conway & Wise have 146 filed cases, and Nachawati Law Group have 72 filed cases. The large majority of these were filed in 2024.  Doubtless these firms collectively have hundreds more cases that have yet to be filed because the statute of limitations does not require it yet. Those unfiled cases also benefit from the work being done by leadership. These firms are demonstrably opposed to paying their fair share. A court order has become necessary to address these would-be free riders.

None of the firms now opposing the entry of a common benefit order opposed the appointment of leadership counsel. In 2020 there were no competing applications for leadership. Nor did they raise their hands and volunteer to take on the work of proving the liability of a publicly-traded company for thousands of sexual assaults. In opposition to the entry of the common benefit order, several firms have filed declarations  -- but absent from these declarations is any description of a single task performed in service of the common benefit—or in proving liability for their clients' assaults. Among the opposition, there is not a single witness deposed, nor document reviewed. The first time these folks have taken the pen and submitted a brief in this litigation is in writing their opposition to this common benefit motion.

If and when these firms are able to resolve cases, it will be because of the possibility of adverse judgments created by litigation pressure from leadership. California courts recognize that litigation pressure drives settlement. (See e.g. *Martinez v. Brownco Construction Co.* (2013) 56 Cal.4th 1014, 1018 (discussing purpose of Code Civ. Pro. §998.)

## III.     LEADERSHIP PROPOSES A SECOND REVISED COMMON BENEFIT ORDER

Since filing the initial proposed common benefit order in July, plaintiffs' leadership has continued to discuss concerns raised by the other plaintiffs' firms. Leadership submitted a revised proposal on August 19, and in response to concerns raised in the opposition papers, leadership files herewith a second revision to the proposed common benefit order. (**Exhibit A**). This revision reflects leadership's position that cases will not be double taxed, and that plaintiffs who are "paddling their own canoes" in uncoordinated state court actions will not be taxed.

Plaintiffs successfully opposed a  forum non conveniens motion by Lyft, which has put this case in an unusual posture among mass torts—there is no parallel MDL. There was—and remains- no need for it because the JCCP is a forum where any plaintiff can file. In practical terms, the JCCP is functioning as an MDL because cases from around the county have been filed here in San Francisco, where Lyft is headquartered.  In the cases referenced in the opposition—*In Re Juul*  and the *Uber* matter, there are MDL leadership firms that worked together with the JCCP in *Juul* and are working together in *Uber.*

The firms opposing a common benefit order hint that an MDL may be formed. The formation of an MDL is by no means a given. If it does happen, the JCCP will not seek to tax cases in the MDL, assuming that the MDL does its own work. As in other mass torts with parallel JCCP and MDL proceedings, plaintiffs would be taxed in only one of the two.

Leadership has detailed cost records for the joint costs assessed and incurred, and tracked time during the pendency of the litigation and will submit that time when the order is entered. (Declaration of William A. Levin in Support of Motion, ¶ 4 (over $500,000 in costs incurred)).

## IV.    **CONCLUSION**

For the foregoing reasons,  Plaintiffs' leadership respectfully requests that the court enter the second revised proposed common benefit order submitted herewith.

                            RESPECTFULLY SUBMITTED,

Dated: September 5, 2025                LEVIN SIMES LLP


                            By: /s/ William A. Levin
                                William A. Levin
                                Laurel L. Simes


Dated: September 5, 2025                CUTTER LAW PC


                            By: /s/ Celine E. Cutter
                                Brooks Cutter
                                Celine E. Cutter

Dated: September 5, 2025                    WILLIAMS HART BOUNDAS LLP


                                           By:  /s/ Walt Cubberly
                                                Walt Cubberly
                                                Margret Lecocke



Dated: September 5, 2025                    ESTEY BOMBERGER LLP


                                           By:  /s/ Angela J. Nehmens
                                                Stephen J. Estey
                                                Angela J. Nehmen

# EXHIBIT A

1   William A. Levin, Esq. (SBN 98592)
2   **LEVIN SIMES LLP**
    1700 Montgomery Street, Suite 250 San
3   Francisco, California 94111
    Telephone: (415) 426-3000
4   Facsimile: (415) 426-3001
    Email: wlevin@levinsimes.com
5

6   Stephen J. Estey, Esq. (SBN 163093)
    R. Michael Bomberger, Esq. (SBN 169866)
7   Angela Nehmens, Esq. (SBN 309433)
    **ESTEY & BOMBERGER, LLP**
8   2869 India Street
9   San Diego, CA 92103
    Telephone: (619) 295-0035
10  Facsimile: (619) 295-0172
    Email: steve@estey-bomberger.com
11  Email: mike@estey-bomberger.com
    Email: angela@estey-bomberger.com
12

13  Walt Cubberly, Esq. (SBN 325163)
    **WILLIAMS HART & BOUNDAS, LLP**
14  8441 Gulf Freeway, Suite 600
    Houston, Texas 77017
15  Telephone: (713) 230-2200
    Facsimile: (713) 643-6226
16  Email: wcubberly@whlaw.com

17  ATTORNEYS FOR PLAINTIFFS;
18  PLAINTIFFS' LEADERSHIP COUNSEL

19              SUPERIOR COURT OF THE STATE OF CALIFORNIA

20                  COUNTY OF SAN FRANCISCO

21

22  Coordination Proceeding          CASE NO. CJC-20-005061
    Special Title (Rule 3.550)
23                                   JUDICIAL COUNCIL COORDINATION
                                     PROCEEDING NO. 5061
24
    **IN RE LYFT RIDESHARE CASES**   *Case Assigned to the Honorable Jeffrey S. Ross,*
25                                   *Dept. 606*
    This Document Relates to:
26                                   **SECOND REVISED PROPOSED ORDER**
        ALL ACTIONS
27

28

I. **APPLICATION AND SCOPE OF THE ORDER**

On January 17, 2020, the Judicial Council of California created In Re Lyft Rideshare Cases, JCCP No. 5061 (the "JCCP Proceeding") in order to coordinate numerous actions against Lyft arising from the sexual assault of Lyft passengers by Lyft drivers. On November 9, 2020, the Court appointed Plaintiffs' Interim Co-Lead Counsel[1]. On May 10, 2021, the Court appointed Plaintiffs' Co-Lead[2] and Liaison Counsel.[3]

Pursuant to these orders, lead counsel and liaison counsel are charged with responsibility for prosecuting the *In re Lyft Rideshare* cases on behalf of all JCCP Plaintiffs. To date, the four JCCP Co-Lead firms have performed work on behalf of all JCCP Plaintiffs and have been funding expenses incurred on behalf of all JCCP Plaintiffs. As the litigation continues forward, it will be necessary to continue to perform work and incur expenses on behalf of all Plaintiffs in the JCCP.

It is fair and reasonable that counsel be compensated for such work and reimbursed for such expenses. At this juncture, JCCP Co-Lead and Liaison Counsel (collectively hereinafter referred to as "JCCP Leadership") seek a Common Benefit Order which provides for the submission of time and expenses, with respect to the work performed, and costs incurred, on behalf of all Plaintiffs in the JCCP. This Order is intended to provide timekeeping procedures for the submission of common benefit time and protocols for the submission of the expense reports.

The terms "cases" and "claims" refer to cases or claims arising from alleged sexual misconduct or sexual assaults committed by a Lyft driver against a Lyft passenger, including claims against any or third party.

A. This Order applies to:

---

[1] Levin Simes, LLP, Estey Bomberger, LLP and Cutter Law, PC
[2] Levin Simes, LLP, Williams Hart Boundas, LLP, Estey-Bomberger, LLP.
[3] Cutter Law PC

1) Counsel who have filed at least one case in the JCCP and all claimants who are represented by such counsel wherein plaintiffs' counsel or claimants represented by such counsel have benefited from Common Benefit work performed within the JCCP. This includes the following:

    a. All cases filed now or later, coordinated into this JCCP, and subject to the jurisdiction of this Court;

    b. Cases and claims filed in other jurisdictions which have benefited from the Common Benefit worked performed and expenses incurred within the JCCP.

    c. All cases and claims, filed or unfiled, in which counsel who represents one or more JCCP Plaintiffs, receives or uses JCCP work product;

    d. All cases or claims settled pursuant to a JCCP negotiated or supervised settlement agreement;

B. If a coordinated multidistrict litigation proceeding is formed in federal court (MDL), and a common benefit order is entered in that MDL, cases filed in that MDL would be outside the scope of this Order.

## II.    Compensable Common Benefit Work

"Common Benefit Work" and "Common Benefit Expenses" includes all work done and expenses incurred that inure to the "benefit" of all Plaintiffs in this JCCP. Consistent with governing case law, and the purpose and spirit of this Order, Common Benefit Work is work undertaken to advance the litigation as a whole, which inure to the benefit of Plaintiffs and Claimants. Common Benefit works includes the development of the general liability case which is common to all Plaintiffs and Claimants through discovery, including without limitation to, written discovery, corporate representative depositions, large scale document production and management, retaining and preparing experts. Common Benefit work also includes managing the

litigation on behalf of all Plaintiffs and Claimants by seeking discovery, seeking discovery orders, and motion practice to obtain legal rulings on common issues of law and fact. Common Benefit Work shall be limited to the amount which is reasonably necessary to complete any given task efficiently and effectively. Common Benefit Work and Common Benefit Expenses that exceed what is reasonably necessary to complete a given task will not be compensated. Common Benefit Work and Common Benefit Expenses should be appropriately authorized and timely and appropriately submitted. Examples of compensable common benefit work when authorized may include, but are not limited to:

1. Reviewing Lyft corporate documents as assigned for review by JCCP Leadership;

2. Preparing and taking the lead in depositions, and work performed to support the lead attorney taking the deposition;

3. Attending and participating in hearings and case management conferences on behalf of JCCP Leadership;

4. Attending and participating in meet and confer calls and case management conferences on behalf of JCCP Leadership;

5. Attending and participating in co-lead meetings, calls. and case management conferences on behalf of JCCP Leadership;

6. Attending and participating in periodic JCCP all counsel calls;

7. Preparing and drafting discovery requests assigned by JCCP Leadership;

8. Drafting joint case management conference statements and informal discovery conference statements as assigned by JCCP Leadership;

9. Preparing and drafting motions as assigned by JCCP Leadership;

10. Expert related work, retaining, and preparing an expert witness as assigned by JCCP Leadership;

11. Bellwether case specific discovery and trial preparation;

12. Document review; and

13. Global settlement negotiations.

All time submitted within 60 days from the date of this Order and will be subject to evaluation. Time submissions that fail to meet the above criteria will be handled on a firm-by-firm basis. All time after the above submission must be submitted by the 20th day of each month, in accordance with the guidelines set forth below.

### III.    CASE MANAGEMENT PROTOCOLS FOR COMMON BENEFIT WORK

The Court hereby adopts the following protocol, which shall govern all the submission of time and expenses.

Counsel are eligible for reimbursement for time and efforts expended for the Common Benefit. Participating Counsel shall be eligible to seek reimbursement for time and efforts expended for Common Benefit Work if said time and efforts are: (a) for the common benefit of all Plaintiffs; (b) timely and appropriately submitted; (c) not duplicative; (d) reasonable in the determination of the Court, or its designee, as informed by the recommendation of a Special Master to be subsequently appointed by the Court pursuant to Section VI; and (e) appropriately authorized. The Court may appoint a fee committee per subsequent order.

Time spent on unauthorized work will not be compensable.

Any counsel seeking reimbursement for Common Benefit fees and Common Benefit expenses under this order shall submit until thirty days (30) after the entry of this Order, Common Benefit fees and Common Benefit expenses to JCCP Leadership to Levin Simes LLP via email to LyftCB@levinsimes.com who will enter the time and expenses on behalf of all submitting counsel in MyHours, a software program which will be utilized by JCCP Leadership in order to maintain the record of submitted common benefit time and expenses. This will be done temporarily until

thirty days (30 ) after the entry of this Order; the deadline for Levin Simes to retain a software vendor that will assume this responsibility.

JCCP Leadership is interviewing software vendors with experience in maintaining common benefit time and expenses in mass tort litigation. It is the expectation of JCCP Leadership that Levin Simes LLP will only maintain the time and expense submissions within MyHours an interim basis until September 30, 2025 by which time it will hire a software vendor that will assume be responsible for this function.

The ultimate determination of what is compensable common benefit work, and the extent to which it is compensable, is within the purview of the Court-appointed Special Master [Cathy Yanni]and the Court. In the event that counsel are unsure whether the action they are about to undertake will be considered common benefit work, they shall receive approval from JCCP Leadership in advance as to whether JCCP Leadership would deem such work as work performed for the common benefit.

**A.  <u>Common Benefit Timekeeping Protocols</u>**

**1.  Recording Requirements**

Timekeeping submissions for Common Benefit Work must be accurately maintained. Time submissions for Common Benefit Work performed after the entry of this Order must be contemporaneously maintained. Any counsel intending to seek payment of common benefit attorneys' fees and reimbursement of common benefit costs and expenses shall keep contemporaneous billing records of time spent in connection with Common Benefit Work in this JCCP, indicating with specificity the hours (in tenth-of-an-hour increments), along with a description of the particular activity.

Descriptions must bear sufficient detail to identify the precise task and how it relates to Common Benefit Work. Individuals identified in time descriptions must be described by at least

their first initial and last name, not by initials. "John Doe" is preferred; "J. Doe" is acceptable; and "JD" is unacceptable.

Each time entry must be categorized using one of the categories in Exhibit A. In general, when possible, a more specific category should be used in place of a more general category. Under no circumstances should a submitting firm create new categories for use in its submission. JCCP Leadership will provide further guidance through memorandum to counsel as needed.

While the time entry categories are generally self-explanatory, below are further explanations for some of the categories that have the potential for confusion:

    a. JCCP Leadership Duties - This category code should only be used for work done by JCCP Leadership, other Court-appointed counsel, and their assigned attorneys and staff, in their capacity as JCCP Leadership. This category should be used primarily for JCCP Leadership members' more general or administrative responsibilities that do not fit into other, more specific categories. These include, but are not limited to, reviewing, analyzing, and summarizing filings and orders as appropriate based on the work being conducted by counsel, or coordinating and designating non-Court-appointed attorneys to conduct common benefit tasks such as document reviews, depositions, or work with experts. This category should not be used by any timekeeper who is not Court-appointed counsel or one of their assigned attorneys or staff.

    b. Document Review - For the purposes of this category, the word "document" specifically means documents or other information produced in discovery (or, for a producing party, which are being reviewed for possible production). In other words, this category is not to be used for every instance of reading a document-it is more specific. Time entry descriptions for document review tasks should include specific

details such as custodians, search query, number of document folders reviewed, or other similar details.

c. Trial – This category is reserved solely for tasks performed during a trial.

d. Miscellaneous - This is a general category that should not be used if a more specific category can be used instead. Any activities done in connection with or as part of a larger task like a brief, or a court appearance, or a meeting, should be categorized according to that larger task. This category should be used relatively infrequently. However, when it is used, it is critical that the description of the task be sufficiently detailed to make clear how the work performed was Common Benefit Work.

**2. Hourly Rates**

Counsel shall record their then-present hourly rates for all attorneys and staff. Counsel shall not bill a rate other than their standard rates at all time work is performed. Use of these rates does not guarantee their payment.

**B. Common Benefit Expense Protocols**

**1. Common Benefit Expenses**

"Common Benefit Expenses" are costs incurred prior to the entry of this Order and future costs that will be paid out of the Litigation Fund administrated by JCCP Leadership. Participating Counsel shall contribute to the Litigation Fund at times and in amounts sufficient to cover Plaintiffs' Shared Costs. The timing and amount of each assessment will be determined by JCCP Leadership, and each assessment will be paid within 14 days as instructed by JCCP Leadership. Failure to pay assessments will be grounds for removal from the appointments made in previous Court orders or other common benefit assignments.

Common Benefit Expenses are costs incurred for the common benefit of Plaintiffs. All Common Benefit Expenses must ultimately be approved by JCCP Leadership. No case specific

costs, except  costs relating to cases selected as bellwether cases that will be for the common benefit (e.g., related to liability and causation), shall be considered Common Benefit Expenses, unless exceptional circumstances exist and are approved by later order of this Court. All costs that meet these requirements and fall under the following categories shall be considered Common Benefit Expenses and qualify for reimbursement. Such costs may include:

     a. Court filing, and service costs related to common issues;

     b. Costs for transcripts of court hearings related to common issues;

     c. Court reporter and interpreter costs for general liability depositions;

     d. Document (both electronic and hard copy) depository creation, operation, staffing, equipment, and administration;

     e. Common benefit administrative expenses (e.g., expenses for courtroom equipment or technology, service costs for court filings and discovery documents, costs related to hosting JCCP Leadership and leadership meetings and conference calls);

     f. Legal, tax, accountant, or financial institution fees relating to the Fund;

     g. Expert witness and consultant fees and expenses for experts approved by JCCP Leadership whose opinions and testimony would be for the common benefit;

     h. Printing, copying, coding, and scanning related to the above (only out-of-house or extraordinary firm costs);

     i. Research by outside third-party vendors, consultants, and attorneys performed for the common benefit, approved by JCCP Leadership;

     j. Translation costs incurred for the common benefit and approved by JCCP Leadership;

     k. Investigative services incurred for the common benefit and approved by JCCP Leadership;

     l. Appellate counsel, incurred for the common benefit and approved by JCCP Leadership.

JCCP Leadership shall prepare and be responsible for distributing reimbursement procedures and the forms associated therewith. Requests for payments from the Fund for common benefit expenses shall include sufficient information to permit JCCP Leadership and, as appropriate, a Certified Public Accountant to account properly for costs and to provide adequate detail to the Court if necessary.

**2. Held Costs**

"Held Costs" are those that will be carried by each attorney in this JCCP Litigation and reimbursed as and when JCCP Leadership determines. Held Costs are those that do not fall into the above Common Benefit Expenses categories but are incurred for the common benefit of all Plaintiffs in this JCCP litigation. No client-specific costs can be considered Held Costs, other than certain common benefit costs relating to future bellwether cases at the discretion of JCCP Leadership. Held Costs shall be recorded in accordance with the guidelines set forth herein and shall be subject to the travel and administrative limitations set forth in this Order.

**3. Travel Limitations**

  **a.** Only reasonable expenses will be reimbursed. Except in unusual circumstances approved by JCCP Leadership, all travel reimbursements are subject to the following limitations:

  **b. Airfare:** For routine domestic flights, only the price of a refundable, changeable, and convenient coach fare seat or its equivalent will be reimbursed. For international travel or transcontinental flights with a total duration exceeding five and a half hours, business class, or if business class is not available, first class may be reimbursed at JCCP Leadership's discretion. Private or charter travel will not be reimbursed except in unusual circumstances, as approved by JCCP Leadership.

**c. Hotels:** Reasonable hotel room charges for the average available room rate of a reasonable business hotel will be reimbursed. Unusually high hotel charges may be reviewed by JCCP Leadership and disallowed.

**d. Meals:** Meal expenses must be reasonable. Unusually large meal expenses may be reviewed by JCCP Leadership and disallowed.

**e. Cash Expenses:** Miscellaneous cash expenses for which receipts generally are not available (e.g., tips, luggage handling) will be reimbursed up to $50.00 per trip, if the expenses are properly itemized.

**f. Automobile Rentals:** Automobile rentals must be reasonable for the date and location of the rental. Unusually high car· rental charges may be reviewed by JCCP Leadership and disallowed.

**g. Mileage:** Mileage claims must be documented by stating origination point, destination, and total actual miles for each trip. The rate will be the maximum rate allowed by the Internal Revenue Service.

**4. Non-Travel Limitation**

**a. Long Distance, Conference Call, and Cellular Telephone Charges:** Common benefit long distance, conference call, and cellular telephone charges are to be reported at actual cost.

**b. Shipping, Overnight, Courier, and Delivery Charges:** All claimed common benefit shipping, overnight, courier, or delivery expenses must be documented with bills showing the sender, origin of the package, recipient, and destination of the package. Such charges are to be reported at actual cost.

**c. Postage Charges:** Common benefit postage charges are to be reported at actual cost.

**d. Telefax Charges:** Common benefit fax charges shall not exceed $0.25 per page.

**e. In-house Photocopy:** The maximum charge for common benefit in-house copies is $0.15 per page.

**f. Computerized Research – Lexis, Westlaw, or Bloomberg:** Claims for Lexis, Westlaw, Bloomberg, or other computerized legal research expenses should be in the actual amount charged to the firm and appropriately allocated for these research services.

**C. <u>Common Benefit Expense Reporting Protocol and Requirements</u>**

Every expense entry should be as detailed and specific as reasonably practical. Every entry must describe the task for which the expense was incurred in enough detail to reasonably identify what the expense was, who incurred it, why it was incurred, and how it related to Common Benefit Work.

No entry should contain more than one category of expense when practical, and no entry should have more than one expense category code assigned to it. If, on the same day, one person incurs two expenses that fall into two different categories, there should be two separate entities for that person for that date, each with the appropriate expense description and category code. Similarly, when practical, no listed expense entry should include expenses incurred by more than one person. If multiple people incur the same expense for the same category, generally there should be a separate entity for each person, unless a single person paid the expense for multiple people.

Every expense entity should be as detailed and specific as reasonably practical. Every entity must describe the task for which the expense was incurred in enough detail to reasonably identify what the expense was, who incurred it, why it was incurred , and how it related to Common Benefit Work. For example: What was filed and on behalf of whom? Who was served with what document and on behalf of whom? What transcript was requested and for what purpose? For whom was the plane ticket purchased, for air travel from where to where, on what dates of travel? (The

same goes for hotels, taxis, car services, tips, meals, and any other travel related expenses.) Expense entries without sufficient detail may be rejected by the Court-appointed Special Master.

Attorneys shall provide receipts for all expenses. This does not mean that receipts are to be provided "upon request"-it means each firm must provide receipts monthly along with their expense submissions, in PDF form, not hard copy. Credit card receipts (not the monthly statements) are an appropriate form of verification. Hotel costs must be proven with the full hotel invoice. Description of expenses on an invoice not claimed in this action may be redacted. All time and expense submissions, including claimed billable hourly rates, shall be reviewed and certified by a partner or shareholder in the Common Benefit Counsel firm attesting to the accuracy of the submissions and attesting that Common Benefit Counsel believes in good faith that all claimed time and expenses are compensable under this Order.

### D. Protocols for Submission of Time and Expenses

#### 1. Format

All time and expense submissions must be provided by submitting counsel in the following format. Counsel must use the Excel forms provided as **Exhibit A** to this Order. In the "Monthly Time Report," the person who performed each task must be identified in the column called "Last Name, First Name" by their complete last name, a comma, and their complete first name (e.g., Smith, John). Do not use abbreviations or initials in this column. In all reports, the date must be provided in month/day/year format (e.g., 12/28/19).

#### 2. Deadlines

All time and expense submissions must be timely submitted on a monthly basis, in accordance with the guidelines set forth herein. Each monthly submission should include all common benefit time and expenses incurred from the first to the last day of the preceding month.

CASE NO. CJC-20-005061                                              Second Revised Proposed Order

Although counsel should endeavor to submit all common benefit expenses incurred in a certain month in the monthly submission made on the 20th of the next month, third-party billing, and credit card statement schedules may occasionally make such expense submission difficult. Thus, submissions of "supplemental" common benefit expense reports will be permitted.

**E.  Protocols for Submission of Prior Common Benefit Work and Expenses:**

The Court authorizes the evaluation of submissions of "Common Benefit work" performed prior to the entry of this order and evaluation of submissions for reimbursement of "Common Benefit Expenses" incurred for the common benefit of all Plaintiffs and which are supportable by objectively variable prior events and costs. Examples of such compensable common benefit work are referenced above in Section III. Counsel will have sixty days (60) from the date of the entry of this Order to submit time entries for any prior "Common Benefit Work" performed and any prior "Common Benefit Expense" incurred to JCCP Leadership via email to LyftCB@levinsimes.com.

**IV.  COMMON BENEFIT ASSESSMENTS**

It is just and appropriate to provide a system of assessment on any settlements and recoveries, to which this substantial effort has contributed, commensurate with common benefit assessments ordered in recent JCCPs. Initially, there will be a "holdback" percentage of settlements and recoveries as set forth below. The percentage of the holdback set forth below is both preliminary and presumptive, and subject to Court approval later in the litigation. The ultimate common benefit fee assessment will be determined by the Court.

**A.  Assessments and Payments into the Account**

Cases and claims as enumerated in Section I.A.1 will be subject to a 7% assessment of the "Gross Monetary Recovery," for fees and 2% for costs. There shall be a 2% holdback for common benefit costs in order to provide reimbursement for costs incurred for the common benefit. To the

extent recoverable common benefit costs are less than 2%, that portion will be returned to the Plaintiff and their counsel.

The Special Master in conjunction with this Court shall determine an offset approach to account for cases already resolved that benefited from Common Benefit Work, where Common Benefit Fees and Common Benefit Costs were not assessed. JCCP Leadership and the Non-Leadership Firms shall meet and propose an offset approach to this Court within 45 days if the entry of this Order.

**B.  <u>Calculating the Assessment</u>**

For any attorney subject to an assessment under the terms of this Order, the Assessment is owed on the "Gross Monetary Recovery" on all of that attorney's cases or claims. A Gross Monetary Recovery occurs when a plaintiff agrees or has agreed—for monetary consideration—to settle, compromise, dismiss, or reduce the amount of a claim (a "Settlement") or, with or without trial, recover a judgment for monetary damages or other monetary relief, including compensatory, and/or abatement costs and/or punitive damages (a "Judgment"), with respect to any Lyft-related claims (individual or class), including but not limited to the private, public, or government entity plaintiffs (including cities, counties, school districts, Indian tribes, state attorney generals, and participating States).

The Gross Monetary Recovery excludes court costs that are to be paid by Defendant(s). The Gross Monetary Recovery includes the present value of any fixed and certain payments to be made in the future, such as those that come about as a result of a structured settlement of a claim or payments for future abatement costs.

**C.  <u>Defendants and Settling Parties Obligations</u>**

Defendants and their counsel shall not distribute any Settlement or Judgment proceeds to any counsel or plaintiffs until (1) no sooner than sixty (60) days after Defendants' counsel notifies

the JCCP Leadership in writing of the existence of a settlement and the name of the individual plaintiff's attorney (without disclosing the amount of the settlement); (2) JCCP Leadership consults with the designee, if necessary, to ascertain if the attorney or his/her/their firm is a firm subject to an assessment; and (3) JCCP Leadership has advised Defendants' counsel in writing whether or not the individual plaintiff's attorney's cases are subject to an assessment and the amount (stated as a percentage of the recovery) of the assessment pursuant to this Order. In addition, plaintiff and plaintiff's counsel who settle one or more cases with Defendant Lyft, shall be obligated under this Order to deposit, seven  percent (7%) of the Gross Monetary Recovery with 7% for fees and 2% for costs, as set forth above in Section V (A) to the Administrator, who will be identified by JCCP Leadership and the Court in a subsequent order, as set forth in the Section VI(A) below. Any subsequent discussions between JCCP Leadership and the individual plaintiff's attorney about a settlement shall be consistent with the confidentiality obligations of the agreement documenting that settlement.

## V.  <u>PLANTIFFS' FEE AND EXPENSE ACCOUNTS</u>

The JCCP Leadership is directed to establish two bank accounts (the "Accounts") to receive and disburse funds consistent with this Order (the "Funds"). These Funds will be held subject to the direction of this Court. The first fund shall be designated as the "Fee Fund," and the second should be designated as the "Expense Fund."

### A.  <u>Appointment of An Administrator for the Lyft Fee and Expense Accounts</u>

The JCCP Leadership, shall identify a Certified Public Accountant to serve as "Administrator" to be appointed by a separate Order who will be directed to oversee the Accounts and to receive and disburse funds in the event of settlements or verdicts as provided in this Order and any subsequent Orders. The Account will be held subject to the direction of this Court.

The Account shall be established at a commercial bank that the Administrator shall select in consultation with the JCCP Leadership. The commercial bank shall be the "Escrow Agent." Depending on the length of time during which the money is in an escrow account, the parties may approach the Court to have the funds safely invested in a manner that is designed to yield some rate of return.

No disbursement shall be made from the Accounts other than by Order of this Court pursuant to a petition requesting an award of fees and reimbursement of expenses (a "Petition"). No Petition shall be filed without leave of Court. No person or entity has any right to make any claim against any of the amounts held in the Accounts except to the extent this Court issues an Order directing the disbursement of any amounts to such a person or entity. The rights of any such person or entity are limited to the amount ordered by the Court to be so disbursed to that particular person or entity. The Leadership Groups may convene a common benefit fees and costs committee, or utilize another appropriate mechanism, to make recommendations to the Court for the award of common benefit fees and costs. Any and all such awards require Court approval on noticed motions.

The amounts held in the Accounts shall not constitute the separate property of any person or entity or be subject to garnishment or attachment for the debts of any person or entity. However, any specific amounts ordered by the Court to be disbursed to a person or entity, upon the entry of such an Order, can then be subject to garnishment or attachment, limited to the amount of the disbursement so ordered. These limitations do not preclude a person or entity from transferring, assigning, or creating a security interest in potential disbursements from the Accounts to which such person or entity may be entitled as determined by the Court, if permitted by applicable state laws and if subject to the conditions and contingencies of this Order. However, no notice of lien or security interest in potential disbursements or of a transfer or assignment of a right of potential

disbursements shall be effective unless and until it is filed in this Court and served upon the Administrator.

In connection with the administrative services, the Administrator shall:

1. Have all such power and authority over the Account as necessary or convenient to exercise the authority granted in this Order;

2. Keep and report periodically to the Court, as requested by the Court, an accounting of the funds received, maintained and disbursed relating to the Account;

3. Have the authority to instruct the Escrow Agent with respect to permitted investments of the Account;

4. Make decisions and take action with respect to treatment of the Accounts for purposes of compliance with the Internal Revenue Code and any applicable local or state tax codes, including creating reports, maintaining and reporting relating to the Accounts and their income, if any, derived therefrom, and as in a Qualified Settlement Fund or such other entity as the Administrator deems appropriate;

5. Out of the assets of the Account, purchase and maintain reasonable amounts and types of insurance for errors and omissions or fidelity bonds;

6. Have the authority to procure, upon consultation with the JCCP Leadership, professional accounting, legal, and other services for the purposes of carrying out the tasks described in this Order, and to be reimbursed for the expenses of such services; and,

7. Have the authority to adopt and implement reasonable procedures consistent with this Order and in consultation with the JCCP Leadership.

Unless required by law (as with a settlement containing a class action component in which certain class members settle parallel to, but outside of, the settlement class), or as otherwise agreed

to by Defendants and the JCCP Leadership, details of any individual settlement agreement, individual settlement amount, and individual amounts deposited into the Account shall be treated as confidential by the Administrator and shall not be disclosed by the Administrator to the JCCP Leadership, the Court, or the Court's designee, unless the Court requests that it receive that information in camera. The Administrator shall, however, on a quarterly basis provide statements to the JCCP Leadership and the Courts showing only the aggregate of the monthly deposits, disbursements, interest earned, financial institution charges, if any, and current balance.

**B.  Requirements of the Escrow Agent**

The Escrow Agent shall be a commercial bank that: (1) has deposits insured by the Federal Deposit Insurance Corporation; (2) is organized under the laws of the United States or any state thereof; and (3) has a total risk-based capital in excess of $5 billion and meets the minimum risk-based ratios established under the Federal Deposit Insurance Corporation Improvement Act of 1991. The Escrow Agent may act as paying agent, depository, custodian, or trustee with respect to funds it holds.

The Administrator shall consider, in designating the Escrow Agent and in procuring professional services, the charges that the Escrow Agent or provider of professional services will impose for its actions and the ability of the Escrow Agent or provider of professional services to undertake the tasks called for with efficiency and responsiveness.

The Escrow Agent shall not acquire or hold for longer than 90 days, any debt securities, certificates, or investments unless such instruments are a U.S. Treasury Bill, U.S. Treasury Money Market, U.S. Government Money Market, or similar type of account guaranteed by the United States or an agency thereof, including an FDIC-Insured Account. The U.S. Treasury Money Market or U.S. Government Money Market must be registered under the Investment Company Act

of 1940, as amended. In determining investments to be held by the Escrow Agent, primary regard shall be given by the Escrow Agent to safety of principal.

The reasonable fees and reasonable expenses of the Administrator and Escrow Agent shall be paid by the JCCP Leadership. The Administrator and Escrow Agent shall each provide to the JCCP Leadership their statements for their reasonable fees and reasonable expenses charged on a monthly basis. When this Court authorizes the filing of a Petition, the reasonable fees and expenses of the Administrator and Escrow Agent that were paid by the JCCP Leadership may be included as items for reimbursement from the Accounts. The Petition shall include copies of the statements of the Administrator and Escrow Agent that were submitted on a monthly basis to the JCCP Leadership to support the request for reimbursement of such payments made by the JCCP Leadership for which reimbursement is requested.

C. **Appointment of a Special Master**

JCCP leadership will identify, and recommend to the Court, a Special Master [Cathy Yanni] to be charged with the responsibility for auditing reported common benefit time and costs, and resolving any common benefit disputes that may arise between any parties authorized to submit common benefit time and expenses. After conferring with counsel representing Plaintiffs, the JCCP Leadership will submit a proposed order recommending a Special Master within thirty (30) days of the entry of this Order. Within forty-five days (45) of the Court Appointment, the Special Master shall meet with JCCP Leadership and other interested Plaintiffs counsel with the goal of identifying any additional protocols, standards, or procedures which may be helpful to further effectuate the goals set forth in this order. To the extent JCCP Leadership and other interested Plaintiffs' counsel identify any additional protocols, standards, or procedures JCCP Leadership will keep the Court apprised of and may seek additional Orders if appropriate.

D. **Allocation of Common Benefit Time and Expense Awards by the Court**

JCCP leadership will review all submitted time and expenses. JCCP leadership will also assess the value conferred by such common benefit work, after its review and assessment, the JCCP leadership will submit its recommendations to the Special Master as to whether the submitted time and expenses qualify as common benefit work and expenses. The JCCP will also submit its recommendations to the Special Master as to appropriate fee allocation to each firm who has performed common benefit, based upon its assessment of the value conferred to the litigation.

In order to make such recommendation to the Court, the Special Master will consider the input from JCCP leadership, as well as input from any other firm with cases within the JCCP after the Special Master has tendered such recommendations to the Court, the Court will set a briefing schedule and hearing in order to provide an opportunity for all counsel to be heard with respect to the adoption or modification of the Special Master's fee and expense award recommendations.

After reviewing the initial recommendations of JCCP leadership, the Special Master's recommendations and the submissions of any other counsel, the Court will make the following determinations as to the time and expense submissions from each firm:

1. Whether the time and expenses qualify as common benefit time and expenses;

2. The amount of fees to be awarded to each firm based upon the nature of  the work performed and the value conferred in the context of the overall result achieved in the litigation;

3. The appropriate expense reimbursement amount for each firm who expended funds for the common benefit of the JCCP Plaintiffs.

## VI.    DISPUTES ARISING FROM THIS ORDER

The intent of this Order is to establish, secure, and supervise a fund to promote the purposes and policies of the common benefit doctrine and provide a source for equitable payment of services rendered and costs incurred for the benefit of the plaintiffs in the JCCP.

Any disputes or requests for relief from or modification of this Order will be decided by the Court in the exercise of its continuing jurisdiction over the parties, and authority and discretion under the common benefit doctrine. The terms of this Order are subject to reevaluation upon a showing of good cause.

**IT IS SO ORDERED.**

DATED: _____, 2025                    _____

                                          THE HONORABLE JEFFREY S. ROSS

-21-

## PROOF OF SERVICE

I certify that I am over the age of 18 years and not a party to the within action; that my business address is 401 Watt Ave., Sacramento, CA 95864; and that on the date last written, I served a true copy of the document(s) entitled:

**Reply In Support of Common Benefit Timekeeping and Expense Protocol**

Service was effectuated by forwarding the above-noted document in the following manner:

**[XX] By Electronic Mail Via File & ServXpress:** Based on a court order or an agreement of the parties to accept electronic service, I caused the above referenced document(s) to be served electronically through File & ServeXpress in portable document format ("PDF") Adobe Acrobat.

**[XX] By Electronic Mail:** I caused a copy of the above referenced document(s) to be transmitted *via* electronic mail in portable document format ("PDF") Adobe Acrobat to the recipients at the email address as noted below.

| | |
|---|---|
| Beth Stewart, Esq.<br>Heidi Hubbard, Esq.<br>David Riskin, Esq.<br>WILLIAMS & CONNOLLY LLP<br>680 Maine Avenue SW<br>Washington, DC 20024<br>bstewart@wc.com<br>hhubbard@wc.com<br>driskin@wc.com<br><br>*Attorneys for Defendant* LYFT, INC. | Warren Metlitzky, Esq.<br>Gabriela Kipnis, Esq.<br>CONRAD METLITZKY KANE LLP<br>4 Embarcadero Center, Suite 1400 San Francisco, CA 94111<br>wmetlitzky@conmetkane.com<br>gkipnis@conmetkane.com<br><br><br>*Attorneys for Defendant* LYFT, INC. |
| C. Brooks Cutter, Esq.<br>Celine Cutter, Esq.<br>CUTTER LAW P.C.<br>401 Watt Avenue<br>Sacramento, CA 95864<br>bcutter@cutterlaw.com<br>ccutter@cutterlaw.com<br><br>*Plaintiffs' Liaison Counsel* | Stephen J. Estey, Esq.<br>R. Michael Bomberger, Esq.<br>Angela J. Nehmens, Esq.<br>ESTEY & BOMBERGER, LLP<br>2869 India Street<br>San Diego, CA 92103<br>steve@estey-bomberger.com<br>mike@estey-bomberger.com<br>anegela@estey-bomberger.com<br><br>*Plaintiffs' Co-Lead Counsel* |

- 12 -

| Walt Cubberly, Esq.<br>Margret Lecocke, Esq.<br>WILLIAMS HART BOUNDAS,<br>LLP<br>8441 Gulf Freeway, Ste. 600<br>Houston, TX 77017<br>wcubberly@whlaw.com<br>mlecocke@whlaw.com<br><br>*Plaintiffs' Co-Lead Counsel* | Judicial Council of California<br>Attn: Appellate Court Services Civil Case Coordination<br>455 Golden Gate Avenue<br>San Francisco, CA 94102<br>Email: coordination@jud.ca.gov |
| --- | --- |

I declare under penalty of perjury pursuant to the laws of the State of California that the foregoing is true and correct.

Executed on September 5, 2025 at San Francisco, California.

Brenda  Reese

CASE NO. CJC-20-005061                                          Proof of Service